RECEIVED

AUG 31 2009

LEONARD GREEN, Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 04-CV-74233-DT

DAMON L. SMITH,
      Petitioner

V.

BLAINE LAFLER,
     Respondent

and

JEFFERY WOODS,
      Additional Respondent.


## RULE 7(b) MOTION TO EXPAND THE RECORD

DAMON L. SMITH   311644
IN PRO SE
KINROSS CORR. FACILITY
16770    WATERTOWER DR.
KINCHELOE, MI   49788

I, Damon L. Smith, Pro Se, come before this Honorable Court pursuant to Federal Rule 7(b), to Expand my Record for Habeas Corpus Relief.

<u>RULE 7(b) EXPANSION OF RECORD</u>

> (b) Materials to be added. "The expanded record may include, without limination, letters predating the filing of the petition in the district court, documents, exhibits, and answers under oath, if so directed, to written interrogatories propounded by the judge. Affidavits may be submitted and considered as a part of the record."

The expansion of my record is of paramount importance to further substantiate that my public defense counsel failed to investigate and present an available alibi witness, thus establishing a prohibited violation of my constitutional rights. My alibi witness substantiates that I was with her during the time this crime took place. Therefore, proving that I am "actually innocent" of my charged crime, and the expansion of my record with the necessary affidavits and letter to the state court's Judge Karen Ford Hood will assist this Court in adjudicating my claim on the merits.

The letter to Judge Karen Ford Hood is mentioned in my Sentencing Transcripts 5/4/00, pgs.3-4. This letter will further enlighten this court about the seriousness of my attorney/client breakdown.

**WHEREFORE**, I pray that this Honorable Court will expand my record to include 2 affidavits and 1 letter that I wrote to the state court Judge.

I declare under the penalty of perjury that all of the before is true and correct.

Damon L. Smith  8/26/09

DAMON L. SMITH    311644
KINROSS CORR. FACILITY
16770    WATERTOWER DR.
KINCHELOE, MI    49788

28 U.S.C B 1746 UnSworn
DECLARATION/AFFIDAVIT

I, Kimberly Smith, declarant, swear to before _La Vonne M. Dennis_ (Notary Public) authorized to administer oaths, that the following is the truth under the penalty of perjury.

I, Kimberly Smith now comes before this Honorable Court in compliance with 28 U.S.C. B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement oath, or affidavit, in writing of the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

_Kimberly R Smith_____ Dated _7-14-08_

LAVONNE MARIE DENNIS    7/14/08
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

1) That I, Kimberly Smith am the mother of Latoya Smith and the sister of Damon Smith.

2) That in the year 2000 Latoya Smith was 15 years old, which legally made her under age to take the stand as a alibi witness for Damon Smith without my permission.

3) That I gave Damon's trial attorney Stephen Taratuta permission to have Latoya Smith take the stand on Damon's behalf at his trial, but Latoya was never called to testify by Mr. Taratuta.

4) That I told Damon's trial attorney Mr. Taratuta that Latoya confided in me and was adamantly certain that Damon was home beside her during the time the crime he is convicted of occurred.

5) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere with or influence the creation of this Affidavit.

28 U.S.C B 1746 UnSworn
DECLARATION/AFFIDAVIT

I, Latoya Smith, declarant, swear to before *La Vonne M. Dennis*
(Notary Public) authorized to administer oaths, that the following is the truth under the penalty of perjury.

I, Latoya Smith now comes before this Honorable Court in compliance with 28 U.S.C. B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement oath, or affidavit, in writing of the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

_Latoya Smith_ Dated 7/11/08

**LAVONNE MARIE DENNIS** 7/14/08
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

1) That during the year 1999, I resided at the residence of 15716 Pierson Rd. (My Grandmother's House) in the City of Detroit.

2) That on the day and evening of September 9, 1999 I was at home, (Grandmother's House), at 15716 Pierson Rd. with my uncle Damon Smith at 9:00 p.m. until I retired to bed (after 11:00 p.m.).

3) My uncle Damon and I was watching television together on the evening of September 9, 1999.

4) That I recall this evening very clear because we was watching the MTV Music Awards and they came on at 9:00 p.m.

5) That I have tried to express this information to Damon Smith's trial lawyer, but he refused to interview me.

6) That I wanted to testify to all of the above at the trial of Damon Smith, but was prevented from doing so by his trial lawyer, Stephen Taratuta.

7) That I am willing to testify to all of the above statements as they are the truth, whenever I am called upon to do so.

8) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere with or influence the creation of this Affidavit.

Honorable Karen F. Hood,

I pray that this letter greets you in good spirits, and Health. I have a very, very important matter, and due to the circumstances its out of my control now.

On April 3, 2000 in front of Honorable Warfell Moob jr. I Damon L. Smith had a trial, which I was charged with 1st degree murder, and I was found guilty of that charge. I truly felt I was misrepresented by my court appointed lawyer.

1). I wanted to fiber him in Oct. 1999, but Honorable Warfell Moob jr. stated that he was a very fine lawyer, and instructed him to come and see me. That he did and stated to me that he wasn't my girlfriend so hes not going to come every time I called, besides he only received $50 per visit. At the same time he has me thinking the evidence the prosecuter had was not enough. That's the reason I didn't fiber him then. "Plus" my family couldn't efford a lawyer at that time. Sence this is the first time I ever been in any trouble in my 24 yr. on earth, im new to the system. He could of told me anything I would of believed him about court and the system.

The last three weeks befor my trial I was appointed an investigator. The investigator, and I communnicated with him more than I ever did my lawyer. I gave the investigator addresses and phone numbers of my witnesses. The two that he subpoenaed wasn't sure of the time, but they wasn't my main witnesses. The friday befor my

trial I told my lawyer, and the investigator to go and serve my sister a subpoena for my neice, because shes only 15-16, and my other little sister 21. My lawyer read for me the way he was going to present my case. I could tell he really haven't read my case. Plus im just received the news that the prosecuter offered my three co-defendents a much lesser charge to testify against me. My lawyer told me this than rushed out the bull pin. I didn't see him again till Monday morning at trial. I gave him the research I've done, and more fact from the tran. about my case, because I can tell that what he read fri. he did read over my transcrips.

2). I tryed to fired my lawyer again before trial, because I knew he wasn't going to fight for me. My life is on the line, and he just through my work in his bag. So I stood up and asked honorable Warfell Moore jr. if I can fired my lawyer. I knew he really didn't care at that point. Then he stood up and asked to have his self removed. The judge told him that if he really fill that he couldn't represent me properly than let him know, but what about me, its my life. My lawyer didn't say anything so we proceeded with the trial. Everything just got worst from that point on.

My lawyer stood in front of my jury and said "Christmas Eve" 1999 did any one read the Detroit News. The judge stoped him as he held the artical up to the jury to

see. This artical was front two pages of the sports section. In the paper it already has me convicted of this crime. With my full name and age. The judge didn't do any thing about this. My jury had three day to read this paper.

Then my lawyer dismissed witnesses that in there statements gave different descriptions of the shooter.

Then when i asked about my witnesses he told me i don't need them. i argued with him, but trial was going on and i didn't know what to do. "Plus" i had the stress of everyone lying on me to save there own self.

"Your Honor", i don't know much about the law, but i do know right from wrong. i am innocent of these charges, i promise. My transcripts prove it, and my witnesses would of told it. My lawyer failed to attemp to prove it. My right to an fair trial was dismissed with the evidence my lawyer didn't present.

i pray and ask that you please grant me a retrial, "Please". Thank you for your time, "God Bless You".

"Truly innocent,"

Damon L. Smith
99# 25172

P.S.
i get sentence on
May 4, 2000.

RECEIVED

AUG 31 2009

LEONARD GREEN, Clerk

No. 06-1429

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Case No. 04-CV-74233-DT

DAMON L. SMITH,
      Petitioner

V.

BLAINE LAFLER,
      Respondent

and

JEFFERY WOODS,
      Additional Respondent.

## RULE 9(b) MOTION

DAMON L. SMITH   311644
IN PRO SE
KINROSS CORR. FACILITY
16770    WATERTOWER DR.
KINCHELOE, MI   49788

No. 06-1429

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Case No. 04-CV-74233-DT

DAMON L. SMITH,
      Petitioner

V.

BLAINE LAFLER,
      Respondent

and

JEFFERY WOODS,
      Additional Respondent.

    I, DAMON L. SMITH, Humbly come before this Honorable Court as a **Pro Se** litigator with respect to all its governing statues, rules, and laws. I, DAMON L. SMITH, as a Citizen of the United States respectfully invoke all of my Constitutional rights, as well as the United States Supreme Courts holdings.

    According to <u>Price</u> v. <u>Johnston</u>, 334 US 266, 292 (1948), the United States Supreme Court holds that:

> "Prisoners are often unlearned in the law," courts <u>cannot</u> <u>impose</u> <u>on</u> <u>them</u> <u>the</u> <u>same</u> <u>high</u> <u>standards</u> <u>of</u> <u>legal</u> <u>art</u> <u>which</u> <u>we</u> <u>might</u> <u>place</u> <u>on</u> <u>the</u> <u>members</u> <u>of</u> <u>the</u> <u>legal</u> <u>profession</u>." See also <u>Hines</u> v. <u>Kerner</u>, 404 US 519, 92 Sct. 594 (1972), <u>Gonzalez</u> v. <u>Crosby</u>, 545 US 524, 125 Sct. 2641, 162 LEd2d 480 (2005).

THANK YOU FOR YOUR TIME AND ENERGY,
SINCERELY,
DAMON L. SMITH

I, Damon L. Smith, Pro Se, come before this Honorable Court pursuant to Federal Rule 9(b) and the United States Supreme Court's holdings in <u>Sanders v. United States</u>, 373 US 1, 83 Sct.1068, 10 LEd2d 148 (1963), in regards to my 'numerically second' petition.

Rule <u>9</u>(<u>b</u>), <u>states</u>:

> (b) Successive petition. "A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination '<u>was</u> <u>on</u> <u>the</u> <u>merits</u>' or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ."

## EXTRAORDINARY CIRCUMSTANCES

My public defense counsel's failure to investigate and present an available alibi witness claim was "<u>not</u> adjudicated on the merits." The district court dismissed my petition "with prejudice" upon their erroneous conclusion that I failed to object to the Magistrate Judge's report and recommendation, when in fact <u>I</u> <u>did</u> <u>object</u>.

The district court denied my Rule 60(b)(1) Motion despite their mistake, but revived their final decision to my petition when they admitted to their 'mistake' and concluded that they "find my objections to be 'without merit.'" Literally, my petition and objections are the same. The manner in which the district court adjudicated my first petition and handled their mistake prohibitively "Suspended" my 'first' writ of habeas corpus in direct violation of Article 1 Sec. 9 cl.2 of our U.S. constitution.

## REVIEWING STANDARD

Section 2244(b) as amended in 1996, does <u>not</u> define 'second or successive' petition. The specific language in the Act derives

from Habeas Rule 9(b) which predates the 1996 amendments, and ... nothing in the new Act affects the determination of what constitutes a 'second or successive' petition.

In Stewart v. Martinez-Villareal, 523 US 637, 118 Sct. 1618, 140 LEd2d 849 (1998), JUSTICE SCALIA, (dissenting) acknowledged that:

> 28 U.S.C. Sec. 2244(b)(1), "The Court today flouts the unmistakable language of the statue to avoid what it calls a "perverse" result" Id. at 1623.

## MY PETITION IS NOT 2244(b) CLASSIFIABLE

Prior to the enactment of AEDPA, the caselaw construing former section 2244(b) recognized at least two situations in which a petition that was numerically "second or successive" could not be subjected to the restrictive rules governing so-called "successive petitions." The first situation does not apply to me, but the second situation does apply to me and states:

> "The later petition - although attacking the same judgment as the earlier petition - was not properly classifiable as "second or successive" because the earlier petition did not produce, or for some reason could not possibly have produced, a judgment "on the merits" of the claim in question."

In constructing AEDPA's successive petition provisions, the Supreme Court held that AEDPA "preserves the preexisting law's" recognizing that these two situations are not subject to statutory and common law restrictions upon successive petitions.

The Supreme Court has made clear that AEDPA's successive petition provision should not be read hypertechnically to penalize petitioners who file a second or subsequent petition to challenge claims that were not properly the subject of adjudication in a previous petition. See Stewart v. Martinez-Villareal, 118 Sct.

2

1618, 1621-22 (1998) (eschewing literal construction of language of 28 U.S.C. Sec. 2244(b) that would produce "far-reaching and seemingly perverse" result of applying restrictive successive petition standards to petitioners who file subsequent petitions to litigate claims previously dismissed for nonexhaustion or "prematurity").

## STRONGLY EMPHASIZED

Even though the Supreme Court used the term 'prematurity' in <u>Stewart</u> v. <u>Martinez-Villareal</u> under different circumstances than mine. The meaning of the term still applies to the standard for which 2244(b) does <u>not</u> apply to numerically second petitions.

In my case, <u>the district court 'prematurely' dismissed my first habeas corpus petition without an substantial consideration of my objections</u>, and <u>under the false perception that I did</u> not <u>object to the Magistrate Judge's report</u> and <u>recommendation</u>. Thus, subjecting my first habeas corpus petition to technical procedures that are 'only' implemented on petitioners who failed to object to the Magistrate Judges report and recommendation.

## FACTUAL BASIS

"On December 14, 2005, <u>I timely filed objections</u> to the Magistrates Judge's report and recommendation."

"Seven days later, on December 21, 2005, the district court's Order adopted the Magistrate's report and recommendation, and erroneously concluded that <u>I failed to object</u> to the Magistrate Judge's report and recommendation." "The court then entered a Judgment "Dismissing With Prejudice any further federal litigations."

"On January 3, 2006, I filed a Rule 60(b)(1) Motion for relief from Judgment, because of the district court's undeniable "mistake" regarding my failure to object."

"In the January 19, 2006 district court's Order, the court admitted to their 'mistake,' but the court refused to relieve me from their 'With

3

Prejudice' dismissal or review my petition inlight of my objection." Instead, the district court arbitrarily stated, "Nevertheless, the Court has since reviewed Petitioner's <u>objections</u> and finds that they are <u>without merit</u>."

After the district court admitted to its 'mistake' in my Rule 60(b)(1) Order, their <u>arbitrary</u> decision left my petition 'dismissed With Prejudice which denied me past and future access to the federal court to test the legality of my state conviction, thus, indirectly 'Suspending' my Writ of Habeas Corpus as prohibited under Article 1 Sec. 9 cl.2 of our constitution.

## AUTHORITIES GOVERNING NO OBJECTION

When the district court mistakenly concluded that I failed to object to the Magistrate Judge's report and recommendation, when I <u>did in fact object</u>. My entire federal proceedings was nullified, because <u>no</u> review of my petition is required if the court determines that "I failed to object to the Magistrate Judge's report and recommendation."

28 U.S.C.A. Sec. 636(b)(1)(c):

"A judge of the district court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which "<u>objections is made</u>.""

"This statue does <u>not</u> on its face require any review at all, by either the district court or the court of appeals, <u>of any issues that is</u> not <u>the subject of an objection.</u>" See <u>Thomas v. Arn</u>, 106 Sct. 466, at 472 (1985).

The Jurisdiction of United States Magistrates, Hearing on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975) recommended guidelines to the district court that states:

> "Where a Magistrate makes a finding or ruling
> on a motion or an issue, his determination should
> become that of the district court, unless specific
> objections is filed within a reasonable time."

The Committee also heard Judge Metzner of the Southern
District of New York, the chairman of a Judicial Conference
Committee on the Administration of the Magistrate system, Testify
that he personally followed that -- practice. See Id., at 11:

> "if any objections come in, ... I review the
> record and decide it. If no objections come in,
> I merely sign the Magistrate's Order."

The Judicial Conference of the United States, which supported
the de novo standard of review eventually incorporated in Sec.
636(b)(1)(c), stating:

> "opined that in most instances no party object
> to the Magistrate's recommendation, and the
> litigation would terminate with the Judge's adoption
> of the Magistrate's report." See Senate Hearing,
> at 35,37.

> "There is no indication that Congress, in
> enacting Sec. 636(b)(1)(c), intended to require
> a district Judge to review a Magistrate's report
> to which no objections are filed." See Thomas v.
> Arn, Supra., at 473.

> "28 U.S.C. Sec. 636(b)(1)(c), grew out of
> Congress' desire to give district Judges "additional
> assistance" in dealing with a caseload that was
> increasing far more rapidly than the Judgeships."
> See Mathews v. Weber, 423 US 261, 268; 96 Sct.
> 549, 553; 46 LEd2d 483 (1976).

## STRONGLY EMPHASIZED

The process of adjudicating a petitioners petition that
failed to object is 'unconstitutional' when applied to a
petitioner's petition that did object. The district court is
fully aware of The House, Senate Reports, 1976 Amendments, and
Congress purpose for enacting Sec. 636(b)(1)(c), which does not

5

require a district judge to review a Magistrate's report and recommendation when no objections are made.

My Rule 60(b)(1) Motion gave the district court the opportunity to insure that "Justice must be done," but instead, the court's actions prove that their only concern was to bring my case to a final close.

The district court's "arbitrary decisions" that concluded my petition and Rule 60(b)(1) Motion "Suspended" an adequate review of my record, substantially important Motions, my petition inlight of my objections, and permitted a 'miscarriage of justice' brought about due to my 'actual innocents.'

The district court's treatment and adjudication of my petition is in direct violation of Article 1 Sec. 9 cl.2 of our constitution, which states:

> "The privilege of the writ of Habeas Corpus shall not be "Suspended," unless when in case of Rebellion or Invasion of the public safety may require it."

In Ex Parte Bollman, 8 US 4 Cranch (1807) at 95, states:

> ".. as the Court has recognized, the writ may be 'suspended indirectly' as well as by repeal."

In Davis v. Adult Parole Authority, 610 F2d 410 (6th Cir.1979), states:

> ".. A Rule which would permit a court to dismiss an action for habeas relief without any consideration of the equities presented renders the habeas corpus process inadequate to test the legality of a person's conviction and, thereby, constitutes a prohibited 'suspension' of the writ."

In I.N.S. v. St. CYR, 121 Sct. 2271 (2001) at 2299, states:

> "To 'Suspend' the writ was not to fail to enact it, much less to refuse to accord it particular content. Noah Webster, in his American Dictionary

6

of the English Language, defined it – with patriotic
allusion to the constitutional text – As to cause
to cease for a time from operation or effect; as
to suspend the habeas corpus act." Vol. 2 pg.86
(1828ed). See also <u>N. Bailey</u>, An Universe
Etymological English Dictionary (1789) ("To suspend
in law signifies a temporal stop of a man's
rights").

The description of the "Suspension Clause" in the Federalist
leads to a similar conclusion. There, Alexander Hamilton stated
that, Via the Suspension Clause, habeas corpus was "Provided
for in the most Ample Manner" in order to guard against "<u>Arbitrary</u>
<u>impeachments</u>, <u>Arbitrary</u> <u>Methods</u> <u>of</u> <u>Prosecuting</u> <u>Pretended</u> <u>Offenses</u>,
and <u>Arbitrary</u> <u>Punishment</u> <u>upon</u> <u>Arbitrary</u> <u>Convictions</u>" and that,
habeas corpus provides comprehensive Protection against "<u>Judicial</u>
<u>Despotism</u>" in criminal cases.

The 1867 habeas corpus act, passed simultaneously with the
adoption of the 14th Amendment, Congress extended the habeas
corpus remedy to all state prisoners incarcerated in violation
of the constitution and that Amendment.

These premises make it reasonable to conclude that the post-
bellum Framers also understood the 14th Amendment's creation
of federal protection against "<u>Judicial</u> <u>Despotism</u>" by state
criminal courts also to extend to state prisoners the
Constitution's Protection against the "<u>Suspension</u>" of a federal
habeas corpus remedy.

## NO ADJUDICATION ON THE MERITS

The "merits" of this claim is that my public defense counsel
failed to investigate and present an available alibi witness.
My public defense counsel's ineffectiveness is established within
the record and by an affidavit by my alibi witness.

The state court's decision 'only' addressed part of the
record. The state court completely misconstrued the part of
the record that it used to deny this claim, and rendered an
inaccurate and unreasonable decision on this claim. I filed
a motion to remand for a evidentiary hearing in the state courts

7

with an affidavit of proof, but the state courts denied my Motion.
Then the state court penalized my claim by restricting it to
the facts apparent on record, and fabricated the portion of the
record that they did use to deny me a new trial. I also filed
a Motion for an evidentiary hearing in the Federal Courts, and
that Motion was also denied.

## FACTUAL BASIS OF THE "MERITS"

"That on the day and evening of September 9,
1999 I, (Latoya Smith) was at home, (Grandmother's
House), at 15716 Pierson Rd. with my uncle Damon
Smith at 9:00p.m. until I retired to bed after
11:00p.m.."

"That I recall this evening very clear because,
we was watching the MTV Music Awards and they came
on at 9:000p.m.."

"That I have tried to express this information
to Damon Smith's trial lawyer, but he refused to
interview me."

"That I wanted to testify to all of the above
at the trial of Damon Smith, but was prevented
from doing so by his trial lawyer, Stephen
Taratuta."

## STRONGLY EMPHASIZED

The facts that Latoya Smith has established are the "merits"
of this claim and substantially proves that my public defense
counsel was ineffective. The state and federal courts failed
to address the above facts in their decisions, and concluded
that counsel was not ineffective despite substantive proof
thereof.

According to the United States Supreme Court's holdings
in Sanders v. United States, 83 Sct. 1068, 373 US 1 (1963), both
the state and federal court's decisions on this claim are not
constituted as "adjudicated on the merits."

Explicitly codifying Sanders' holdings in the 1966 amendments
to 28 U.S.C. Sec. 2244(b), Congress limited successive petition

dismissals to situations in which relief was denied in the earlier proceeding "after and evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law. Consistent with this language and with Sanders' holdings, the courts have concluded that "with prejudice" dismissals of prior petitions are not on the merits when:

> (1) "The claim as pleaded in either the prior or current petition alleges dispositive facts that are not "conclusively" disproved by the record and that were not tested at an evidentary hearing in the prior proceeding."

> (2) "The prior determination in other respects was summary and not based upon the legal merits of the petitioner's claims."

> (3) "The hearing in the prior proceeding was not full and fair."

The first and second standards establishes that my prior claim was not decided "on the merits." The 6th circuit has abided by the U.S. Supreme Court's standards set forth in Sanders in Matthews v. Wingo, 474 F2d 1266, 93 Sct. 2283 (1973), Stating:

> "Under 28 U.S.C. Sec. 2244(b) and the doctrine of Sanders v. United States, 373 US 1, 83 Sct. 1068, 10 LEd2d 148 (1963), A federal district court may deny a petition for writ of habeas corpus where the ground presented in the second petition has been determined, "on the merits.""

## MY PETITION IS NOT A SUCCESSIVE PETITION

A second petition is not successive, (and not subject to dismissal under Sanders v. United States) if the courts did not dismiss the earlier action "on the merits."

In Sanders v. United States, supra., at 15-16, in accordance to 28 U.S.C. Sec. 2244(b), the U.S. Supreme Court holds that:

> "Successive petition rule applies only "after an evidentiary hearing on the merits of a material

factual issue, or after a hearing on the merits of an issue of law."

In 28 U.S.C. Sec. 2244(b) (1994) (enacted in 1948; subsections (b) and (c) added in 1966), Congress established:

(b) "When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a state court has been denied by a court of the United States or a Justice or Judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a Justice or Judge of the United States unless the application alleges and is "predicated on a factual" or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, Justice, or Judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

## STRONGLY EMPHASIZED

My case also qualifies under "no adjudication on the merits," where my first petition was merely an adoption of the Magistrate Judge's report and recommendation because of an technical ambiguity in my procedure. The district court's final decision was that my objections was "without merits." Without any clarity from the Court, the district Judge's final Ruling on my federal litigation concludes my petition as well as objections to be "without merit."

## ENDS OF JUSTICE

The United States Supreme Court still acknowledges Sanders v. United States, supra. as an controlling standard for governing second and successive habeas corpus petitions. Sanders establishes that the "ends of justice" requires consideration

10

of my petition for writ of habeas corpus, where a colorable showing of actual innocents supplements my constitutional violation claim.

In <u>Kuhlmann v. Wilson</u>, 477 US 436, 106 Sct. 2616, 91 LEd2d 364 (1986), Justice Powell, with three Justices concurring and two Justices dissenting in the judgment, determined that:

> "Federal court should consider the ends of justice before dismissing successive habeas corpus petition as a means of identifying the rare case in which the court should exercise its discretion to hear a successive petition."

> "Ends of justice require federal courts to entertain successive habeas corpus petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocents; prisoners must make his evidentiary showing even though the evidence of guilt may have been unlawfully admitted; prisoner must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted and evidence tenably claimed to have been wrongly excluded, the trier of facts would have entertained a reasonable doubt of guilt."

Consistent with Congress' intent in enacting Sec. 2244(b), however, the Advisory Committee Note to Rule 9(b), 28 U.S.C., p.358, states that federal courts should entertain successive petitions only in "rare instances." As a means of identifying the rare case in which federal courts should exercise their discretion to hear a successive petition, the Supreme Court continue to rely on the reference in <u>Sanders v. United States</u>, supra. to the "ends of justice." <u>Kuhlmann v. Wilson</u>, supra. at 2626.

In the light of the historic purpose of habeas corpus and the interests implicated by successive petitions for federal habeas relief from a state conviction, the Supreme Court concluded that the "ends of justice" require federal courts to entertain such petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence. <u>Kuhlmann v. Wilson</u>, supra. at 2627.

In _Kuhlmann_, seven Members of the U.S. Supreme Court squarely rejected the argument that in light of the 1966 Amendments, "federal courts no longer must consider the 'ends of justice' before dismissing a successive petition." 477 US at 451, 106 Sct., at 2625 (plurality opinion); id., at 468-471, 106 Sct., at 2634-2636. (noting that in kuhlman, "we held that despite the removal of the reference to the ends of justice from 28 U.S.C. Sec. 2244(b) in 1966, the "miscarriage of justice exception would allow successive claims to be heard"). See my Actual Innocents claim.

Since habeas corpus is, at its core, an equitable remedy, a court must adjudicate even successive claims when required to do so by the ends of justice. Thus, in a trio of cases, the U.S. Supreme Court firmly established an exception for fundamental miscarriages of justice. _Carrier_, 477 US at 495, 106 Sct. at 2649; _Kuhlman_, 477 US 436, 106 Sct. 2616; _Smith v. Murray_, 477 US 527, 106 Sct. 2661.

## STRONGLY EMPHASIZED

Substantive Reasons why my previously presented claim regarding my public defense counsel's failure to investigate and present available alibi witness deserves adjudication "on the merits" for habeas corpus relief, "a new trial."

1) I am actually/factually innocent of my convicted crime, which establishes a "miscarriage of justice" and the "end of justice" will be concluded if my claim is adjudicated on the merits.

2) Newly Discovered Evidence is being presented where, the state and federal court's previous decisions regarding this claim is based on an incomplete, inaccurate, and a misinterpretation of the facts.

3) The state and federal courts never adjudicated this claim "on the merits."

4) The district court prohibitively "Suspended" my writ of habeas corpus in direct violation of Article 1 Sec. 9 cl.2, where the district court dismissed with prejudice my previous petition because, the court mistakenly concluded that "I failed

to object to the Magistrate Judge's R & R, when I did in fact object.

5) My public defense counsel's failure to investigate and present an available alibi witness in my case is a complete denial of my 6th amendment right to the effective assistance of counsel for my defence and my 14th amendment right to a fair trial.

In Sanders v. United States, supra., the U.S. Supreme Court holds that:

> "Conventional notions of finality of litigation have no place where life or liberty are at stake and infringement of constitutional rights is alleged."

In Fay v. Noia, 372 US 391, 83 Sct. 822, 9 LEd2d 837 (1963), the U.S. Supreme Court holds that:

> "Conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal review," at 424; "It should be unnecessary to repeat what so often has been said and what is so plainly the case: that the availability of the Great Writ of habeas corpus in the federal courts for persons in the custody of the State offends no legitimate state interest in the enforcement of criminal justice or procedure," at 440: "Habeas corpus is one of the precious heritages of Anglo-American Civilization," at 441.

In Harris v. Nelson, 394 US 286, 292, 89 Sct. 1082, 22 LEd2d 281 (1969), the U.S. Supreme Court holds that:

> "There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law."

In Reed v. Ross, 468 US 1, 15, 104 Sct. 2901, 82 LEd2d 1 (1984), the U.S. Supreme Court hold that:

> "This Court has never held ... that finality,

13

standing alone, provides a sufficient reason for federal courts to compromise their protection of constitutional rights under 28 U.S.C. Sec. 2254."

WHEREFORE, I pray that this Court finds that my previous petition was <u>not</u> adjudicated on the merits, and that 28 U.S.C Sec. 2244(b), 2244(b)(3)(A), and 2244(b)(3)(E) is <u>not</u> applicable to my case. I pray that this Court remand me to the district court instructing them to adjudicate this claim on the merits.

I declare under penalty of perjury that all the before is true and correct.

DAMON L. SMITH    311644
IN PRO SE
KINROSS CORR. FACILITY
16770   WATERTOWER DR.
KINCHELOE, MI   49788

RECEIVED

AUG 31 2009

LEONARD GREEN, Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 04-CV-74233-DT


DAMON L. SMITH,
            Petitioner

V.

BLAINE LAFLER,
            Respondent

and

JEFFERY WOODS,
            Additional Respondent.


**ACTUAL INNOCENTS**
AND
**PETITION FOR WRIT OF HABEAS CORPUS**

DAMON L. SMITH    311644
IN PRO SE
KINROSS CORR. FACILITY
16770    WATERTOWER DR.
KINCHELOE, MI    49788

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 04-CV-74233-DT


DAMON L. SMITH,
          Petitioner

V.

BLAINE LAFLER,
          Respondent

and

JEFFERY WOODS,
          Additional Respondent.


    I, DAMON L. SMITH, Humbly come before this Honorable Court as a **Pro Se** litigator with respect to all its governing statues, rules, and laws. I, DAMON L. SMITH, as a Citizen of the United States respectfully invoke all of my Constitutional rights, as well as the United States Supreme Courts holdings.

    According to <u>Price</u> v. <u>Johnston</u>, 334 US 266, 292 (1948), the United States Supreme Court holds that:

> "Prisoners are often unlearned in the law," courts <u>cannot impose on them the same high standards of legal art which we might place on the members of the legal profession.</u>" See also <u>Hines</u> v. <u>Kerner</u>, 404 US 519, 92 Sct. 594 (1972), <u>Gonzalez</u> v. <u>Crosby</u>, 545 US 524, 125 Sct. 2641, 162 LEd2d 480 (2005).

THANK YOU FOR YOUR TIME AND ENERGY,
SINCERELY,
DAMON L. SMITH

# TABLE OF CONTENTS

Page No.

Statement of Facts . . . . . . . . . . . . . . . . . . . . i

Actual and Factual Innocents . . . . . . . . . . . . . . 1

Standard of Review . . . . . . . . . . . . . . . . . . . 1

Prejudice Requirement . . . . . . . . . . . . . . . . . . 2

Indepth Synopsis of The
Unjust Plot for my Conviction . . . . . . . . . . . . . . 3

Accomplice Patrick Roberts' Affidavit . . . . . . . . . . 5

Cross-Examination by my Public Defender . . . . . . . . . 5

Public Defender Sabotaging
my Trial Defense . . . . . . . . . . . . . . . . . . . . 6

The Accomplice's Deceitful and
Corrupt Interrogations . . . . . . . . . . . . . . . . . 8

Conception of Fabricated Allegations Against Me . . . . . 8

Factual Basis . . . . . . . . . . . . . . . . . . . . . . 9

Affiant Patricia Y. Roberts . . . . . . . . . . . . . . . 10

Affiant George E. Roberts . . . . . . . . . . . . . . . . 11

The Prejudice In Court Identification
Factual Basis . . . . . . . . . . . . . . . . . . . . . . 12

My Trial Judge's Perversion of Justice
Relevant to my "Actual Innocents" . . . . . . . . . . . . 14

Refusal of Mandatory Jury Instruction . . . . . . . . . . 16

Judge Moore's Suspension
For Pertinent Misconducts . . . . . . . . . . . . . . . . 17

Judge Moore Forced me to trial
with an Adversary for Counsel . . . . . . . . . . . . . . 18

Prejudice of not Safeguarding Defendants (Me)
From the Onus of Public Defense Counsels . . . . . . . . 19

Additional Misconduct by Judge Moore . . . . . . . . . . 20

Extremely Important Facts . . . . . . . . . . . . . . . . 20

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 21

Extremely Important Facts . . . . . . . . . . . . . . . . . 22

Important Evidence <u>not</u>
Presented at my Trial . . . . . . . . . . . . . . . . . . . 24

Facts that Refute my
Presence at the Crime Scene . . . . . . . . . . . . . . . . 25

Prosecution's Cover-Up . . . . . . . . . . . . . . . . . . 27

Factual Basis . . . . . . . . . . . . . . . . . . . . . . . 28

My Alibi Witness that was
never Presented at Trial . . . . . . . . . . . . . . . . . 29

Two Different Crime Scenes and <u>No</u>
Proof of the Exact Crime Scene . . . . . . . . . . . . . . 30

Factual Basis . . . . . . . . . . . . . . . . . . . . . . . 31

Opening Argument . . . . . . . . . . . . . . . . . . . . . 33

Indepth Synopsis of the Lack
of Proof to Validate my Conviction . . . . . . . . . . . . 35

Factual Basis . . . . . . . . . . . . . . . . . . . . . . . 36

Semiautomatic Firearm . . . . . . . . . . . . . . . . . . . 38

Required Showing . . . . . . . . . . . . . . . . . . . . . 40

Required Showing . . . . . . . . . . . . . . . . . . . . . 41

CJI2d 16.1 Elements of First Degree Murder . . . . . . . . 42

CJI2d 16.15 Act of Defendant
Must be Cause of Death . . . . . . . . . . . . . . . . . . 43

CJI2d 16.1 Continues . . . . . . . . . . . . . . . . . . . 43

Miscarriage of Justice . . . . . . . . . . . . . . . . . . 43

Petition for Habeas Corpus Relief . . . . . . . . Next pg. 1

## INDEX TO APPENDICE

Affidavits, App. . . . . . . . . . . . . . . . . Yellow Paper

Affiant LaToya Smith
Affiant Kimberly R. Smith
Affiant Patrick J. Roberts

II

## INDEX TO APPENDICE CON'T.

Affiant George E. Roberts
Affiant Patricia Y. Roberts
Affiant Domonique Moore

Motion and Statements, App. . . . . . . . . . . . Orange Paper

Lynell Drake's Motion to Suppress Statement
Statement, Odie Boatwright.
Statement, Odetha Boatwright.
Statement, Joseph Marshall.
Statement, Ronald Stewart.
Statement, Arteece Thomas.

Presentence Investigation Report, App. . . . . . . Green Paper

Evidence Sheets, App. . . . . . . . . . . . . . Green Paper

Criminal Defense Newsletters, App. . . . . . . . . Green Paper

## STATEMENT OF FACTS

I, Damon L. Smith, was charged with First Degree Murder, in violation of MCL S. 750.316, and Felony Firearm, in violation of MCL S. 750.227b.

On 9/9/99, witnesses reported that they saw Jonathan Nettles and Lynell Drake on Darryl Towns porch and both were banging on Towns' door messing with him. Towns came out the side door and was telling Nettles and Drake to leave his house and go home. Both subjects refused to leave and Nettles and Towns got into a fight. The witness and another person broke up the fight. As Nettles was leaving, he told Towns to "watch his back." The witness reported that later he saw Nettles and Drake, along with three or four other males, pull up and drive around the coner from Towns house. He saw three males walk up to Towns, who was standing in the driveway. One of the men had a baseball bat. The man threatened to hit Towns in the head and then three jumped on Towns. This witness went over and broke up the fight and then then two other males came from across the street. An older male pulled out a gun and pointed the gun at the witness and told him to stay out of it. The witness stated that the older man walked up to where Towns was laying on the ground and shot him. (Presentencing Investigation Report, P.1-2)

**Annette Towns**, testified that between 9:00 and 10:00p.m. on 9/9/99, she got a phone call regarding her son, decedent Towns, having been shot. Her son was pronounced dead at Grace Hospital. (T.,P.191-194,4/4/00).

**Dr. Carl Schmidt**, the forensic pathologist, testified that decedent sustained a gunshot entrance wound on the right side of the chest, existing on the left side of the chest, and another through and through gunshot wound on the outer left thigh, with the exit wound inside his thigh. The cause of death was multiple gunshot wounds. (T.,P.9-17,4/5/00).

**Ronald Stewart**, lived across the street from Darryl Towns. On 9/9/99, he went to the Towns house at about 7:00p.m.. Darryl Towns was in the house with some girls. Jonathan Nettles and

i

Lynell Drake was banging on the door, trying to get in. Towns did not let them in. Stewart went to knock on the door because he had some movies to give him. Because Towns did not let Stewart in, he went home and called the Towns residence, but there was no answer. (T.,P.22-23,4/5/00). Then Towns called him back. After this conversation, Towns, girlfriend called Stewart. Then Stewart went back to the Towns house. Darryl Towns was trying to get outside to fight with Jonathan Nettles. They got into a minor scuffle. (T.,P.24-25,4/5/00). Then Stewart took Towns in the house, while Jonathan Nettles and Lynell pulled out of the driveway in their vehicle, a teal or blue-green Contour. Later that night, Stewart saw that vehicle again, at almost 9:00p.m.. (T.,P.26-27,4/5/00).

Four or five people were inside the vehicle, which turned off of Fielding Street onto Orangelawn. After that, he saw some suspicious people walking down the street, and saw them about to jump Darryl Towns. (T.,P.28-29,4/5/00). One of the people ran across the street. Stewart heard gunshots. His friend Brandon went to call the police; Stewart ran to the scene. He heard people hollering that Darryl was shot, and he saw Lynell Drake running away from the scene. Stewart went to Towns house, found Darryl lying on his face in the kitchen, shot, and pulled him outside to take him to the hospital. (T.,P.31-34,4/5/00).

**Jonathan Nettles**, was in a fight with Darryl Towns. Nettles was beaten up and wanted revenge, so he called Patrick Roberts, but he spoke instead to his brother, Damon L. Smith. Smith said to come pick him up. Nettles and Lynell Drake picked up Damon Smith and Patrick Roberts in the car. (T.,P.38-42,4/5/00). Damon Smith asked Nettles to take him to his cousin's house, on Bryden Street. Smith and Patrick Roberts entered the house, then returned and told nettles to open the trunk. He opened it from inside the car. Then they went to Terrence Dorsey's house "to pick him up to see if he wanted to beat him up." Dorsey did not come with them. Then they went to area around Darryl's house, going down Fielding. (T.,P.42-44,4/5/00). Smith asked Nettles if he wanted to do a drive-by, "did I want to shoot up the house." A gun was

in Smith's hand. They parked the car and Smith took a bat, and something in a sock, or something white out of the trunk. (T.,P.45-46,4/5/00).

Nettles and Drake walked down the street, in front of Roberts and Smith. Drake was joking around, saying "I don't want to get my face messed up." Drake somehow got possession of the bat. Drake and Nettles approached Darryl's house first. They saw him there with Joseph Marshall and some woman. They walked up the driveway. Darryl was standing beside his porch on the phone. Drake said, "remember all that mess you did earlier, now what?" (T.,P.46-47,4/5/00). Nettles and Towns got into another fight. Lynell Drake just froze, and stood there. (T.,P.48,4/5/00).

Then Patrick Roberts came across the street and swung at Darryl, who fell down and curled into a ball against the wall of the house next door. "Then (w)e started sort of hitting him and then I looked up and saw Mr. Marshall out (sic) the house." Nettles ran, because of something Marshall had said earlier. He heard gunshots and screams, and ran toward the alley where the car was parked. He made it to the car, and drove off with Smith and Patrick Roberts. He asked Smith if he had shot Darryl, and Smith said yes, he shot him in the stomach and the leg. (T.,P.49-51,4/5/00).

Nettles admitted entering a plea bargain. Nettles admitted that he was beaten up by Darryl Towns, his pride was bruised, and he wanted revenge. (T.,P.53,4/5/00). Nettles admitted that he did not see who shot Darryl Towns. (T.,P.57,4/5/00). He pled guilty to a "Lesser Charge" than First Degree or Second Degree Murder. (T.,P.59,4/5/00). My public defense counsel did not elicit the penalties for First Degree Murder and Second Degree Murder, and did not elicit the nature of the lesser charge to which the accomplices had pled, or the penalty they was facing which happened to be "Probation" instead of natural life.

**Arteece Thomas**, testified that he was the cousin of Damon Smith and Patrick Roberts. On 9/9/99, Smith arrived at his house with Nettles, Roberts, and Drake. Smith told Thomas what his plans were for the evening, and asked to borrow his pistol. He

did not say why. (T.,P.65-66,4/5/00). Thomas gave him the loaded pistol because he asked for it. Smith and Roberts left the house and got onto the car with Nettles and Drake. (T.,P.71-72,4/5/00). After Thomas saw the 11:00p.m. news, Thomas called Smith to see if anything was going on. (T.,P.73,4/5/00).

In the house, Smith never told Thomas he was going to shoot anybody, or do a drive-by. He saw Smith place the pistol in the car trunk. (T.,P.74,4/5/00). Smith told Thomas that his plans for the evening were "to hook up with some female." (T.,P.75,4/5/00).

**Jonathan Nettles**, was recalled. He said Smith had taken the gun out of the trunk on two occasions, the last time in the alley by Darryl Towns' house. (T.,P.82-84,4/5/00). Then he admitted that he did not know at the time what was put in the trunk; he later "kind of put two and two together." (T.,P.84,4/5/00).

**Joseph Marshall**, a 28 year old cousin of decedent Towns, was visiting him and a young lady named Odie when some guy had a confrontation with decedent. Jonathan Nettles, and the guy he brought with him, who had a bat. He thought it was Lynell (Drake). (T.,P.87-88,4/5/00). Nettles and the man with the bat fought with Towns. There were three minors fighting with Towns. Marshall tried to break it up, but was threatened with the bat. (T.,P.89-90,4/5/00). The three guys beat his cousin to the ground, and were "beating him bad." Then someone else came across the street and shot his cousin. The shooter was about 5'10 and 135 or 140 pounds, older than the others. He had a bandanna across his face so that only his eyes could be seen. (T.,P.93,4/5/00). He had thick eyebrows. (T.,P.97-98,4/5/00). The shooter said to Marshall what did he have to do with this. Marshall saw a pistol drawn in the man's hand. He heard three or four shots. (T.,P.94-96,4/5/00).

Marshall admitted that when the guys had overpowered his cousin, he told them he was going to get his gun to break it up, and then made a gesture as though he was going to go in the house. He did this hoping to scare them off. (T.,P.99-101,4/5/00).

Until this time, the other individuals was standing across the street, just watching the fight. It was then, after Marshall stated that he was going for a gun, that this other person pulled the gun on him and said what do you have to do with it. (T.,P.101,4/5/00). Marshall said he had no gun, and saw no one else with a gun, except the shooter. (T.,P.100-101,4/5/00). There was another person standing across the street with the shooter. That person simply stood there, and never argued, fought, or even came across the street. (T.,P.102,4/5/00).

**Lynell Drake**, testified that he was 16 years old, and a friend of Jonathan Nettles and Patrick Roberts; he also knew Smith. He was present for the fight between Nettles and Darryl Towns at about 7:00p.m.. After the fight broke up, Drake stayed at Towns' house and "shot a couple of hoops," for about 10 minutes. (T.,P.105-106,4/5/00). Then he rode his bike to Jonathan Nettles' house. Jonathan got off the phone, and got permission from his mother to use the car to go to the store. They drove to Patrick Roberts' house. Smith talked to Jonathan, then they went into the house. He could not hear them, because he stayed in the car. When they came out, Smith put a baseball bat in the trunk, and they all left in the car. (T.,P.107-109,4/5/00).

They went to Arteece Thomas' house. On the way, Smith said "we need you to get some heat." Smith entered the Thomas house, and emerged with a white sock, which he put in the trunk. (T.,P.110-111,4/5/00). As they drove off, Smith stated he "had to get one of his boys because he knew that Patrick wasn't going to fight and he knew I wasn't going to fight. (T.,P.112,4/5/00). After visiting another house, they went to a store, then headed back toward Darryl Towns' house. They circled the block, and Smith asked Jonathan what did he want to do; he responded that "he didn't know, he wasn't really sure." (T.,P.115,4/5/00).

Drake said that Nettles and Towns were wrestling, then Patrick Roberts came across the street and knocked Darryl down. Then, Drake stated, "I saw Smith come across the street and dig in his coat, that's when I took off running, but when I turned around I saw Smith with the gun." He could not see Smith's face,

because he had a bandanna over the lower half. (T.,P.116-117,4/5/00). Drake admitted that, "he did not see Smith shoot the gun," but saw him holding the gun straight out. After he ran about four or five houses down, he heard gunshots. Then he went home. (T.,P.117,4/5/00).

Drake stated that he had entered a plea agreement, pleading 'No Contest' to a lesser offense, in exchange for getting "Probation" in the juvenile system and avoiding First and Second Degree Murder. (T.,P.121,4/5/00). My public defense counsel did not elicit the penalty for First and Second Degree Murder, the nature of the lesser offense, or the penalty of 'probation' that this accomplice was to receive.

Drake stated that after the original fight between Darryl Towns and Jonathan Nettles, Towns had displayed a gun. (T.,P.122,4/5/00). Later he changed his testimony to say it was a BB gun. (T.,P.127-128,4/5/00).

Drake stated that Nettles had told his mother he needed the car to go to Walgreens for a school project, and that this was true. At the time, Drake said he actually believed they were going to Walgreens. (T.,P.124-125,4/5/00).

**Patrick Roberts**, testified that he was Damon Smith's brother. On the date of the incident, he went along with Smith, to pick up their cousin, and that "he might bring his gun with him." (T.,P.131-135,4/5/00). He later saw Smith put a white sock in the trunk. Roberts was asked if he remember giving a statement to police, and responded "yes." Then he was asked if he was to see that statement would it refresh his memory as to what he saw or what he heard, and he responded "no."

Roberts was then asked, "I'm going to ask you one question and I'm going to sit down, so I want you to listen to it very carefully, did you see your brother Damon Lamar Smith shoot Darryl Towns, and he responded "yes." (T.,P.136-140,4/5/00).

Roberts took a lesser plea to avoid conviction of First or Second Degree Murder. (T.,P.141,4/5/00). My public defense counsel did not elicit the penalties for First and Second Degree Murder, the nature of the lesser offense, or the penalty that

this accomplice was facing which was "Probation" instead of life in prison.

**I, Damon L. Smith**, testified that I heard about the original fight from Jonathan Nettles, and laughed at him because "I thought it was funny, he came over talking about he got beat up." Then I asked Nettles to take me over Arteece Thomas' house. When Thomas did not have money owed me, I asked to hold one of his pistols as collateral. (T.,P.152-154,4/5/00). Thomas owed me about $100 or $150. I put the gun in the trunk because I did not want to get pulled over and have a gun on me, and have my name go around the Church as having gotten Jonathan in trouble over a gun. I denied having a white sock, or putting the gun in a white sock. Then we went to my friend Terrence Dorsey's house, because I wanted to see Dorsey's newborn child. The three accomplices stayed in the car. After I tried to phone a female friend, I went back to the car. (T.,P.155-156,4/5/00). I told Jonathan to take me home. Then I told them that I ain't about to fight with y'all, and he took me home. (T.,P.157,4/5/00).

On the way home, I stopped and brought a Colt 45. Later that night, I heard about the shooting through a phone call from Arteece Thomas. (T.,P.157-158,4/5/00). Later, I went down to the police station for questing. I do not know what happened to the gun after I put it in the trunk; I left it with Patrick and Jonathan in the car. (T.,P.160,4/5/00).

I worked right around the corner, and would not have gone in the neighborhood to commit a crime. I did not shoot decedent, and did not even know him. Accomplice Nettles, Drake, and my brother, were all lying. (T.,P.160-162,4/5/00).

On April 7, 2000, the jury found me guilty of First Degree Murder, and Felony Firearm. (T.,P.4-6,4/7/00). I was later sentenced to mandatory life imprisonment, consecutive to the mandatory two-years sentence for Felony Firearm. (S.T.,P.25-26,5/4/00).

iiiiiii

## ACTUAL AND FACTUAL INNOCENTS

I, DAMON L. SMITH, declare that I am actually and factually innocent of my convicted crime. My 6th and 14th amendment constitutional rights were prohibitively withheld from me. My public defense counsel failed to investigate and present my alibi witness which denied me effective assistance of counsel and a fair trial, both of which is guaranteed by our constitution's 14th and 6th amendments and defined by the Supreme Court in Strickland v. Washington, 466 US 668, 80 LEd2d 674, 104 Sct. 2052 (1984).

Any competent and effective trial counsel would have presented affiant LaToya Smith at my trial. LaToya Smith substantiates my sole trial defense of "lack of presence at the crime scene." (See attached affidavit) My trial counsel had no reason for not investigating and not to present my alibi witness to prove that I am actually innocent of my convicted crime.

## STANDARD OF REVIEW

In order to establish the "Gateway" needed to allow this Court to reach and adjudicate my Habeas Corpus Petition for relief on the merits. I present before this Court a very substantive showing of actual and factual innocence according to the United States Supreme Court's holdings in Schlup v. Delo, 513 US 298, 115 Sct. 851 (1995); Kuhlmann v. Wilson, 477 US 436, 106 Sct. 2616 (1986); Murray v. Carrier, 477 US 474, 106 Sct. 2639 (1986), and Sanders v. United States, 373 US 1, 83 Sct. 1068 (1963).

The Schlup v. Delo holdings incorporates the standards and requirements for effectively establishing my "Actual Innocents" for procedural purposes from Kuhlmann v. Wilson and Murray v. Carrier, and are met throughout my actual and factual innocents claim.

The Carrier standard requires me to show that "a constitutional violation has probably resulted in the conviction

1

of one who is actually innocent." 477 US at 496, 106 Sct., at 2649-2650.  To establish the requisite probability, "I must and have shown that it is more likely than <u>not</u> that no reasonable jury would have convicted me in light of my new evidence."

The <u>Carrier</u> standard thus ensures to this Court that <u>my case is</u> "<u>Truly Extraordinary</u> " while still providing me a meaningful avenue by which to avoid a "manifest injustice."

In <u>Kuhlmann</u>, Justice Powell concluded that a prisoner retains an overriding interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated. 477 US, at 452, 106 Sct., at 2626.

In <u>Schlup v. Delo</u>, supra., the U.S. Supreme Court holds that:

> "For a claim of actual innocence to be credible, claim requires habeas petitioner asserting actual innocence in successive or abusive petition to support his allegations of constitutional error with new reliable evidence, whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was <u>not</u> presence at trial."

## STRONGLY EMPHASIZED

My Actual and Factual Innocents claim consist of affidavits from trustworthy eyewitness accounts, critical physical evidence that was <u>not</u> presence at my trial, and thoroughly elaborates on every aspect of my case that has unjustly produced my conviction, and thus, forced a 'Manifest Injustice' upon me.

## PREJUDICE REQUIREMENT

In order to prevent "redundancy" between my petition and my actual innocent claim.  The prejudice requirement that is needed to prove my public defense counsel's deficient performance for my Ineffective Assistance of Trial Counsel issue is also presented throughout this claim.

In <u>Strickland v. Washington</u>, supra., the Supreme Court

2

requirement for relief is that:

> "Second, the defendant must show that the deficient performance prejudiced the defense."

## INDEPTH SYNOPSIS OF THE
## UNJUST PLOT FOR MY CONVICTION

My trial began as a "Credibility Contest" between me and three accomplices who either arranged and/or participated in the deceased murder. The credibility contest was prejudicially awarded to the accomplices when my trial Judge refused to give my jury the standard accomplice cautionary instruction, and thus, instructed my jury to believe that the accomplices were merely 'disputed' accomplices. (T.T. 4/6/00, pgs. 54-57) What began as a 'credibility contest,' ended with my trial Judge's bias decision to prejudicially increase the credibility of the accomplice's unsubstantive testimonies.

From the very beginning my trial Judge prejudicially persuaded prosecution and the accomplice's attorneys to settle this case with plea agreements. The problem with the plea agreements is that the accomplices were freed from the consequences of their criminal actions in exchange for testimonies that falsely accused me of a crime that they committed.

The accomplice's incriminating allegations against me derived from their deceitful and corrupt interrogations. (See attached Motion and Affidavits) The Motion to suppress the accomplice statement was never adjudicated by my trial Judge. The unjust and prohibited details concerning the accomplice's interrogations avoided being challenged by the accomplice's attorneys because of their plea agreements. This strategy executed by prosecution allowed the fabricated allegations from the accomplice's interrogations to appear to be meritous.

The sole requirement for the accomplice's 'freedom' obligated them to concede to the fabricated allegations against me, which validates the unjust plot for my conviction.

The prosecution underhandedly supported the accomplice's

3

unsubstantive allegations against me by making "bias suggestions" to his witness while on the witness stand. The prosecutor made me stand-up 'alone' in court to conduct an unconstitutional "In Court Identification" in which he coached his witness to look at me and recall comparisons between me and the "masked" gunman that the witness failed to recall shortly after the crime.

"The prosecutor willingly released the real murders in this case." Accomplice Jonathan Nettles is the only person that wanted and arranged his revenge on the deceased for beating him up that day. Jonathan is the only person that wanted the deceased dead and did everything he could possibly do to make the death of the decease happen. Prosecution diminished Jonathan's determination and intelligence to murder the deceased inorder to unjustly justify my conviction.

## STRONGLY EMPHASIZED

My absence from the crime scene and none participation in the death of the deceased is ascertained through analyzing the specific details of this crime. Due to the 'mask' that the gunman wore, it was very easy for the accomplices to agree and prosecution to allege that I was the masked gunman. Especially when my public defense counsel failed to challenge and put the allegations against me to a meaningful and adversarial test.

The accomplices are the only evidence that implicated me in this crime. Through research and close examinations, I have ascertained substantial evidence of my innocents that any 'competent trial counsel' would have presented to my jury.

Had my public defense counsel investigated and adversely crossed-examined accomplice Patrick Roberts, he could have exposed most, if not all of the information in Patrick's affidavit regarding my inability to commit this crime.

Had my public defense counsel investigated and presented all of my affiants for my defense, especially my alibi witness LaToya Smith, the jury could have concluded that I was not at the crime scene with the accomplices.

4

## ACCOMPLICE PATRICK ROBERTS' AFFIDAVIT

Accomplice Patrick Roberts' informative affidavit should not be "depreciated" because of his retractions, but attested inlight of his coached statement and testimony that has no substantive value.

Mr. Roberts' affidavit exist solely on my public defense counsel's 'incompetency.' Any competent trial counsel would have given Mr. Roberts a meaningful cross-examination that would have exposed the "factual impossibilities" of the allegations against me, 'and if only asked,' ascertained the information in Mr. Roberts' affidavit. (See Attached Affidavit)

## STRONGLY EMPHASIZED

My public defense counsel prejudically conceded to Mr. Roberts unsubstantial allegations against me when he failed to adversely contest Mr. Roberts on the 'factual impossibilities' of the allegations against me.

My Public defense counsel sabotaged my entire trial defense. My only trial defense was "lack of persence." My public defense counsel over-extensively questioned Mr. Roberts about my drinking which would only be relevant for a intoxication defense that is "completely contrary" to my trial defense. My public defense counsel's mind-boggling actions only left my jury with a false impression of guilt due to drinking.

## FACTUAL BASIS

## CROSS-EXAMINATION BY MY PUBLIC DEFENDER

> Public defender: Mr. Roberts, you were set to go
> to trial on this case Monday weren't you?
> Mr.Roberts: yes
> Public defender: and on Monday morning you entered
> a plea of guilty to a lesser offense did you not?
> Mr. Roberts: yes

5

Public defender: In return for that deal with the
prosecutor you agreed to testify against your
brother did you not?
Mr. Roberts: yes
Public defender: You're well aware that you were
charged with open murder, correct?
Mr. Roberts: yes
Public defender: and in order to avoid that you
decided to take the deal and testify, correct?
Mr. Robertd: yes
(T.T. 4/5/00, pg.141)


## STRONGLY EMPHASIZED

My public defense counsel clearly established a pivotal
reason why my jury should <u>not</u> believe the accusations against
me, but incompetently failed to contest the unsubstantial
allegations with meaningful questions that proves the allegations
are truly fabricated.


## FACTUAL BASIS CON'T.


## PUBLIC DEFENDER SABOTAGING MY TRIAL DEFENSE

Public defender: Do you know if your brother was
drinking that night?
Mr. Roberts: yes
Public defender: Do you know what he was drinking?
Mr. Roberts: yes
Public defender: what was it?
Mr. Roberts: Hennessy
Public defender: Hennessy, that a liquor?
Mr. Roberts: yes
Public defended: Did he have it with him in the
car?
Mr. Roberts: yes
Public defender: Did he have it with him before
he got in the car?
Mr. Roberts: yes
 Public defender: In fact you said you went to
the liquor store, correct?
Mr. Roberts: right
Public defender: Who went in?
Mr. Roberts: He did
Public defender: He meaning Damon?
Mr. Roberts: yes
Public defender: Did he come out?

Mr. Roberts: yes
Public defender: Did he have anything with him when he came out?
Mr. Roberts: yes
Public defender: What did he have?
Mr. Roberts: a beer
Public defender: He had more liquor, or more beer?

The Court: He said he had a beer that was his answer.

Public defender: How many beers?
Mr. Roberts: one
Public defender: Did you say a beer?
Mr. Roberts: yes
Public defender: He came out with more alcohol?
Mr. Roberts: yes
Public defender: What did he do when he came back to the car?
Mr. Roberts: He came back to the car
Public defender: Didn't he get into someone else's car first?
Mr. Roberts: yes
Public defender: Then he got into your car?
Mr. Roberts: right
Public defender: Nothing futher.
(T.T. 4/5/00, pgs. 142-144)(This is the entire cross-examination)

## STRONGLY EMPHASIZED

My public defense counsel's cross-examination was **not** fashioned to convince my jury that my drinking made it impossible for me to have committed my charged crime, **nor** that my drinking increased my desire to be with affiant Dominique Moore, thus, was **not** present at the crime scene.

Instead, my public defense counsel erronrously gave an indirect message to my jury of possible wrong doing due to my drinking despite my absence. This fact is substantiated by my public defense counsel's request for the diminished capacity through intoxication jury instruction 'that my jury never received.' (T.T. 4/5/00, pgs. 180-183) Thus, leaving my jury with an option that any competent trial counsel would have never given a jury, which is to misconstrue my drinking.

Not only did my public defense counsel sabotage my only

trial defense, but his cross-examination did <u>not</u> render my trial a reliable adversarial testing process as required by the Supreme Court's holdings in <u>Strickland</u> <u>v.</u> <u>Washington</u>, supra., at 80 LEd2d 694.


## THE ACCOMPLICE'S DECEITFUL
## AND CORRUPT INTERROGATIONS

<u>CONCEPTION OF FABRICATED ALLEGATIONS AGAINST ME</u>

The false accusations that 'I went to the crime scene with the accomplices' and 'that I was the masked gunman' was <u>not</u> originated by the accomplices. <u>The lack of substantive proof proves that someone other than a participating party concocted the allegations against me</u>. In their statements, accomplices Jonathan and Lynell did <u>not</u> accuse me of being the masked gunman. When accomplice Patrick Roberts was questioned by detective Simon, (after Lynell and Jonathan was questioned) it was the Detective and <u>not</u> Patrick that theorized that I was the masked gunman. (See George and Patricia Roberts' attached affidavits).


<u>ACTUAL FACTS</u>

When I, Damon L. Smith, voluntarily went to the Police Station for questioning, the same Detective that interrogated accomplice Patrick kindly told me what she believed happened during the course of this crime. Then she aggressively tried to convince me that I was at the crime scene and that I shot the deceased.

When I tried to correct her on the fact that I was dropped off at home before the accomplices committed this crime and that I was not the gunman. The Detective told me that since 'I wanted to play hard-ball, they were going to make me the gunman.' That is how I miraculously became the gunman of a crime that I was <u>not</u> present to commit.

8

I declare under penalty of perjury that the above Actual Facts are true and correct.

_Damon L. Smith_    Dated: _8/26/09_

## STRONGLY EMPHASIZED

My trial Judge and the prosecutor knowingly used tainted evidence to sustain the charges against me. Accomplice Lynell filed a 'Motion to Suppress' his statement. The adjudication of the illegal content of Lynell's statement was postponed and never addressed by my trial Judge.

Therefore, the details that Sgt. Smoot added and deleted to Lynell's statement was never addressed or corrected, which makes the conception of the allegations against me 'Alarmingly Specious.' It was well known and 'documented' before the distribution of plea agreements that Lynell's statement was:

    1) A violation of MCLA764.27, MSA 28.886,

    2) A Miranda Violation – Ineffective Waiver,

    3) Was <u>not</u> voluntary, and

    4) Was fruit of the Poisonous tree where his statement was made while in custody resulting from an Illegal Arrest/Detention. (See attached Motion to Suppress Statement).

My trial Judge and the prosecutor concealed the 'above and the following facts' by giving the accomplices plea agreements to mere 'probation,' which obligated them to falsely implement me in this crime.

## FACTUAL BASIS

The facts within accomplice Lynell Drake's Motion to Suppress his Statement, states the following (in part):

    1) "From approximately 11:45p.m. to approximately

2:20a.m., Lynell was held in an inside, windowless, chairless room, made to sit on the floor, handcuffed alone. He was denied his request for something to eat and/or drink."

2) "At approximately 2:20a.m., defendant was taken to Detroit Police Sgt. Thomas J. Smoot's, and Sgt. Smoot asked defendant if he was "Ready to Come Clean.""

3) "Sgt. Smoot presented defendant and his mother with the constitutional rights certificate of notification. Lynell's mother was told that if Lynell made a statement now without a Lawyer, he could go home."

4) "Sgt. Smoot wrote five pages of questions and answers, which Lynell and his mother reviewed and both pointed out that Lynell's answers did not appear to be complete and accurate."

5) "Sgt. Smoot acknowledged that he did not write down every single thing that Lynell said, but that the items he left out were not relevant and not important, and directed them where to sign on the pages." (See attached Motions).

## STRONGLY EMPHASIZED

Sergeant Thomas J. Smoot's erroneous editing of accomplices Lynell's statement allowed Patrick's interrogating Detective to further interject her false beliefs about this crime into her composition of Patrick's statement with the intent to make the accomplices statements seem like they corroborate.

Accomplice Patrick Roberts faced the same deceitful and corrupt situation as Lynell did. Affiants George and Patricia Roberts was present to witness the magnitude of the deceit and corruption during Patrick's interrogation, and states the following (in part):

## FACTUAL BASIS

## AFFIANT PATRICIA Y. ROBERTS

1) "That Patrick Roberts initial statement to Detective Barber Simon did not implicate Damon

10

Smith as the shooter of Darryl Towns."

2) "That 'Only' when Detective Simon began to narrate her theory to George, Patrick, and I, did Damon become the shooter and main suspect."

3) "That Detective Simon manipulated me into believing her theory of Damon being the shooter which made me instantly cry and highly emotional, inturn, made me pressure Patrick into corroborating with Detective Simon's theory rather than what he knew to be the truth."

4) "That the underhanded technique regarding Detective Simon writing and then reading to me her description of the crime, and using her authoritative influence to legally secure a half right/half wrong statement with my signature, facilitated the wrongful conviction of Damon Smith."

### AFFIANT GEORGE E. ROBERTS

1) "That Patrick's initial statement spoken to Detective Barber Simon did not implicate Damon Smith as the shooter in the crime Damon is convicted of."

2) "That 'Only' when Detective Simon began to narrate to Patricia, Patrick, and I her theory of the crime, is when Damon became the shooter of Mr. Towns."

3) "That Detective Simon convinced me to believe her theory that Damon was the shooter against my better judgment, and because I had no knowledge of what actually happened during the course of this crime."

4) "That the underhanded technique that Detective Simon utilized by writing and then reading to me her description of the crime, and the way that she used her authoritative influence to lock me into a half right/half wrong statement with my signature, facilitated the wrongful conviction of Damon Smith."

### STRONGLY EMPHASIZED

My jury was <u>not</u> aware of the accomplices deceitful and corrupt interrogations. My trial Judge, prosecution, and my

11

public defense counsel all played significant roles in concealing exculpable information and exaggerating the 'unsubstantive' allegations to gain my conviction. It is well proven that my participation in this crime was 'arbitrarily added,' because there is credible evidence that disproves my presence at the crime scene and its a 'factual impossibility' for me to have shot the deceased.

## PREJUDICE IDENTIFICATION

In prosecution's unjust attempt to corroborate the false allegations against me, prosecution forced witness Joseph Marshall to fabricate comparisons between me and the 'masked gunman.'

## FACTUAL BASIS

> <u>Prosecution</u>: Do you think you could identify him? (the gunman)
> <u>Mr. Marshal</u>: I wouldn't be a hundred percent sure but.
> <u>Prosecution</u>: You wouldn't be a hundred percent sure?
> <u>Mr. Marshall</u>: I could identify him by body weight, and he had his face covered with the bandanna and he had dark clothes on.
> (Prelim.T. 10/8/99, pg.112)

After Mr. Marshall told prosecution that he 'wouldn't be a hundred percent sure' about the identification of the gunman. Prosecution then assisted Mr. Marshall by coaching him to 'fabricate comparisons between me and the masked gunman' that Mr. Marshall failed to describe to the police and failed to mention in his statement shortly after the crime happened.

## FACTUAL BASIS

## <u>THE PREJUDICE IN COURT IDENTIFICATION</u>

> <u>Prosecution</u>: Your Honor, if I may ask, I would like for defendant Smith to stand, not say anything,

just to stand.
The Court: Would you please stand?
         (Defendant Smith is Standing)
Prosecution: Mr. Marshall, does this defendant fit the height and body weight of the person that you saw shoot your cousin?
Mr. Marshall: Yes, close to it. Very close. Five-nine.
Prosecution: I want to direct your attention to the upper portion of his face. Does that look like the person who you saw shot your cousin?
Mr. Marshal: The eyebrows were really thick. They came like.
Prosecution: That person had thick eyebrows?
Mr. Marshall: Thick, black.
Prosecution: Like this defendant's eyebrows?
(Prelim.T. 10/8/99, pgs. 112-113)

The In Court Identification was not only extremely prejudice, but it was also an insufficient effort to collaborate the 'substantially different' descriptions of the alleged gunman.

## FACTUAL BASIS

At the crime scene police officer Terence Sims and Michael Cook took statements from multiple witnesses describing exactly what the alleged gunman was wearing. The witnesses stated the following:

    Odie Boatwright stated that the gunman was wearing all black and a hood.(She was on the porch with Joseph).

    Odetha Boatwright made a statement hours later and stated that the gunman was wearing a navy blue jacket with a hood.(She is the deceased Grandmother and was on the porch).

    Odie and Odetha never testified at my trial.

    Joseph Marshall gave a statement to the police and stated that the gunman was a black male 21-22 yrs. old 5'7 130-140. Wearing all black and had a black bandanna on. (None of which describes me)(See attached statements).

13

Joseph Marshall's description of the gunman's height and weight changed when prosecution coached him during my In Court Identification.

Accomplice Lynell Drake stated that the alleged gunman was wearing a 'red jacket.' (T.T. 4/5/00, pg.169) Which eliminates the accomplices ability to unmask the gunman, because the shooting was done by a guy in all black, 'not red.' .

Witnesses Odie and Odetha's description of the gunman wearing a "hood" negates Joseph's ability to distinguish the gunman's thick eyebrows.

Prosecution failed to present the witnesses that seen the gunman with a hood on, and used Mr. Marshall to fabricate a 'thick eyebrow identification inorder to falsely implement me in this crime.

Our due process clause demands prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime that I am convicted of. The circumstantial evidence that prosecution depended on to "connect" the accomplice's alleged gunman to the other witnesses gunman is not sufficient proof.

Prosecution's witnesses can not identify the 'masked gunman,' and the accomplice's alleged gunman is not the gunman that was seen shooting the deceased. Furthermore, the accomplices stated that they did not see who shot decedent Towns. (T.T. 4/5/00, pgs. 57, 117).

## MY TRIAL JUDGE'S PERVERSION OF JUSTICE
## RELEVANT TO MY "ACTUAL INNOCENTS"

Throughtout my case Judge Warfield Moore, jr. used his controlling authority in a manner that intentionally perverted Justice. Judge Moore improperly designed a plan and assembled an extremely prejudice trial process for me. The bias plan that judge Moore implemented against me and his prejudice actions taken to ensure the success of his plan nullified my

constitutional rights to a fair trial, a trial by jury, and to the effective assistence of counsel.

On February 17, 2000, before Judge Warfield Moore, jr., at an Motion Hearing. After reading the preliminary examination transcripts for this case, Judge Moore repeatedly declared the following:

> Judge Moore: and I tell you, Mr. King (prosecution) until I got to the very end, (Prelim.T.) when we started getting statements and other things, and various things, you were out the box.
> I mean, you were completely out of the box as far as I'm concerned. I couldn't see any reason for them binding them over onto any charge up to that point. (pg.22)

> Judge Moore: and I say that to you, Mr. Prosecutor, because I'm not certain -- and I'm being honest with you -- if it is tried before me, and now that I know all of these facts and whatever facts, unless something really, you know, some real rockets go off in the sky with reference to this whole matter. I don't know if you can survive a Motion. (pg.26)

> Judge Moore: Now, I'm judging the words on the paper. But you may have a hard -- you may have a mountain that you can't climb, sir, no matter what equipment you think you have. (Motion T. 2/17/00,pg.27)

## STRONGLY EMPHASIZED

After Judge Moore thoroughly informed prosecution that his case is <u>not</u> likely to gain convictions. Judge Moore then used his authority to implement a bias plan that would gain the accomplice's convictions and unsubstantively convict me of a crime that the accomplices committed.

## FACTUAL BASIS

> Judge Moore: Okay. Let me ask you something, or all of you, and maybe all except Mr. Smith. This would apply to -- especially to the three. (pg.30)

> Judge Moore: Do you think that despite anything

else to the contrary, this matter is going to be -- I want to say compromised, but dealt with short of a trial? Do you think that's a possibility, Mr. King. (prosecutor)

Prosecutor: I have been hoping that, Your Honor.

Judge Moore: Do you think that possibly exist, Ms. Sager?

Ms. Sager: Pardon me, sir?

Judge Moore: Do you think that possibly exist? I think it is. Do you think it exists, Mr. Braxton?

Mr. Braxton: It depends, yes. (pg.31)

Judge Moore: Why don't we let the three of you, and I'll be here to give your client -- Mr. Taratuta -- a trial. (me)(Motion T. 2/17/00,pg.32)

## STRONGLY EMPHASIZED

Judge Moore's prejudice plan created a way to gain convictions for a crime that he had predetermined to be none-convictional. Judge Moore's plan was designed to secure convictions by giving three guilty accomplices plea-bargains to mere 'probation,' which in this case placed a 'mandatory obligation' on the accomplices to unsubstantively accuse me of a crime that they committed.

Judge Moore intentionally ignored the existence of the accomplice's deceitful and corrupt interrogations that concocted the false allegations against me, and insisted on plea bargains that would allow the fabricated allegations against me to appear to be substantive.

## REFUSAL OF MANDATORY JURY INSTRUCTION

Judge Moore refused to uphold my constitutional right to a fair trial, where he failed to give the proper accomplice 'cautionary jury instruction.' (T.T. 4/6/00,pgs.54-57) Judge Moore's unjust conduct compelled the jury to believe that the accomplice's credibility should be regarded as though they were regular/credible witnesses.

In a criminal case such as this one, where credibility was the only determining factor in this case. When Judge Moore

intentionally took actions to improperly bolster the accomplice's credibility, my 14th amendment due process right to a fair hearing before a tribunal was nullified.

Judge Moore's bias plan ultimately concealed exculpatory evidence that would prove that I am 'Actually Innocent' of this crime.

## JUDGE MOORE'S SUSPENSION FOR PERTINENT MISCONDUCTS

Shortly after my trial, Judge Warfield Moore, jr. was 'suspended' from the bench for a continuation of misconducts likened to the perversion of justice that he displayed in my case.

In Re Moore, 464 Mich 98, 119; 626 NW2d 374 (2001), found that the pattern of improper judicial conduct by my trial judge merited a 'substantial suspension' from the bench. The Supreme Court determined:

> "Judge Moore's conduct frequently violated the Code of Judicial Conduct and demonstrates, on those occasions, a lack of judicial temperament. While the incidents vary in severity, and some may ostensibly seem innocuous, misconduct may be proven by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the Judiciary."...

> "Judge Moore's conduct demonstrates a pattern of "persistent interference in and frequent interruption of the trial of cases." Therefore, we conclude the conduct is of a nature that warrants discipline." In Re Moore, 626 NW2d, at 393.

Judge Moore's misconduct infected my entire trial process, thus, making it impossible for me to have had a fair trial. Judge Moore's misconduct prevented the exercise of my constitutional rights, and disallowed the exposition of my 'actual innocents' that is now being presented.

## JUDGE MOORE FORCED ME TO TRIAL WITH AN ADVERSARY FOR COUNSEL

On October 29, 1999 at the arraignment before Judge Warfield Moore, jr., I wanted to discharge my public defense counsel, but Judge Moore insured me that my public defense counsel was a very fine lawyer and if I had any further problems with my public defense counsel, Judge Moore said he would be forced to fire my public defense counsel.

On April 3, 2000, one day before I was to begin jury selection and two days before my trial begin. I diligently sought to discharge my public defense counsel. (T.4/3/00,pg.35-39)

After Judge Moore refused to permit me to discharge my public defense counsel. My public defense counsel sought to withdraw as my counsel. Judge Moore denied my public defense counsel's Motion to withdraw and 'forced me to trial with an adversary for my counsel.' (T. 4/3/00,pg.39)

## STRONGLY EMPHASIZED

Judge Moore's conduct in this instance was discriminatively displayed by failing to "Protect" my constitutional right to the effective assistance of counsel. Judge Moore did <u>not</u> investigate into the seriousness of my 'attorney/client breakdown.' Instead, Judge Moore justified his refusal to investigate by giving an arbitrary excuse that "I'm doing nothing but a stall." (T.4/3/00,pg.40).

Judge Moore did <u>not</u> establish the proper proceeding that would have allowed my public defense counsel to break attorney/ client privilege, or to isolate my public defense counsel away from his peers so that he would <u>not</u> fell embarrassed to expose his 'incompetence.'

Judge Moore knew that I was the only defendant with a 'public defense counsel.' Judge Moore also knew the consequences and seriousness of the first-degree murder charges that I was facing at trial. Yet, Judge Moore refused to take a moment to adequately investigate the complete attorney/client breakdown between my

public defense counsel and I.

## PREJUDICE OF NOT SAFEGUARDING DEFENDANTS (ME)
## FROM THE ONUS OF PUBLIC DEFENSE COUNSELS

Judge Moore was fully aware of the unconstitutional deficiencies that I was susceptible to and forced to suffer with Michigan's Public Defense Service. The fact that this problem has existed for more that 30 years should have alerted Judge Moore to take the necessary actions to make sure the existing problems are <u>not</u> compounded to make my trial with a 'public defender' "<u>a sham</u>."

The Michigan Coalition for Justice investigation reveals that "Michigan defendants who cannot afford private counsel do not receive "<u>Equal Justice</u>" because,

> 1) "There is no adequate attorney training or qualification standard, so public defense lawyers frequently lack the experience and skills necessary to handle the cases to which they have been assigned."

> 2) "There are no attorney workload standards and public defense lawyers are burdened by overwhelming caseloads."

> 3) "There are no written attorney performance standards or meaningful systems of attorney supervision and monitoring."

> "The result is that the public defense provided in Michigan does <u>not</u> meet even the minimal constitutional requirements for effective assistance, no less the national standards established by the American Bar Association."

> "When the fundamental right to counsel is violated, the justice system cannot function. The result is errors -- <u>people</u> <u>spend</u> <u>much</u> <u>longer</u> <u>in</u> <u>jail</u> <u>than</u> <u>appropriate</u> <u>or</u> <u>worst</u>, <u>the</u> <u>wrong</u> <u>people</u> <u>are</u> <u>convicted</u>."
> (See Attached Criminal Defense Newsletter).

The Michigan Coalition for Justice investigation <u>not</u> only proves that Michigan Public Defense Service is seriously flawed, but that Judge Moore contributed to the problem by failing to

allow my public defense counsel to 'withdraw as my counsel,' and/or failed to adequately investigate into the seriousness of my attorney/client breakdown.

(See attached Criminal Defense Newsletters for an accurate report on issues dating over the last 30 years concerning the unconstitutional deficiencies in Michigan's Public Defense Service.)

## ADDITIONAL MISCONDUCT BY JUDGE MOORE

Judge Moore failed to instruct my jury that "a reasonable doubt is one which would cause a person of ordinary prudence to hesitate to act in the more important affairs of life." . Reasonable-doubt instructions must impress on jurors "the need to reach a subjective state of near certitude." Jackson v. Virginia, 443 US 307, 315; 99 SCt. 2781; 61 LEd2d 560 (1979).

Judge Moore's omission of the "hesitate to act" concept violates my Fourteenth Amendment due process right to a jury trial. (T. 4/6/00,pg.40) United States v. Merlos, 8 F3d 48, 51 (US App. DC 1993), cert den 114 SCt. 1635 (1994); Sullivan v. Louisiana, 508 US 275; 113 SCt. 2078; 124 LEd2d 182 (1993).

The most incriminating evidence against me is the existence of Judge Moore's constant misconducts that deliberately perverts justice. Judge Moore's misconducts incited confusion and distracted the attention away from the absence of "material evidence" needed to validate my conviction.

Judge Moore's misconducts was an determining factor in this case. Without Judge Moore's continuous misconducts, "my actual/factual innocents would have been proven beyond a reasonable doubt."

## EXTREMELY IMPORTANT FACTS

1) "Accomplice Jonathan Nettles is the only person who had a fight with decedent Towns, and was beat-up by decedent Towns on the day of this crime."

2) "Accomplice <u>Jonathan</u> <u>Nettles</u> is the only person who had a bruised ego because decedent Towns beat him up in front of some girls."

3) "Accomplice <u>Jonathan</u> <u>Nettles</u> is the only person who wanted <u>revenge</u> on decedent Towns and told decedent Towns "To watch his back."

4) "Accomplice <u>Jonathan</u> <u>Nettles</u> is the only person who lied to his mother by telling her that he needed her car to go to Walgreen, when he really used her car to get revenge on decedent Towns."

(See T.T. 4/5/00,pgs.35-60,105-129,19-35, and attached Presentence Investigation Report)


## STRONGLY EMPHASIZED

Jonathan intelligently lied to his mother to get revenge on decedent Towns. Which shows that Jonathan had no problem lying to the Court to <u>not</u> go to prison for life.

Jonathan Nettles hid behind the false allegations against me and all of the controversy and confusion that the Detective's fabrications of this crime created inorder to conceal the fact that "he murdered decedent Towns." The interrogating Detectives implemented 'lies' that overshadowed the 'truth,' and sheltered the accomplices, especially Jonathan, from facing the consequences of their criminal actions. Jonathan never completed his 'statement,' because he committed this crime, and only implemented me in this crime '<u>at trial</u>.'


## RELEVANT FACTS

1) "I have never seen, met, spoken to, or knew that decedent Towns existed before I was charged with his murder."

2) "I have never had a reason to harm decedent Towns, Nor was Jonathan getting beat-up a reason for me to want to harm decedent Towns."

3) "I have never committed a crime."

4) "I do not have a criminal history."

5) "I have never been charged with or accused of committing a crime before this crime."

6) "I do not have a criminal mentality that would have made me incline to commit a crime or a murder."

7) "I never made a statement, or spoke contrary to the fact that I was not present at the crime scene."

8) "Up until the day that I went in for questioning, I worked at a Beauty Salon cutting hair in the afternoons and I attended cosmetology school in the mornings. I am the father of twin boys that I faithfully provided for and love."

9) "I was at work the day after this crime happened, and I worked everyday up until I when in for questioning about this crime."

## "EXTREMELY IMPORTANT FACTS"

1) "Jonathan Nettles is not related to me. There was no emotional connection between Jonathan and I that could have ever motivated me to commit a crime with or for Jonathan."

2) "When Jonathan showed up at my house, he told me about him getting beat-up and "I laughed."

3) "I honestly thought that Jonathan getting beat-up was extremely "funny."

4) "I did not take Jonathan serious, Nor did he make the situation out to be serious to me."

5) "My mind was completely occupied by Domonique Moore, and spending the evening with her."

6) "My only reason for asking Jonathan to take me over Arteece Thomas house was to collect the money that he owed me."

7) "When we got to Arteece's house, his girlfriend had just left and she had all of his money. I could not wait for her to come back because of my plans with Domonique."

8) "I did not understand why Arteece gave my

money or all of his money to his girlfriend. I actually believed that Arteece was 'lying' to me, that is what honestly made me asked to hold his gun for 'collateral.'" ("Nobody knew that Arteece had been owing me $150 dollars for months, and every month he comes up with a new and interesting lie to tell me").

9) "The gun that I retrieved from Arteece was 'insignificant' to me and so irrelevant to Jonathan's situation that I went through the trouble of _not_ only putting the gun in the trunk, but also lifting up the carpet in the trunk to get to the wooden compartment where the spare tire is kept underneath, then unscrewing the spare tire and stashing the gun underneath the spare tire, then screwed the tire back down and put the wooden lid and carpet back in place."

10) "After we left Arteece's house with the gun we did _not_ go and murder decedent Towns. Instead, we went over Terrence Dorcy's house. I went in and called Domonique to see exactly what time she was coming to pick me up, and I washed my hands before I held Terrence's newborn baby.

11) "When I could _not_ reach Domonique, I realized that I left my pager at home and she could be paging me or on her way to pick me up. That is truly why it became mandatory for me to return home."

12) "When we left Terrence's house we went to the Party Store. When I came out of the Party Store I told Jonathan to hurry up and take me home."

13) "When we got back to my house, Jonathan, Lynell, and Patrick told me that they would be right back as I ran in the house to check my pager and call Domonique."

14) "_I honestly did_ not _go to the crime scene with the accomplices._"

(See T.T. 4/5/00,pgs.151-175, and Patrick's affidavit).

My presence with Jonathan before he decided to commit this crime was 'misconstrued and reinterpreted' to be something that it was absolutely _not_.

I declare under the penalty of perjury that the above facts is true and correct.

*Damon L. Smith* _____ Dated __8/26/09__

## IMPORTANT EVIDENCE NOT PRESENTED AT MY TRIAL

My jury never had a chance to hear why it was so important for me to be back at home. My jury did <u>not</u> know that Domonique and I spent all of our spare time together. That is why as time progressed that evening I had to be at home where she could reach me.

In Domonique Moore's affidavit, she declares,

1) "That during the entire year of 1999 Damon and I shared a very rapturous and intimate relationship together."

2) "That on September 9, 1999, Damon and I had made plans earlier that day to go out to dinner, then to see a movie, and over to my house."

3) "That on the evening of September 9, 1999, I talked to Damon at home and explained that I could not make our date for personal reasons; so we agreed to get together tomorrow."

4) "That on September 10, 1999 I went to visit Damon at the Beauty Salon where he worked, and he was cutting hair as usual."

5) "That I was ready and willing to testify to all of the previous stated truths at Damon's trial, but I was never called to testify by his lawyer."

(See Attached Affidavit)

## STRONGLY EMPHASIZED

As I began to expound upon all of the 'contradictions' that cleary expose the fabricated allegations against me. Please remain mindful that the accomplices were "<u>Freed</u>" from murdering

24

decedent Towns in exchange for perpetuating the fabricated allegations against me.

All of the "Contradictions and Specific Details" are of paramount importance to my case. The charges against me are not based on any substantive evidence, "just mere accusations." There are specific details that was given by witnesses to fulfill the required elements of my crime. These specific details are refuted by 'physical impossibilities' and 'reliable witnesses.'

Prosecution cleverly employed the mechanics of 'circumstantial evidence' to avoid exposing the facts that prove my innocents. The problem with prosecution using circumstantial evidence is the existence of 'specific details' given by all the witnesses that clearly negates any "Circumstantial Evidence."

### FACTS THAT REFUTE MY
### PRESENCE AT THE CRIME SCENE

My conviction is based on the accomplices 'accusation' that "I was in the front passenger seat suggesting ways to commit this crime when the car returned to the crime scene." (T.T. 4/5/00,pgs.45,115) I was at home when the accomplices when to commit this crime, and it is evident that my presence in the car and at the crime scene was 'arbitraily implemented.' The belief that we left the Party Store and went to the crime scene is 'completely fabricated.'

Prosecution's witness Ronald Alvin Stewart substantiates the fact that I was not in the front passenger seat when the accomplices returned to the crime scene. Mr. Stewart had no reason to volunteer false information to 'help' the detectives catch his friend's murder. Mr. Stewart was a reliable witness for prosecution whereas,

> 1) "Mr. Steward is a very good friend of accomplices Jonathan, Lynell, and also decedent Towns."

> 2) "Mr. Stewart was present the entire day that this crime occurred, and witnessed this crime unfold from the very beginning."

25

3) "Mr. Stewart saw decedent Towns beat-up Jonathan in front of two females name Theresa Berry and Kayla Jones, which bruised Jonathan's ego."

4) "Mr. Stewart saw and heard Jonathan tell decedent Towns after he was beat-up to "watch his back and he was going to get his cranium cracked."

5) "Mr. Stewart saw Jonathan and Lynell leave the crime scene together in Jonathan's mother car, and he saw them return to the crime scene together in the same car."
(See attached Police Report)

Mr. Stewart wrote in his statement and testified to the above and following 'exculpatory facts' at my preliminary examination, but was 'silenced' at my trial. Hours after this crime occurred Mr. Stewart gave a detailed statement to Sergeant Ronald Visbara, stating that,

"I saw John-John's car come back home and Lionel was still in the front seat with him, but there was 3 or 4 other guys in the back seat now."

"He (Lynell) had on a black dew-rag on, red shorts, white T-shirt, white and red air Jordan shoes, and a gold necklass."
(See attached Statement pg.2)

At my preliminary examination, Mr. Stewart took the witness stand for prosecution and testified during direct examination in support of his statement to the following 'exculpatory facts,'

Mr. Stewart: Later on, before Darryl was shot, they rode past his house.
Prosecution: Who rode past the house?
Mr. Stewart: Jonathan Nettles.
Prosection: Okay, let me ask you this. When they left, you indicated that they left from Jonathan's house. You're indicating Mr. Drake and you're indicating Mr. Nettles, is that correct?
Mr. Stewart: Yes.
Prosecution: Who was driving?
Mr. Stewart: Jonathan.
Prosecution: Okay. Where was Mr. Drake in the car?
Mr. Stewart: In the passenger seat.

Prosecution: Now, you indicated there was a point in time when they came back, is that correct?
Mr. Stewart: Yes.
Prosecution: and where were you when you saw them?
Mr. Stewart: I had went back to Darryl's house and I was with him.
Prosecution: Okay. and where did you see them?
Mr. Stewart: Jonathan.
Prosecution: Jonathan and Mr. Drake?
Mr. Stewart: They rode past his house.
Prosecution: Okay. Were they alone?
Mr. Stewart: No. They were not alone.
Prosecution: You saw others with them?
Mr. Stewart: Yes.
Prosecution: Could you tell how many?
Mr. Stewart: It was at least two or three people with them in the back.
Prosecution: Okay. Were they still seated in the same position? (Jonathan and Lynell)
Mr. Stewart: Yes.
(Preliminary Trans. 10/8/99,pgs.18-19)

Mr. Stewart witnessing Jonathan's car return to the crime scene with Jonathan and Lynell still in the front seat "affirms my absence in the car when it returned to the crime scene." I was not in the front seat when the car returned to the crime scene because, "I was at home." This 'exculpatory fact' was silenced after the accomplices received plea agreements.

## STRONGLY EMPHASIZED

This crime does not have a time-line that refutes the fact that I was taken home before the accomplices committed this crime.

## PROSECUTION'S COVER-UP

Inorder to make the accusation that 'I went to the crime scene' seem plausible. Prosecution lied about the presence of 5 people there to commit this crime. There was 4 of us in the car when we left the Party Store. I was in the front passenger seat when we left the Party Store. When the car returned to the crime scene there was 5 people in the car and "I was not in the front passenger seat." The allegation that we went

27

directly to the crime scene from the Party Store is "Fabricated."

Prosecution ignored substantial facts and covered-up the existence of other people with the accomplices at the crime scene because, Jonathan going to get other people means that we did not leave the Party Store and go to the crime scene which help prove that the allegations against me are fabricated.

Jonathan's determination for revenge, intelligence, and desire to murder decedent Towns was 'completely ignored.' Prosecution lied to my jury to conceal exculpatory facts, and positioned himself before my jury as a credible witness against me.

## FACTUAL BASIS

> Prosecution: "The fifth person that he's talking about as Joseph Marshall indicated was across the street. Never came across the street to where Darryl Towns was, never argued with anyone, never fault with anyone, who knows who that person was. No one said that, that fifth person was with Damon Lamar Smith, or Jonathan Nettles, or Lynell Drake, or Patrick Roberts. For all we know it could have been a neighbor, we don't know."
> (T.T. 4/6/00,pg.32)

## STRONGLY EMPHASIZED

Prosecution's witnesses Brandon Robinson, Odetha Boatwright, Odie Boatwright, Ronald Stewart, and Joseph Marshall all seen 5 people come together to commit this crime.

Ronald Stewart stated that he saw Jonathan, Lynell, and 3 or 4 other people in the back of Jonathan's mother car when it returned to the crime scene minutes before the crime happened. (Prelim.T. 10/8/99,pg.18-19).

Joseph Marshall stated, "I seen the shooter and another guy that was with them, but he didn't come all the way over." (T.T. 4/5/00,pg.98)

Prosecution prevented my jury from 'analyzing' the sequence of events after we left the Party Store by convincing my jury

28

that there was _not_ 5 accomplices despite reliable facts thereof. Had _not_ prosecution lied, my jury could have found that I was _not_ at the crime scene, and ascertained all of the exaggerations and fabrications against me.

### MY ALIBI WITNESS THAT WAS NEVER PRESENTED AT TRIAL

Mr. Stewart is substantial proof that I was _not_ with the accomplices at the crime scene and affiant LaToya Smith is substantial proof that I was indeed at home while this crime was being committed.

In LaToya Smith's affidavit she declares (in part),

> 1) "That during the year 1999, I resided at the residence of 15716 Pierson Rd. (My Grandmother's House) in the City of Detroit.

> 2) That on the day and evening of Setember 9, 1999 I was at home, at 15716 Pierson Rd. with my uncle Damon Smith at 9:00p.m. until I retired to bed (after 11:00p.m.)".

> 3) "My uncle Damon and I was watching television together on the evening of September 9, 1999."

> 4) "That I recall this evening very clear because we was watching the MTV Music Awards and they came on at 9:00p.m.."

> 5) "That I have tried to express this information to Damon Smith's trial lawyer, but he refused to interview me."

In accomplice Patrick Roberts' affidavit he declares (in part),

> 4) "That on September 9, 1999, Jonathan Nettles, Lynell Drake, and I dropped Damon Smith off at 15716 Pierson (Mother's House) in which he stayed, then Nettles, Drake, two of Nettles friends, and I went on Fielding to confront Darryl Towns for beating-up Jonathan Nettles earlier that day, and witnessed the crime that Damon Smith is wrongfully convicted of."

## TWO DIFFERENT CRIME SCENE AND
## NO PROOF OF THE EXACT CRIME SCENE

My case consist of 'two different' crime scenes without any proof of which scene is the actual crime scene. Establishing the actual crime scene in this case is "mandatory" to constitute the crime that I was charged with and now convicted of.

Without proof of a actual crime scene in this case the identity of the gunman is 'inconclusive,' and the gunman is also "mandatory" to prove in my case.

Our Constitutional Due Process is established to make certain that the charges against us have substantive proof of every fact constituting the alleged crime. Otherwise, the truly innocent such as you and I can be arbitrarily convicted for a crime we did <u>not</u> commit and unconstitutionally deprived of our life and liberty.

Our Due Process Clause clearly states:

> "The constitutional provision that prohibits the government from 'unfairly or arbitrarily' depriving a person of life, liberty, or property."

### STRONGLY EMPHASIZED

My public defense counsel was 'completely incompetent' and 'ineffective' in my case. The most effective way for me to substantively prove my innocents, where the perpetrator(s) responsible for this crime are the only evidence that places me at the crime scene, is to prove that the allegations against me are fabricated.

> "Fabricated -- To invent, forge, or devise falsely. To fabricate a story is to create a plausible version of the events that is advantageous to the person relating those events." The term is softer than lie. (Blacks Law Dic.8th Ed.pg.627).

The purpose for establishing that prosecution did <u>not</u> prove the necessary crime scene, and did <u>not</u> prove that the alleged

murder weapon was indeed the actual murder weapon, is to prove
to this court that the allegations against me were 'fabricated'
and 'I am actually Innocent of my convicted crime.'

## ACTUAL FACTS REITERATED

I was at home when the accomplices committed this crime.
My association with the accomplices earlier the day of this crime
was 'completely exaggerated' and my involvement in this crime
is 'absolutely fabricated.' This truth is evident through a
thorough and meaningful examination of this crime.

## THE LOCATION OF BOTH CRIME SCENES

1) The first crime scene alleged by <u>Joseph Marshall</u> was
"in the driveway." The 'impossibility' of this crime happening
in the driveway is the facts that the inevitable empty
semiautomatic cartridges from the .32 semiautomatic firearm
(alleged murder weapon) is completely missing.

2) The second crime scene was substantiated by <u>Ronald Steward</u>
finding decedent Towns face down on the kitchen floor immediately
after shots were fired; which is the exact time the deceased
was allegedly laying in the driveway with Mr. Marshall. Mr.
Stewart was the person who pulled the deceased to the driveway.

## FACTUAL BASIS

### THE FIRST CRIME SCENE, "<u>DRIVEWAY</u>"

> <u>Joseph Marshal</u>: "I went to my cousin's rescue <u>to</u>
> <u>the ground</u> with my cousin to see was he all right.
> I didn't really see nothing after that, <u>I</u> <u>know</u>
> <u>they ran</u>, but I didn't see anything after that
> <u>I stayed with my cousin</u>." (T.T. 4/5/00pg.97)

### THE SECOND CRIME SCENE, "<u>THE KITCHEN</u>"

> <u>Mr. Stewart</u>: I ran down there to see what happened;
> I saw Lynell Drake running away from the scene.
> <u>Prosecution</u>: When you went into Darryl's house

what if anything did you observe?
Mr. Stewart: Darryl was laying on his face in the kitchen.
Prosecution: Could you tell where he was shot?
Mr. Stewart: I really didn't look because I just immediately pulled him out the house.
Prosecution: Where did you pull him to?
Mr. Stewart: To the driveway.(T.T. 4/5/00,pgs.33-35)

## STRONGLY EMPHASIZED

The accomplices who are the only witnesses other than Mr. Marshall and Mr. Stewart, did not substantiate an exact crime scene. The accomplices stated that they ran before any shots were fired, and that they did not see who shot decedent Towns. (T.T. 4/5/00,pgs.57,117)

The timing of shots heard negates the existence of only one specific crime scene.

## FACTUAL BASIS

Accomplices Lynell stated "that he was about 4 or 5 houses down when he heard gunshots." (T.T. 4/5/00,pg.117)

Prosecution's witness Ronald Steward stated that "he ran down to decedent Towns house immediately after he heard shots, and saw Lynell running away from the crime scene. (T.T. 4/5/00,pg.33)

Decedent Towns was seriously battered, shot twice with one shot in the leg, and allegedly outside laying on the ground with Mr. Marshall after he was shot.

Mr. Stewart arrived immediately after decedent Towns was shot and found him face down on the kitchen floor 'at the exact time decedent Towns and Mr. Marshall was allegedly outside laying on the ground.'

The kitchen is substantially an actual crime scene, because it was Mr. Stewart that pulled decedent Towns from the kitchen to the driveway after he was shot; and most importantly, decedent Towns' body can not be in the kitchen and in the driveway at

32

the same time.

## STRONGLY EMPHASIZED

Prosecution predicated his "duty" to prove every fact necessary to constitute the crime that I am charged with on the following:

## OPENING ARGUMENT

> <u>Prosecution</u> - "Arteece Thomas will tell you that all four defendants came to his house. That this defendant (me) came in the house and asked him to hold a pistol."
> "Arteece Thomas will tell you that he gave this defendant the gun. And that all defendants left."
> "That this defendant retrieved the gun from the trunk of the car. And then you'll hear that this defendant put a scarf around the bottom part of his face, ran over across the street, held the gun on a Mr. Joseph Marshall who was there with our deceased victim, that he held the gun on him and asked him what do you have to do with this."
> "And then turned to Darryl Towns as he lie there trying to get up because he was just jumped by three other juveniles, that he fired not once, but twice." (T.T. 4/4/00,pgs.177-179;also Motion T. 2/17/00,pgs.8-12)

## STRONGLY EMPHASIZED

The crime that I am charged with is constituted by having 'only one specific crime scene,' (the driveway) having 'only one specific murder weapon,' (.32 semiautomatic firearm), and having 'only one specific course of actions.'

Prosecution did <u>not</u> fulfill his duty to prove "every above fact" necessary to constitute the crime that he charged me with and convicted me of.

<u>In Re Winship</u>, 397 US 358, 90 Sct. 1068, 25 LEd2d 368 (1970), the United States Supreme Court holds:

> "The due process clause protects an accused against convictions except upon proof beyond a reasonable doubt "every fact" necassary to

constitute the crime with which he is charged."

## STRONGLY EMPHASIZED

Prosecution willing abondoned his duty and the only avenue to prove beyond a reasonable doubt every fact necessary to constitute the crime that I am charged with when he 'waived all of the investigating Police Detectives.'

Prosecution and my public defense counsel knowingly and willingly nullified the sole purpose for conducting my trial when they both agreed to relinquish the "required burden of proof" by waiving all police officers and civilians in this case. (T.T. 4/5/00,pg.147)

## FACTUAL BASIS

Trial Judge: "Under the rule that pertain in criminal matters if the people say they are going to call a witness the defense has a right to rely on the presence of that witness being here."
"When it comes down to call them if the prosecution wishes to waive them and the defense has no objection then they may be waived." (T.T. 4/5/00,pg.147-148)

Just like prosecution presented Dr. Schmidt for his first-hand knowledge as a reliable basis to establish the "fact that decedent Towns died as a result of multiple gun shot wounds." (T.T. 4/5/00,pg.7) The investigating crime scene Detectives are the "only reliable source in this case with first-hand knowledge that could establish the exact crime scene and the actual usage of the alleged murder weapon."

The investigating crime scene Detectives are the only source of "Relevant Evidence" for providing the 'mandatory' foundation needed to prove 'every allegation' necessary to constitute this crime. Especially in my case where the only evidence against me is given by participating accomplices who received "Probation" instead of life in prison.

"Relevant Evidence" — means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (FRE 401)

### STRONGLY EMPHASIZED

The absence of all empty semiautomatic or the pertinent empty .32 semiautomatic cartridges are also "Relevant Evidence" in my case. Prosecution is accusing me of performing a specific sequence of actions that constitutes this crime.

The empty .32 semiautomatic cartridges are "irrefutable physical evidence" that is 'mandatory' in this case to prove who shot decedent Towns and where is the actual crime scene.

The .32 semiautomatic firearm that I obtained from Atreece Thomas was "obligated" to be the murder weapon, but prosecution 'failed' to prove that it was the murder weapon.

The Detectives that investigated this crime could have testified to the mechanics of a .32 semiautomatic weapon and the relevance of the 'mandatory missing empty cartridges' that refutes me shooting decedent Towns, but they did not testify.

### INDEPTH SYNOPSIS OF THE LACK
### OF PROOF TO VALIDATE MY CONVICTION

My conviction was determined solely on whether I was 'present' at the crime scene, and not on whether I actually committed this crime. Since there were three accomplices who used their involvement in this crime to falsely accuse me of being present at the crime scene. The jury was more susceptible to believe three over one; especially when my public defense counsel failed to present my alibi witness and failed to adversely contest the allegations against me.

Once prosecution used the accomplices to astutely persuade the jury that I was present at the crime scene. Prosecution relied on my 'presence' to infer that I committed this crime without any 'substantive proof.' In fact, prosecution's witnesses detailed descriptions of the actual occurrence of this crime

35

eliminates my involvement and reveals my 'Innocents.'

## FACTUAL BASIS

My conviction 'mandates' me to have shot decedent Towns with Arteece Thomas' .32 semiautomatic firearm.

Arteece Thomas -- was a witness for prosecution in this case.

1) Arteece Thomas stated that "on 9/9/99 Damon Smith obtained from him a loaded .32 automatic weapon with 6 bullets in the magazine."

2) Arteece Thomas stated that "he owned the .32 semiautomatic gun for 6 months, and purchased the gun from a guy in the hood named Juan." (See Attached Statement)

Joseph Marshall -- was a witness for the prosecution in this case. (Prelim. T. 10/8/99)

1) Joseph Marshall stated that "the gunman had a semiautomatic pistol pointed at him for about 45 seconds." (pg.85,116).

2) Joseph Marshall stated that "the gunman's gun looked like a .9 millimeter or a .380 automatic." (pg.117)

3) Joseph Marshall stated that "after the gunman finished pointing the gun at him, the gunman 'went over to his cousin, boom, boom, boom,' and fired 3 to 4 shots at his cousin." (pg.88,102).

4) Joseph Marshall stated that "after the shots were fired, they took off running, and he stood by his cousin's side." (pg.101,102).

It is factual that the Autopsy Report shows that there was not any .32 semiautomatic slugs taken from decedent Towns body.

It is factual that the Police Detectives' evidence sheet does not docket any empty .32 semiautomatic cartridges found at the crime scene, and there were no empty cartridges admitted into evidence at my trial. Nor was there anything over the gun to catch the empty cartridges as specifically described by Joseph Marshall and nobody stayed to pick the empty cartridges up after the shooting. (See attached Evidence Sheets).

## SEMIAUTOMATIC FIREARM



MAGAZINE

BULLET & CARTRIDGE

MICHIGAN COMPLIED LAW 750.224e(4)(c); MSA 28.421(4)(4)(c)

## "SEMIAUTOMATIC FIREARM"

(c) ""Semiautomatic Firearm" means a firearm employing gas pressure of force of recoil to mechanically eject an empty cartridge from the firearm after a shot, and to load the next cartridge from the magazine, but requiring renewed pressure on the trigger for each successive shot."

38

Scientifically, all semiautomatic firearms eject empty cartridges. A .32 semiautomatic firearm is <u>not</u> an exception to the mechanics of every other semiautomatic firearm. A .32 semiautomatic firearm functions exactly like <u>MCL</u> 750.224e(4)(c); <u>MSA</u> 28.421(4)(4)(c) states that a semiautomatic firearm functions. Inevitably, when a .32 semiautomatic firearm is fired, an empty cartridge will eject and land in the surrounding area that it was fired in. Out of 3 to 4 shots fired, there was <u>not</u> one single empty cartridge found at the alleged crime scene.

According to all the above facts and <u>MCL</u> 750.224e(4)(c); <u>MSA</u> 28.421(4)(4)(c), it is 'factually impossible' for a semiautomatic firearm to have been fired 3 to 4 times and <u>not</u> eject a empty cartridge at the crime scene in this case. The lack of physical evidence refutes the "Cause" (me) of this crime.

It is factual that the .32 semiautomatic firearm that Arteece Thomas gave to me, and the semiautomatic firearm that Joseph Marshall seen the alleged 'mask gunman' with, certainly ejects empty cartridges. The physical evidence does <u>not</u> corroborate with my alleged actions to have committed this crime. <u>The facts refute my conviction and substantively proves that I did</u> not <u>and could</u> not <u>have committed my convicted crime</u>.

## I AM ACTUALLY AND FACTUALLY INNOCENT OF THIS CRIME.

In <u>Schlup</u> <u>v.</u> <u>Delo</u>, 115 Sct. 851, 513 US 298, 130 LEd2d 808 (1995), the United States holds that,

> "To establish requisite probability that constitutional violation has probably resulted in the conviction of one who is actually innocent, habeas petitioner asserting actual innocence in an abusive or successive petition must show that it is more likely than not that no reasonable jury would have convicted him in light of the new evidence and, thus, petitioner is required to make a strong showing than that needed to establish prejudice; petitioner must show that it is more likely than not that no reasonable jury would have found petitioner guilty beyond a reasonable doubt."

1) "Petition must show that it is more likely than <u>not</u> that no reasonable jury would have convicted him in light of the new evidence."

In my case it is more likely than <u>not</u> that no reasonable jury would have convicted me in light of my new evidence.

A) In light of the new evidence regarding Patricia Roberts, George Roberts, and Lynell Drake's Motion to Suppress his Statement. It is more likely that no reasonable jury would have convicted me knowing that the allegations against me are the result of an deceitful and illegal interrogation that misconstrued and exaggerated my presence earlier with the accomplices.

B) In light of the new evidence regarding <u>MCL</u> 750.224e(4)(c) "Semiautomatic Firearm." It is more likely that no reasonable jury would have convicted me with a complete understanding of how a semiautomatic firearm functions in relation to the 'mandatory empty cartridges that is missing from this crime.' Without actual proof that the .32 semiautomatic firearm that Arteece gave me was indeed the actual murder weapon, <u>the necessary</u> <u>"Intent" needed for my charged crime can not be proven</u>. Nor can the actions of the alleged 'masked gunman' be attributed to me.

C) In light of the new evidence regarding Domonique Moore. It is more likely that no reasonable jury would have convicted me with material proof that refutes my allege 'motive and intent' to commit this crime. My true 'motive and intent' to be with Domonique the evening of this crime was impervious opposed to being at the crime scene. Domonique credibly substantiates to a jury why I went home rather than stayed with Jonathan.

D) In light of the new evidence regarding my alibi witness LaToya Smith. It is more likely that no reasonable jury would have convicted me with a reliable witness that could validate the fact that I was indeed at home with her before and during the time this crime was committed. Especially where another reliable witness stated that Lynell was in the front seat of

the car when it returned to the crime scene, and the front seat is where I was accused of sitting when the car returned to the crime scene.

E) In light of the new evidence regarding accomplice Patrick Roberts. It is more likely that no reasonable jury would have convicted me knowing that the incriminating allegations against me was agreed to through the use of duress and manipulation. Patrick's allegation that I shot decedent Towns is proven to be 'factually impossible.' This fact proves that Patrick's incriminating allegations against me was deceitfully concocted by an intervening source.

Patrick's statement was <u>not</u> wrote by Patrick, and when questioned by prosecution, he could not remember what was in his statement. (T.T. 4/5/00,pg.138) Patrick was <u>not</u> allowed to give a full detailed description about this entire crime at my trial. Nor was he adversely question about this crime.

Patrick's affidavit is the first time that he is allowed to speak openly about what happened the evening of this crime. My conviction was based on Patrick's unsubstantive trial testimony. No jury would have convicted me in light of the information in Patrick's affidavit.

## REQUIRED SHOWING

> 2) "Petitioner must show that it is more likely than <u>not</u> that no reasonable jury would have found petitioner guilty beyond a reasonable doubt."

In my case it is more likely than <u>not</u> that no reasonable jury would have found me guilty beyond a reasonable doubt where,

A) The lack of physical evidence nullifies the allegation that I was the masked gunman.

B) There are two substantive crime scenes and <u>no</u> proof of the actual crime scene which nullifies proof of who actually caused the death of the deceased.

C) The presentation of a credible witness that justifies my 'motive' for the evening, alone with <u>no</u> proof of Arteece's

41

gun being the murder weapon which nullifies my inferred 'intent' to commit this crime.

D) The presentation of another credible witness that refutes my presence in the car when it returned to the crime scene.

E) And, A third credible witness that validates the fact that I was at home before and during the time this crime happened. (Accomplice Patrick supports this truth also).

## REASONABLE DOUBT

"A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence"... (CJI2d 1.9(3))

## CJI2d 16.1 ELEMENTS OF FIRST-DEGREE MURDER

1) "That the defendant caused the death of deceased, that is that deceased died as a result of my actions, in my case, multiple gun shot wounds."

It is not likely that any reasonable jury could find me guilty of this first element of murder where,

Under the physical-facts rule, the testimonies regarding the actions of the masked gunman and the different locations of the alleged crime scene is 'insufficient' evidence that is unable to fulfill prosecution's duty to prove beyond a reasonable doubt "every fact" necessary to constitute the crime charged against me.

## PHYSICAL-FACT RULE

"The principle that oral testimony may be disregarded when it is inconsistent or irreconcilable with the physical evidence in the case." (Blacks Law Dic.8th Ed.pg.1184)

## FACTUAL IMPOSSIBILITY

> "Impossibility due to the fact that the illegal
> act cannot physically be accomplished, such as
> trying to pick an empty pocket." (Blacks Law Dic.8th
> Ed.pg.771)

According to the absent 'empty' .32 semiautomatic cartridges,
my alleged actions as the masked gunman establishes a "Factual
Impossibility."  I could not have physically accomplished shooting
the deceased with the .32 semiautomatic, unless the decease was
shot with an empty gun.

## CJI2d 16.15 ACT OF DEFENDANT MUST BE CAUSE OF DEATH

> "It is not enough that the defendant's act made
> it possible for the death to occur. In order to
> find that the death of decedent Towns was caused
> by the defendant, you must find beyond a reasonable
> doubt that the death was the natural or necessary
> result of the defendant's act."

## CJI2d 16.1 CON'T.

2) That the defendant intended to kill deceased.

3) That this intent to kill was premeditated,
that is, thought out beforehand.

Jonathan Nettles was the person who had the fight with and
wanted to crack the cranium of decedent Towns, not me.  I did
not obtain Arteece's gun to shoot anybody.  This fact is
substantiated because, Arteece's gun was not used in this crime.
Therefore, it is well proven that I never had an 'intent' to
kill decedent Towns.

When the car returned to the crime scene, I was not in the
front seat suggesting ways to commit this crime.  Therefore,
it is also well proven that my alleged actions was not thought
out beforehand, premeditated.

## MISCARRIAGE OF JUSTICE

In <u>Schlup v. Delo</u>, supra., the United States Supreme Court holds that,

> "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a 'miscarriage of justice' that would allow a habeas court to reach the merits of a barred claim; however, if habeas petitioner presents evidence of innocence so strong that a court cannot have confidence in the outcome of trial, unless the court is also satisfied that trial was free of nonharmless constitutional error, petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims in a successive habeas petition."

Likened to <u>Schlup</u>, the purpose for my actual innocents claim is to justify a review of the merits of my constitutional claim. As the Supreme Court repeatedly noted, "(a)t common law, res judicata did not attach to a court's denial of habeas relief." McCleskey, 499 US, at 111 Sct., at 1462. Instead, "a renewed application could be made to every other judge or court in the realm, and each court or judge was bound to consider the question of the prisoner's right to a 'discharge independently,' and not to be influenced by the previous decisions refusing discharge," Ibid., quoting W. church, Writ of Habeas corpus ß 386,p. 570(2d ed. 1893).

The Court has explained the early tolerance of successive petitions, in part, by the fact that the writ originally performed only the narrow function of testing either the jurisdiction of the sentencing court or the legality of Executive detention. See <u>McCleskey</u>, 499 US, at 478, 111 Sct., at 1461-1462; <u>Wainwright v. Sykes</u>, 433 US 72, 78; 97 Sct. 2497, 2502; 53 LEd2d 594 (1997).

To alleviate the increasing burdens on the federal courts and to contain the threat to finality and comity, Congress attempted to fashion rules disfavoring claims raised in second and subsequent petitions. For example, in 1996, Congress amended

28 U.S.C. ß 2244(b) "to introduce a greater degree of finality of judgments in habeas corpus proceedings." Kuhlmann v. Wilson, 477 US, at 450; 106 Sct., at 2625, quoting S.Rep. No.1797, 89th Cong., 2d Sess., 2 (1966)(Senate Report); See also McCleskey, 499 US, at 468; 111 Sct., at 1466. Similarly, in 1976, Congress promulgated Rule 9(b) of the Rules Governing Habeas Corpus Proceedings in part to deal with the problem of repetitive filings.

The Court has adhered to the principle that habeas corpus is, at its core, an "equitable remedy." The Supreme Court has consistently relied on the equitable nature of habeas corpus to preclude applications of strict rules of res judicata. Thus, for example, in Sanders v. United States, 373 US 1; 83 Sct. 1068; 10 LEd2d 148 (1963), the Supreme Court held that a habeas court must adjudicate even a successive habeas claim when required to do so by the 'ends of justice.'

In Kuhlmann, seven Members of the Supreme Court squarely rejected the argument that in light of the 1966 amendments, "federal courts no longer must consider the 'ends of justice' before dismissing a successive petition." 477 US, at 451, 106 Sct., at 2625 (plurality opinion); id., at 468-471; 106 Sct., at 2634-2636 (Brennan, J., dissenting); id., at 476-77; 106 Sct., at 2638-39 (STEVENS, J., dissenting); see also Sawyer, 505 US, at 339; 112 Sct., at 2519 (noting that in Kuhlmann, "(w)e held that despite the removal of (the reference to the ends of justice) from 28 U.S.C. ß 2244(b) in 1966, the "miscarriage of justice exception would allow successive claims to be heard"").

Thus, while recognizing that successive petitions are generally precluded from review, Justice Powell's plurality opinion expressly noted that there are "limited circumstances under which the interests of the prisoner in relitigating constitutional claims held meritless on a prior petition may outweigh the countervailing interests served by according finality to the prior judgment." 477 US, at 452; 106 Sct., at 2626.

To ensure that the 'fundamental miscarriage of justice exception' would remain "rare" and would only be applied in the

"extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Supreme Court explicitly tied the 'miscarriage of justice exception to the petitioner's innocence."

In <u>Kuhlmann</u>, for example, Justice Powell concluded that a prisoner retains an "overriding interest in obtaining his release from custody" if he is innocent of the charge for which he was incarcerated." 477 US, at 452; 106 Sct., at 2626.

The general rule announced in <u>Kuhlmann</u>, <u>Carrier</u>, and <u>Smith</u>, and confirmed in the Supreme Court's more recent decisions, rest in part on the fact that habeas corpus petitions that advance a substantial claim of actual innocence are extremely rare. Explicitly tying the miscarriage of justice exception to innocence thus accommodates both the systemic interest in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the "extraordinary case," <u>Carrier</u>, 477 US, at 496; 106 Sct., at 2649.

> "The maxim of the law is ... that it is better that ninetynine ... offenders should escape, than that 'one innocent man' should be condemned."

I am innocent of my convicted crime. For this Court to preclude review of my constitutional deprivation, 'where my public defense counsel failed to investigate and present my available alibi witness,' would be a complete disregard for my inflicted "miscarriage of justice."

The Eighth Amendment prohibits "cruel and unusual punishment." This proscription is not static but rather reflects evolving standards of decency. The protection of the Eighth Amendment does not end once a defendant has been validly convicted and sentenced. It also may violate the Eighth Amendment to imprison someone who is actually innocent. <u>HERRERA v. COLLINS</u>, 506 US 390, 122 LEd2d 203, 113 Sct. 853, at 876-77.

# PETITION FOR WRIT OF
## HABEAS CORPUS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Case No. 04-CV-74233-DT


DAMON L. SMITH,
            Petitioner

V.


BLAINE LAFLER,
            Respondent

and

JEFFERY WOODS,
            Additional Respondent.


## PETITION FOR WRIT OF HABEAS CORPUS


DAMON L. SMITH    311644
IN PRO SE
KINROSS CORR. FACILITY
16770    WATERTOWER DR.
KINCHELOE, MI    49788

# TABLE OF AUTHORITIES CITED

CASES                                                  Page   No.


Bradshaw v. Richey, 546 US 74, 126 Sct 602, 163 LEd2d 407 (2007),
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Hilton v. Braunskill, 481 US 770 (1987), . . . . . . . . . 23

Johnson v. Zerbst, 304 US 548, 58 Sct. 1019, 82 LEd2d 1461, .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Miller-El v. Cockrell, 537 US 322 (2003), . . . . . . . . . 6,7

Rompilla v. Bread, 125 Sct. 2456 (2005), . . . . . . . . . 2

Sanders v. United States, 373 US 1, 83 Sct.1068 (1963), . . 2,3

Strickland v. Washington, 466 US 668, 104 Sct. 2052, 80 LEd2d
674 (1984), . . . . . . . . . . . . . . . . . 1,11,15,16,17,18,22

United States v. Cronic, 466 US 648, 104 Sct. 2039, 80 LEd2d
657 (1984), . . . . . . . . . . . . . . . . . . . . . . . 16

Wiggins v. Smith, 539 US 510, 123 Sct. 2527 (2005), . . . . 4,6

# CONSTITUTION AND STATUES

28 U.S.C. Sec. 2254(d)(2), . . . . . . . . . . . . . . 3,4,6,7,23

28 U.S.C. Sec. 2254(a), . . . . . . . . . . . . . . . . . . 22

U.S. Constitution Amendments 6 and 14, . . . . . . . . . . 1

Sixth Amendment Counsel Clause, . . . . . . . . . . . . . 10,11

# TABLE OF CONTENTS

                                                          Page    No.

Standard of Review . . . . . . . . . . . . . . . . . . .    1

Standard of Review for AEDPA's Requirement . . . . . . .    3

The State Court's Decision is Procedurally
and Substantively Unreasonable . . . . . . . . . . . . .    4

No Presumption of Correctness
Applies in my Case . . . . . . . . . . . . . . . . . . .    4

Procedurally Unreasonable . . . . . . . . . . . . . . .     4

Substantively Unreasonable . . . . . . . . . . . . . . .    5

Substantial Merits of this Issue . . . . . . . . . . . .    5

The State Court's Decision . . . . . . . . . . . . . . .    7

Notice of Alibi Defense . . . . . . . . . . . . . . . .     9

Notice of Withdrawal of Alibi Defense
Presented as Newly Discovered Evidence . . . . . . . . .   10

Unconstitutionality of State Court's Decision . . . . . .   10

The State Court's Unreasonable
Determination of Facts . . . . . . . . . . . . . . . . .   12

Factual Basis . . . . . . . . . . . . . . . . . . . . .    13

My Public Defense Counsel's
Ineffectiveness "Not" Trial Strategy . . . . . . . . . .   16

Prejudice . . . . . . . . . . . . . . . . . . . . . . .    18

Prejudice Requirement Continues . . . . . . . . . . . .    22

Authorizing Relief . . . . . . . . . . . . . . . . . . .   22

Relief Praying For . . . . . . . . . . . . . . . . . . .   23

## INDEX TO APPENDICES

Affidavits, App. . . . . . . . . . . . . . . . . Yellow Paper

Notice of Alibi Defense, App. . . . . . . . . . . . Gold Paper

"Newly Discovered Evidence"
Notice of Withdrawal of Alibi Defense, App. . . . . Gold Paper

WHETHER MY 6TH AMENDMENT CONSTITUTIONAL RIGHT TO HAVE THE EFFECTIVE ASSISTANCE OF COUNSEL FOR MY DEFENCE AND MY 14TH AMENDMENT RIGHT TO A FAIR TRIAL WAS PROHIBITIVELY REVOKED ACCORDING TO THE UNITED STATES SUPREME COURT'S HOLDINGS IN STRICKLAND V. WASHINGTON, 466 US 668, WHICH MANDATES A "NEW TRIAL," WHERE MY PUBLIC DEFENSE COUNSEL FAILED TO INVESTIGATE AND PRESENT MY AVAILABLE ALIBI WITNESS DENYING ME A FAIR TRIAL.

## STANDARD OF REVIEW

Under the 6th Amendment I am entitled to the effective assistance of counsel for my defence, and yet, the effective assistance of counsel was <u>not</u> provided for my entitlement. <u>Strickland v. Washington</u>, 466 US 668; 104 Sct. 2052; 80 LEd2d 674 (1984). In <u>Strickland v. Washington</u>, the United States Supreme Court holds that,

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components."

> "1) The defendant must show that counsel's performance was deficient."

> "2) The defendant must show that the deficient performance prejudiced the defense."

The United States Supreme Court also holds that,

> "In adjudicating a claim of actual ineffectiveness of criminal defense counsel, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged and on whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."

The United States Supreme Court defines our 14th Amendment's right to a 'fair trial' in <u>Strickland v. Washington</u>, as,

> "A fair trial is one in which evidence subjected to adversarial testing is 'presented' to an impartial tribunal for resolution of issues defined

1

in advance of the proceeding."

Whether ineffective assistance of counsel was rendered in my case is a mixed question of fact and law, and is required to be reviewed 'de novo,' where the state courts failed to adjudicated this issue on the 'merits.'

In <u>Rompilla</u> v. <u>Beard</u>, 125 Sct. 2456, 2467 (2005), the United States Supreme Court determined that,

> "Because the state courts found the representation adequate (under first prong of Strickland v. Washington standard for assessing claim of ineffective assistance of counsel), they never reached the issue of prejudice, ... and so we examine this element of the Strickland claim de novo."

### STRONGLY EMPHASIZED

The state court failed to reach the issue of prejudice for this issue. Thus, requiring this court to examine the 'prejudice' prong of this issue de novo.

According to the United States Supreme Court's holdings in <u>Sanders</u> v. <u>United States</u>, 83 Sct. 1068; 373 US 1 (1963), both the state and the federal court's previous decisions on this issue are <u>not</u> constituted as an adjudication 'on the merits.'

> "Explicitly codifying <u>Sanders</u>' holdings in the 1966 amendments to 28 U.S.C. S. 2244(b), Congress limited successive petition dismissals to situations in which relief was denied in the earlier proceeding 'after an evidentiary hearing on the merits of a material factual issue or after a hearing on the merits of an issue of law. Consistent with this language and with <u>Sanders</u>' holding, the courts have concluded that "with prejudice" dismissals of petitions are <u>not</u> on the merits when:"

> 1) "The claim as pleaded in either the prior or current petition alleges dispositive facts that are <u>not</u> "conclusively" disproved by the record and that were <u>not</u> tested at an evidentiary hearing in the prior proceeding."

2

2) "The prior determination in other respects was summary and <u>not</u> based upon the legal merits of petitioner's claims."

3) "The hearing in the prior proceeding was <u>not</u> "full and fair.""

<u>STRONGLY EMPHASIZED</u>

After due diligence in both the state and federal courts, I was denied an evidentiary hearing that would have allowed this issue to be adjudicated on the merits.

The district court indirectly "suspended" my writ of habeas corpus in violation of Article 1 Sec. 9 cl.2, where the district court dismissed 'with prejudice' my previous petition because, the court mistakenly concluded that I failed to object to the Magistrate Judge's report and recommendation, and 'I did in fact timely object.' (See Rule 9(b) Motion).

<u>STANDARD OF REVIEW FOR AEDPA'S REQUIREMENT</u>

Now comes Petitioner Damon L. Smith, pro se, pursuant to AEDPA'S 28 U.S.C. S. 2254(d)(2), which authorizes this Court to <u>grant</u> habeas corpus relief in my case, where an adequate application of 2254(d)(2)'s requirements for relief are set forth within the following:

<u>28 U.S.C S. 2254(d)(2) states</u>:

(d) "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" ---

(2) "Resulted in a decision that was based on an "unreasonable determination" of the facts in light of the evidence presented in the State Court proceedings."

## STRONGLY EMPHASIZED

The 'deferential standard' of review set forth in S. 2254(d) is completely inapplicable to my claim because, it has never been adjudicated on the merits. Nor does my claim qualify for 2254(d)'s ban. Therefore, this Court is obligated to employ the traditional pre-AEDPA standard of 'de novo' review.

## THE STATE COURT'S DECISION IS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

The United States Supreme Court has demonstrated in its applications of section 2254(d)(2), a federal court's determination that the state court's fact finding process was "unreasonable" (either procedurally or substantively) negates the 'presumption of correctness' that would otherwise attach to state court fact findings. See Wiggins v. Smith, 539 US 510; 123 Sct. 2527 (2005).

## NO PRESUMPTION OF CORRECTNESS APPLIES IN MY CASE.

It is factually established within my case that the state court's decision regarding my public defense counsel's failure to investigate and present my available alibi witness constitutes as "procedually and substantively unreasonable."

## PROCEDURALLY UNREASONABLE

My appellant counsel filed a Motion to Remand for a Ginther (evidentiary) hearing to the Court of Appeals with an affidavit form my alibi witness in support of my public defense counsel's failure to investigate and present my available alibi witness.

The Court of Appeals denied my Motion for Remand for a Ginther Hearing, and later added the following remarks to the denial of this issue in their decision:

"Because there was no Ginther Hearing, our review

4

is limited to errors apparent on the record." <u>People v. Damon L. Smith</u>, Unpublished May 1, 2003, No. 229661, LC No. 99-010166, pg.3-4.

The state courts failed to address the merits of my issue because, 'they' denied me an evidentiary hearing. The process that the state court used to adjudicate this issue left me without a forum to test the legality of my unconstitutional conviction. Which proves that the state court's fact finding process is "procedurally unreasonable."

## SUBSTANTIVELY UNREASONABLE

In my case, an evidentiary hearing would have prevented the state courts from 'ignoring' the merits of this issue. The state courts chose apart of the record that is "misleadingly inaccurate" to base there decision on, despite the complete record that 'substantively proves' that my public defense counsel failed to investigate and present my alibi witness. (Sen.T. 5/4/00,pg.13-14)

## SUBSTANTIAL MERITS OF THIS ISSUE

Attached to my Motion for a Ginther Hearing was as Affidavit from my alibi witness in support of the record (Sen.T. 5/4/00,pg.13-14), stating (in part):

1) "That on the day and evening of September 9, 1999 I was at home, (Grandmother's House), at 15716 Pierson Rd. with my uncle Damon Smith at 9:00p.m. until I retired to bed after 11:00p.m.."

2) "That I recall this evening very clear because, we was watching the MTV Music Awards and they came on at 9:00p.m."

3) "That I have tried to express this information to Damon Smith's trial lawyer, but he refused to interview me."

4) "That I wanted to testify to all of the above at the trial of Damon Smith, but was prevented

5

from doing so by his trial lawyer, Stephen Taratuta." (See Attached Affidavit).

## STRONGLY EMPHASIZED

The state court ignored the well proven fact that my public defense counsel did <u>not</u> deny on record that he willingly and consciously refused to investigate and present my alibi witness. The state courts gave an "substantively unreasonable" determination of the 'actual facts' for their decision. (See Sen.T. 5/4/00,pg.13-14).

In <u>Wiggins</u> v. <u>Smith</u>, 539 US 510; 123 Sct. 2527 (2005), the United States Supreme Court determined that:

> "State Court's factual conclusion about information available to trial counsel at time of sentencing is rejected under section 2254(d)(2) because, State Court's fact finding process was marred by court's "erroneous assumption" about content of social service record in counsel's possession."

> "Court relies on section 2254(d)(2) both to reject state court's view of content of social service records as 'substantively' incorrect and to reject state court's ultimate conclusion about information available to counsel at time of sentencing because, <u>factual determination was procedurally marred by state court's "partial reliance on an erroneous factual finding.""</u>

> "State Court's assumption that the (social service) records documented instances of this (sexual) abuse was "incorrect" and reflects an 'unreasonable determination' of the facts in light of the evidence presented in the state court proceeding, S. 2254(d)(2) and accordingly requirements of S. 2254(d) ... "<u>pose no bar to granting petitioner habeas relief."</u>

In <u>Miller-El</u> v. <u>Cockrell</u>, 537 US 322, 246 (2003), the United States Supreme Court determined that:

> "Our concerns are amplified by the fact that the state court also had before it, and apparently

6

"ignored," testimony demonstrating that the Dallas
County District Attorney's office had, by its own
admission, used this process to manipulate the racial
composition of the jury in the past."

In both of these cases the United States Supreme Court found
that the state court's fact findings was either "incorrect" or
"ignored," and granted habeas relief under section 2254(d)(2).
The state court's decision in my case is "incorrect," and the
state court "ignored" the part of the record that proved that
my public defense counsel simply failed to investigate and present
my available alibi witness. Therefore, this court is permitted
to grant me habeas relief on the basis of section 2254(d)(2).

## THE STATE COURT'S DECISION

The state court's "unreasonable determination" of the 'facts'
in light of evidence presented in state court proceedings is
as follows:

"Defendant also maintains that counsel failed
to investigate and question a possible alibi
witness. Yet, defense counsel stated at trial that
both he and defendant had chosen to abandon the
alibi defense after an unsuccessful attempt to
diligently pursue that defense through the use
of an investigator." People v. Damon L. Smith,
Unpublished May 1, 2003 No. 229661.

The following "pre-trial" transcript is the source of the
above state court decision:

Trial Counsel: "You were correct we did try
to assert an alibi defense. We did pursue that
diligently. We had an investigator go out. We have
withdrawn "that alibi defense" "based on those
investigations AT THIS TIME" your Honor." (T.
4/3/00,pg.13).

On first read, the state court's decision seems to relay
an adequate interpretation of the transcripts, but "it does not."

7

The state court's decision leaves out and substitutes very important words from the transcripts that manipulates the facts. Thus, wanting this Court to believe that their decision is a correct interpretation of the facts, but "its <u>not</u>."

## The Transcripts States:

"withdrawn 'that' alibi defense based on 'those' investigations 'at this time.'" (T. 4/3/00,pg.13).

## The State Court's Decision States:

""At trial" that both he and defendant had chosen to abandon the alibi defense."

1) The state court's decision substitutes "withdrawn that," for "abandon the." "Withdrawn that alibi defense" is referring to a 'specific' alibi defense. While 'abandon the alibi defense' is referring to the 'entire' alibi defense.

2) The state court's decision incorrectly states that my public defense counsel made the pertinent statement, "at trial." The statement that the state court is using to base its decision on took place two days before trial on 4/3/00, and <u>not</u> 'at trial' which started on 4/5/00.

### STRONGLY EMPHASIZED

My public defense counsel specifically stated withdrawn 'at this time.' At this time is <u>not</u> a final determination like the state court's decision want this court to believe, we were two days from the beginning of trial "at that time."

The state court's decision is incorrect for using the phrase 'abandon the alibi defense,' because my jury would <u>not</u> have deliberated on CJI 7.4 "Lack of Presence/Alibi Witness defense" if my public defense counsel and I agreed to 'abandon the alibi defense.' (T.T. 4/6/00,pg.52).

## NOTICE OF ALIBI DEFENSE

The attached "Notice of Alibi Defense" will further this Court's insight into the state court's 'unreasonable determination' of the facts.

## The Transcripts States:

"that alibi defense based on those investigations"

When my public defense counsel made the above statement, the record shows that he is referring to the "Notice of Alibi Defense Motion" that he filed to the trial court. (See Attached Notice of Alibi Defense).

The "Notice of Alibi Defense Motion" has Larry Austin and Damus Taylor as the alibi witnesses for what my public defense counsel referred to as "that alibi defense."

The Notice of Alibi Defense Motion shows that Larry Austin and Damus Taylor are the only two alibi witnesses that were investigated, and the only two alibi witnesses that my public defense counsel was referring to in his statement, "based on those investigations."

## STRONGLY EMPHASIZE

This issue is not based on my public defense counsel's failure to investigate and present available alibi witnesses Larry Austin and Damus Taylor. This issue is substantiated by my public defense counsel's failure to investigate and present available alibi witness affiant "LaToya Smith."

The statement that my public defense counsel made, (T. 4/3/00,pg.13) regarding my alibi witness was completely misconstrued by the state courts. Affiant LaToya Smith's name was not on that Notice of Alibi Defense Motion, which excludes her from this 'false assumption.'

9

## NOTICE OF WITHDRAWAL OF ALIBI DEFENSE
## PRESENTED AS NEWLY DISCOVERED EVIDENCE

The attached Notice of Withdrawal of Alibi Defense Motion is the only evidence that might indicate that I consented to my public defense counsel's failure to investigate and present my alibi witness at trial. (See Attached Notice of Withdrawal of Alibi Defense).

My public defense counsel and I never agreed to withdraw my alibi 'defense,' and the Notice of Withdrawal of Alibi Defense Motion does <u>not</u> confirm any 'agreement' between my public defense counsel and I to withdraw my alibi defense. The state court's factual basis for this conclusion is 'wrong.'

The Notice of Withdrawal of Alibi Defense Motion is of paramount importance, because it highlights the confusion surrounding the state court's unreasonable determination. Contrary to the title of this Motion, "it is <u>not</u> substantially equipped to withdraw my "<u>alibi</u> <u>defense</u>."

The language in the body of the Motion clearly states:

> "Now comes the defendant Damon Smith by and through his attorney, Stephen M. Taratuta and respectfully '<u>withdraws</u> <u>his</u> <u>Notice</u> <u>of</u> <u>Alibi</u>.'"

### STRONGLY EMPHASIZED

The Motion's 'title' "Notice of Withdrawal of Alibi Defense" is <u>not</u> the same as the language in the body of the Motion. The language in the body of the Motion does <u>not</u> state 'withdraws his Notice of Alibi <u>Defense</u>.' Thus, it is <u>not</u> authorize to withdraw my alibi '<u>defense</u>.' Nor was I ever aware of or informed that a waiver of my 'only' defense was at stake.

### UNCONSTITUTIONALITY OF STATE COURT'S DECISION

The Sixth Amendment's Counsel Clause guarantees the following (in part):

10

> "In all criminal prosecutions, the accused shall enjoy the right; to have compulsory process for obtaining witnesses in his favor." <u>Strickland v. Washington</u>, 80 LEd2d. at 691-92.

My constitutional violation is <u>not</u> the denial of a compulsory process, but that the state court's decision falsely claim that I knowingly and understandingly abandoned my right to the 'compulsory process.'

> <u>Compulsory Process Clause</u>: "The clause of the Sixth Amendment to the U.S. Constitution giving criminal defendants the subpoena power for obtaining witnesses in their favor."

The compulsory process was activated in my case. The state court failed to inform me 'if I did' abandon my constitutional right like they alleged I did; before the court of appeals made an 'unreasonably determined' that I did. There was never a "colloquy" implemented to ask me if I understood that I was waivering or abandoning my rights.

> <u>Colloquy</u>: "Any formal discussion, such as an oral exchange between a judge, the prosecution, the defense counsel, and a criminal defendant in which the judge ascertains the defendant's understanding of the proceedings and of the defendant's rights."

In <u>Johnson v. Zerbst</u>, 304 US 458, 464-65; 58 Sct. 1019; 82 LEd 1461, the United States Supreme Court holds that:

> "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do <u>not</u> presume acquiescence in the loss of fundamental rights.'"

The state court is 'completely incorrect' in their findings that I abandoned my alibi defense. The state court's decision is clearly an 'unreasonable determination' of the facts and constitutes a 'miscarriage of justice,' where 'I am actually innocent' and the state courts 'ignored' exculpatory fact thereof to justify my conviction.

## THE STATE COURT'S
## UNREASONABLE DETERMINATION OF FACTS

The State Court's decision failed to address the 'fact' that my public defense counsel did <u>not</u> investigate and present an available alibi witness. The evidence presented in the state court proceeding shows that the state court 'ignored' the complete record and incorrectly interpreted the information that they based their decision on.

## FACTUAL BASIS

From the onset of trial, my public defense counsel prepared my jury for an alibi defense. During opening arguments my public defense counsel stated the following:

> <u>Public Defense Counsel</u>: "They stopped off at his mother's house and at that point that's when Mr. Smith got out of the car, and he stayed at his mother's house and that's on Pierson Street about three and a half miles away from the scene. And that's where Mr. Smith was for the rest of that night."(T.T. 4/4/00,pg.182)

Throughout trial, my public defense counsel opposed prosecution's case with a lack of presence, alibi defense. The trial Court read Criminal Jury Instruction CJI2d 7.4 "Lack of Presence, Alibi Witness," and instructed the jury according to the following:

> Trial Judge: "Now the defendant has interposed what is called a lack of presence, or alibi in this matter. He said that he wasn't present at the time of the death of Mr. Darryl Towns." (T.T.4/6/00,pg.52)

During trial I testified to the fact that I was at home with affiant LaToya Smith during the time this crime was committed. The record is as follows:

> Prosecution: You maintain you went home, right?
> Me: That's right.
> Prosecution: And who was home?
> Me: LaToya, which is my niece.
> Prosecution: How old is LaToya?
> Me: About 14,15.
> Prosecution: Where is LaToya?
> My Public Defense Counsel: Judge, objection to that, that calls for 'speculation.' (T.T. 4/5/00,pg.175-76)

The trial Court knew for certain that my public defense counsel and I did not "abandon my alibi defense," and the record supports this truth. The trial Court also knew with great certainty that I had an alibi witness that my public defense counsel 'simply did not present.' In fact the record shows that the trial Court blamed me for my public defense counsel's ineffectiveness.

## STRONGLY EMPHASIZED FACTUAL BASIS

> Me: The witnesses that he (public defense counsel) subpoened (Larry Austin, Damus Taylor) was not the main witnesses that would verify what I was doing, the witness that he had knew that I was home.
> Trial Court: Who did you want?
> Me: Yes my sister and my cousin.
> Trial Court: Why didn't you just call them?
> Me: My sister -- (My sister is my niece guardian, see affidavit)
> Trial Court: Why didn't you tell your mother to bring them?
> Me: You can ask Mr. Steve Taratuta. (my public defense counsel)

13

Trial Court: Sir, why didn't you just say, your mother testified in this matter in reference to your sister, or your brother in reference, why didn't you just say mama bring sister?
Me: I did, your honor.
Trial Court: Your mother wouldn't bring your sister?
Me: I did not tell my mother I told Mr. Steve Taratuta.
Trial Court: Why didn't you tell other than Mr. Taratuta.
Me: I did not talk to my mother, when I called her this evening she was not home.
Trial Court: This matter has been pending since October of last year.
Me: I thought that I was under the impression that my witnesses was going to get up on the stand the thursday not wednesday because everything --
Trial Court: Sir, let me tell you something. We told you, I told you, and I know the record will reflect, we said that everybody get your witnesses here on the date the trial start. Now everyone, every witness we have a trial we have witnesses here on this trial every witness cannot be called at the same time we can only call one at a time, but you are responsible for having them here, sir.
   And if you tell me your sister -- you wanted your sister here your mother was here she was here everybody, she's here now sitting back there. And your brother was here and you could tell me if you wanted your sister here.
Me: No that's why I passed the note to Steve Taratuta and he can verify and I was going to have him call all of my witnesses because I had character witnesses. (Sen.T. 5/4/00,pg.13-14)


STRONGLY EMPHASIZED


   The record undeniably proves that my public defense counsel simply did not investigate and present my alibi witness. My public defense counsel never denied the fact that he just did not present my alibi witness, and he had numerous opportunities to refute what I was saying if it was not true. The trial Court knew that he did not present my alibi witness, and justified his 'deficient performance' by blaming me for not presenting my own witnesses.

   Based solely on the record, it is 'irrefutable evidence' that my public defense counsel did not investigate and present

14

an available alibi witness which constitutes a serious 'deficient performance' on behalf of my public defense counsel that deprived me of a fair trial according to <u>Strickland v. Washington</u>, supra..

All of the following United States Supreme Court holdings are the standards that proves my case to be a denial of my 6th and 14th amendment rights, inwhich the state court's decision bases its 'unreasonable determination' of the facts on.

In <u>Strickland v. Washington</u>, supra., the United States Supreme Court holds that:

>"The constitution guarantees a fair trial through the due process clause, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause:"

>"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and District wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

>"In representing a criminal defendant, counsel <u>owes</u> the client a duty of loyalty, a duty to avoid conflicts of interest, a duty to advocate the defendant's cause, a duty to consult with the defendant on important decisions, a duty to keep defendant informed of important developments in the course of the prosecution, and a duty to bring to bear such skills and knowledge as will render the trial a reliable adversarial testing process."

>"That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to insure that the trial is fair."

>"A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."

In *United States* v. *Cronic*, 466 US 648; 80 LEd2d 657; 104 Sct. 2039 (1984), the United States Supreme Court holds that:

> "If counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."

> "Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."

> "If no actual 'assistance' for the accused 'defence' is provided, then the constitutional guarantee has been violated. To hold otherwise, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the constitution's requirement that an accused be given the assistance of counsel."

> "The Sixth amendment, however, guarantees more than the appointment of competent counsel. By its terms, one has a right to Assistance of counsel (for) his defence.' Assistance begins with the appointment of counsel, it does not end there."

In *Bradshaw* v. *Richey*, 546 US 74; 126 Sct. 602; 163 LEd2d 407; 2007 US App. LEXIS 18983 (2007), the Court determined that the state court unreasonably applied *Strickland* v. *Washington* in holding that *Richey* had not been deprived of constitutionally effective representation, and concluded that:

> "A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocents, or that raises sufficient confidence in the verdict, renders deficient performance."

## MY PUBLIC DEFENSE COUNSEL'S
## INEFFECTIVENESS "NOT" TRIAL STRATEGY

In my case, the 'only' defense that was presented and the 'only' plausible defense for my involvement in this crime was 'lack of presence, alibi witness defense.' The fact that my

public defense counsel did <u>not</u> investigate and present my alibi witness at trial can <u>not</u> be considered "trial strategy" according to the United States Supreme Court's holdings in <u>Strickland</u> <u>v.</u> <u>Washington</u>' supra..

In <u>Strickland</u> <u>v.</u> <u>Washington</u>, 80 LEd2d 674, the United States Supreme Court holds that:

> "If there is only one plausible line of defense, the court concluded, counsel <u>must</u> conduct a "reasonably substantial investigation" into that line of defense, since there can be no strategic choice that renders such an investigation unnecessary." Id., at 689.

The record proves that my public defense counsel's failure to investigate prohibits the assertion of "trial strategy" to my public defense counsel's choice of actions in my case. My public defense counsel could have given the trial court a reason for his failure to investigate and present my alibi witness at any time during my complaint to the Judge if I was lying on him. My public defense counsel knew that he intentionally sabotaged my only defense, that is why he remained silent and unquestioned by the trial court.

In <u>Strickland</u> <u>v.</u> <u>Washington</u>, supra., the United States Supreme Court also holds that:

> "The Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance <u>must</u> be based on professional decisions and informed legal choices can be made only after investigation of options." Id., at 688.

> "The same duty exist if counsel relies at trial on only one line of defense, although others are available. Id., at 689.

In <u>Strickland v. Washington</u>, 80 LEd2d 674, the United States Supreme Court holds that:

> "In adjudicating a claim of actual ineffectiveness of criminal defense counsel, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged and on whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."

In my case, there was a complete breakdown in the adversarial process that makes the result of my trial 'completely unreliable.'

1) On October 29, 1999, at the arraignment before my trial Judge Warfield Moore Jr.. I expressed my dissatisfaction with my public defense counsel, and my aggravation with him <u>not</u> coming to visit me. I also expressed my desire to replace my public defense counsel, but my trial Judge convinced me that he was a very fine lawyer. Then my trial Judge instructed my public defense counsel to come and visit me or he will be forced to fire him.

2) On April 3, 2000, two days before my trial. I raised my hand in court to readdress the seriousness of my attorney/client breakdown, and to inform the court that my trial counsel has failed to adequately meet with me for trial preparations. The trial Court gave me permission to speak, and the following exchange took place:

> <u>Me</u>: Yes, sir, there is something I have to say I would like to dismiss my lawyer for the simple fact of --
> <u>Trial Court</u>: You're <u>not</u> going to do that either. Mr. Smith, you're <u>not</u> going to sit here -- you know what, you want to play an (sic) around with justice, you want to do everything all the way

up to this time because you want to do it.

Me: That's not true.

Trial Court: No, sir. You're not going to dismiss your lawyer. Mr. Taratuta is a fine lawyer he's well able to represent you. Go on tell me why do you want that?

Me: Because, first of all, he didn't come and see me about nothing and about nothing about this case. And he's going on assumptions of my family, and I feel as though that I'm misrepresented by Mr. Taratuta. Therefore I feel as though that I cannot have the fair trial that I am suppose(d) to have due to the fact of his assumptions.

Trial Court: What is it you think Mr. Taratuta didn't do for you that he should have done?

Me: There's a number of things.

Trial Court: Well just tell me one.

Me: Mr. Taratuta did not hear any of the questions that I had to raise about my case ... Reading my transcripts and going over it and coming to --

Trial Court: What transcripts, you haven't testified to anything?

Me: No, I'm talking about my discovery packet they gave me.

Trial Court: What about it, sir, that you think he hasn't gone over?

Me: He haven't listened to none of my reasons.(sic)

Trial Court: Reasons for what sir, shooting and killing somebody?

Me: I thought a lawyer and a --

Trial Court: You have this nebulous reasoning, what are you talking about, what is he suppose(d) to do that he hasn't done, sir? (T. 4/3/00,pgs.35-37)

The trial Court thereafter asked me, "Now, anything else you want to say?" I responded, "I really feel as though" -- The trial court then interrupted me to state:"

Trial Court: "Well you can feel that all you wish, sir, but there is nothing I see on this record that would indicate Mr. Taratuta is less than adequate to represent you. Because the Towns folks have a right to get this case over with. And we have 52 jurors coming back in an hour --

Me: Mr. Taratuta haven't even came to see me about this case, I'm just now getting my --

Trial Court: Sir, sit down and be quiet, sir, you've added, no we're not going to dismiss him. Thank you, very much, Mr. Smith, have a seat.

Mr. Taratuta: Your Honor, based on his statement

19

and his unhappiness with my representation I feel
I have to make the 'Motion to Withdraw.' (T.
4/3/00,pgs.38-39).

At that moment when the trial Court refused to allow my
public defense counsel to withdraw, the trial Court destroyed
my attorney/client relationship and formulated an alliance between
prosecution and my public defense counsel. A brief inquiry in
'open court' is <u>not</u> the proper forum for my public defense counsel
and I to discuss the depths of his ineffectiveness or to break
the secrecy of attorney/client privilege.

The trial Court 'forced' my public defense counsel to inflict
the magnitude of his 'incompetence' upon me throughout my entire
court proceedings.

1) During <u>voir dire</u>, my public defense counsel
'incompetently' informed my jury about an article that was
published in 'The Detroit News Papers' that was seriously bias
toward the fairness of my case. This 'factoidal article' was
published to pervert justice by establishing an inclination of
guilt toward me to its readers. The propaganda within this
article had erroneously convicted me before trial by attaching
my full name to a murder that I did <u>not</u> commit.

No ally of mine or my defense would have introduced my jury
to an article that was underhandedly created to spread falsehood
to the masses to gain my conviction. My public defense counsel
intentionally sabotaged my case. After my public defense counsel
told my jury where they can find this prejudice article, there
was nothing done to prevent my jury from reading this article.

This article was printed on the front two pages of the Sport
Section on Christmas Eve, and took up the entire front page.

## FACTUAL BASIS

<u>My public defense counsel</u>: I want to talk to you
a little bit about some pretrial publicity. Now
this case was in the newspaper at one time, how
many people read the Free-Press or the News.

> (Whereupon <u>some members of the jury panel raised their hand.</u>)
> <u>Public defense counsel:</u> Does anyone get it home delivered, to their office?
> (Whereupon <u>a juror No. 6 raised her hand.</u>)
> <u>Public defense counsel:</u> So you read it on a regular basis?
> <u>Juror No. 6: Pretty Much.</u>
> <u>Public defense counsel:</u> Do you remember, anyone here remember reading an article in the paper on Christmas Eve of last year. (T. 4/4/00,pg.89-90).

The trial Court, prosecution, and my public defense counsel continued to discuss in detail the content of this bias article. Which strongly proves that the adversarial process that our system counts on to produce 'just results' was "destroyed" in my case.

> 2) "The trial Court 'forced' me to go through a murder trial with an 'adverse and incompetent' public defense counsel." (T. 4/3/00,pg.39).

> 3) "My public defense counsel failed to elicit that the co-defendants in my case benefited through testifying for prosecution to avoid life sentences." (T. 4/5/00,pgs.52,58-59,121,141; 4/6/00,pgs.28,30).

> 4) "My public defense counsel failed to 'object' to erroneous instructions where the trial court plainly and prejudicially erred in instructing the jury that my co-defendants were merely 'Disputed Accomplices" rather than giving the standard "Accomplice Testimony Instruction." (T. 4/6/00,pgs.3-6,54-57)

> 5) "And, my public defense counsel also failed to 'object' to the trial Court giving a sub-standard reasonable doubt instruction." (T. 4/6/00,pg.40)

> 6) "My public defense counsel failed to 'object' to the misconduct of the prosecutor, where the prosecutor made a argumentative and prejudicial opening statement." (T. 4/4/00,pgs.179-80,175-76).

> 7) "My public defense counsel failed to 'object' to prosecution improperly vouching for my guilt, by telling the jury "I was lying." (T. 4/6/00,pg.14).

> 8) "My public defense counsel failed to 'object' to the prosecution improperly appealing to my jury's sympathy, and prosecution's prejudicially and

disparaging remarks." (T. 4/6/00,pgs.20,32-33).

## PREJUDICE REQUIREMENT CONTINUES

In <u>Strickland</u> <u>v.</u> <u>Washington</u>, supra., the United States Supreme Court holds that:

> "A convicted defendant's claim that his counsel's assistance was so defective as to require reversal of a conviction has two components, each of which the defendant must show in order to set aside the conviction:"
>
> 1) "That counsel's performance was deficient, which requires a showing that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."
>
> 2) "That the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

## STRONGLY EMPHASIZED

In order to prevent "redundancy" within my petition and my actual innocents claim. Both of the <u>Strickland</u> components that warrants setting aside my conviction for the denial of my constitutional rights are 'substantively satisfied' throughout my actual innocents claim. The <u>Schlup</u> <u>v.</u> <u>Delo</u> requirements for establishing a valid claim of 'actual innocence' is identical to the requirements in <u>Strickland</u>.

## AUTHORIZING RELIEF

AEDPA's section 2254(a) states that:

> (a) "The Supreme Court, a Justice thereof, a circuit Judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody 'in violation of the Constitution or

laws or treaties of the United States.'"

I am in custody in violation of our constitution and the United States Supreme Court's laws, where my public defense counsel failed to investigate and present my available alibi witness denying me a fair trial and "I am actually innocent."

Section 2254(d) does <u>not</u> bar this Court from <u>Granting</u> habeas corpus relief in my case. This Court <u>can</u> <u>Grant</u> me relief under section 2254(d)(2), where the state court failed to make a factual determination based upon the entire record, and the factual determination that the state court did make is, 'misconstrued,' 'completely incorrect,' and 'it is an "unreasonable determination" of the facts presented in the state court proceedings.'

In <u>Hilton</u> <u>v.</u> <u>Braunskill</u>, 481 US 770, 775 (1987), the United States Supreme Court holds:

> "Federal habeas corpus practice, as reflected by the decisions of this Court, indicates that a court has broad discretion in conditioning a judgment granting habeas relief. Federal courts are authorized, under 28 U.S.C. S. 2243, to dispose of habeas corpus matters "as law and justice requires.""

### RELIEF PRAYING FOR

WHEREFORE, I humbly pray that this Honorable Court <u>Grant</u> me a "Conditional Release" giving the state court "30 days" to retry me or release me.

I declare under the penalty of perjury that all of the facts and information throughout my 'petition' and my 'actual innocents' claim is true and correct, and my signature validates this truth.

*Damon L. Smith*  8/26/09

DAMON L. SMITH    ç311644
In Pro Se
Kinross Corr. Facility
16770  Watertower Dr.
Kincheloe, MI   49788

# APPENDICES
# <u>AFFIDAVITS</u>

## <u>CONTENTS</u>

Six Affidavits
Letter from Patrick Roberts

28 U.S.C B 1746 UnSworn
DECLARATION/AFFIDAVIT

I, Patricia Y. Roberts, declarant, swear to before *La Vonne M. Dennis* (Notary Public) authorized to administer oaths, that the following is the truth under the penalty of perjury.

I, Patricia Y. Roberts now comes before this Honorable Court in compliance with 28 U.S.C. B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement oath, or affidavit, in writing of the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

*Patricia Y. Roberts* Dated 7-14-08

LAVONNE MARIE DENNIS 7/14/08
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

1) That I, Patricia Y. Roberts am the mother of Patrick Roberts and Damon Smith.

2) That on September 10, 1999 George Roberts and I, took Patrick Roberts down to the police station for questioning regarding the death of Darryl Towns.

3) That Patrick Roberts initial statement to Detective Barber Simon did not implicate Damon Smith as the shooter of Darryl Towns.

4) That 'Only' when Detective Simon began to narrate her theory to George, Patrick, and I, did Damon become the shooter and main suspect.

5) That Detective Simon manipulated me into believing her theory of Damon being the shooter which made me instantly cry and highly emotional, inturn, made me pressure Patrick into corroborating with Detective Simon's theory rather than what he knew to be the truth.

6) That my motherly intuition knew that Damon did not commit the crime he is convicted of, but outside entities led me away from the truth.

7) That the underhanded technique regarding Detective Simon writing and then reading to me her description of the crime, and using her authoritive influence to legally secure a half right/half wrong statement with my signature, facilitated the wrongful conviction of Damon Smith.

8) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere or influence the creation of this Affidavit.

28 U.S.C B 1746 UnSworn
DECLARATION/ AFFIDAVIT

**LAVONNE MARIE DENNIS** 2/22/
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

I, George E Roberts, declarant, Swear to before
(Notary Public) to administer oaths, that the following is the truth under the penalty of
perjury.

I George E Roberts, now come before this Honorable Court in compliance with U.S.C.
B 1746 UnSworn Declaration penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or
requirement made pursuant to law, any matter is required or permitted to be supported,
evidenced, established, or proved by the sworn declaration, verification, certification,
statement, oath, or affidavit, in writing of the same (other than deposition, or an oath of
office, or an oath required to be taken before a specified official other than a notary
public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced,
established, or proved by the unsworn declaration, certification, verification, or
statement, in writing of such person which is subscribed by him, as true under penalty of
perjury and dated."*

I declare under the penalty of perjury that the foregoing is true and correct.

George E. Roberts Dated 2/22/09

1.) That I George E Roberts am the father of Patrick Roberts.

2.) That on September 10 1999 Patricia Roberts and I tool Patrick Roberts to the
police station for questioning concerning the death of Darryl Towns.

3.) That Patrick's initial statement spoken to Detective Barber Simon did not
implicate Damon Smith as the shooter in the crime Damon is convicted of.

4.) That 'Only' when Detective Simon began to narrate to Patricia, Patrick and I
her theory of the crime, is when Damon become the shooter of Mr. Towns.

5.) That Detective Simon convinced me to believe her theory that Damon was the
shooter against my better judgment, and because I had no knowledge of what actually
happened during the course of this crime.

6.) That the underhanded technique that Detective Simon utilized by writing and
then reading to me her description of the crime, and the way that she used her

authoritative influence to lock me into a half right/half wrong statement with my signature, facilitated the wrongful conviction of Damon Smith.

I, Kimberly Smith, declarant, swear to before *La Vonne M. L Dennis* (Notary Public) authorized to administer oaths, that the following is the truth under the penalty of perjury.

I, Kimberly Smith now comes before this Honorable Court in compliance with 28 U.S.C. B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement oath, or affidavit, in writing of the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

*Kimberly R. Smith* _____ Dated 7-14-08

**LAVONNE MARIE DENNIS**   7/14/08
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

1) That I, Kimberly Smith am the mother of Latoya Smith and the sister of Damon Smith.

2) That in the year 2000 Latoya Smith was 15 years old, which legally made her under age to take the stand as a alibi witness for Damon Smith without my permission.

3) That I gave Damon's trial attorney Stephen Taratuta permission to have Latoya Smith take the stand on Damon's behalf at his trial, but Latoya was never called to testify by Mr. Taratuta.

4) That I told Damon's trial attorney Mr. Taratuta that Latoya confided in me and was adamantly certain that Damon was home beside her during the time the crime he is convicted of occurred.

5) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere with or influence the creation of this Affidavit.

<center>28 U.S.C B 1746 UnSworn</center>
<center>DECLARATION/AFFIDAVIT</center>

I, Latoya Smith, declarant, swear to before *La Vonne M. L Dennis*
(Notary Public) authorized to administer oaths, that the following is the truth under the
penalty of perjury.

I, Latoya Smith now comes before this Honorable Court in compliance with 28
U.S.C. B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement oath, or affidavit, in writing of the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

_Latoya Smith_ ____ Dated _7/14/08_

7/14/08

**LAVONNE MARIE DENNIS**
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

1) That during the year 1999, I resided at the residence of 15716 Pierson Rd. (My Grandmother's House) in the City of Detroit.

2) That on the day and evening of September 9, 1999 I was at home, (Grandmother's House), at 15716 Pierson Rd. with my uncle Damon Smith at 9:00 p.m. until I retired to bed (after 11:00 p.m.).

3) My uncle Damon and I was watching television together on the evening of September 9, 1999.

4) That I recall this evening very clear because we was watching the MTV Music Awards and they came on at 9:00 p.m.

5) That I have tried to express this information to Damon Smith's trial lawyer, but he refused to interview me.

6) That I wanted to testify to all of the above at the trial of Damon Smith, but was prevented from doing so by his trial lawyer, Stephen Taratuta.

7) That I am willing to testify to all of the above statements as they are the truth, whenever I am called upon to do so.

8) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere with or influence the creation of this Affidavit.

**LAVONNE MARIE DENNIS**
Notary Public - Michigan
Wayne County
Commission Expires April 22, 2011

I, Domonique Moore, declarant, Swear to before _La Vonne M. Dennis_ 2/22/09 (Notary Public) to administer oaths, that the following is the truth under the penalty of perjury.

I, Domonique Moore, now come before this Honorable Court in compliance with 28 U.S.C. B 1746 UnSworn Declaration under penalty perjury, where:

*"Under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certification, statement, oath, or affidavit, in writing of the same (other than deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with 'Life Force' and 'Effect,' be supported, evidenced, established, or proved by the unsworn declaration, certification, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under the penalty of perjury that the foregoing is true and correct.

_(signature)_ ———— Dated  2-22-09

1.) That during the entire year of 1999 Damon and I shared a very rapturous and intimate relationship together.

2.) That on September 9, 1999, Damon and I had made plans earlier that day to go out to dinner, then to see a movie, and over to my house.

3.) That on the evening of September 9, 1999, I talked to Damon at home and explained that I could not make our date for personal reasons; so we agreed to get together tomorrow.

4.) That on September 10, 1999 I went to visit Damon at the Beauty Salon where he worked, and he was cutting hair as usual.

5.) That I was ready and willing to testify to all of these previously stated truths at Damon's trial, but I was never called to testify by his lawyer.

DAMON

What's up? I pray that you doing alright in there. Me my self I am just happy that you for gave me for what I have done to you. I didn't mean to being you in to this but I know you was going to be brought in this situation one way or the other. but I didn't think that you would get in it this deep, but only reason I said that was cause John-rthen told me that if I tell the truth that some thing was going to happen to our family so I get real scared. Artece was asking me who did it and I was telling him the truth. but he keep on saying that he me you did it so stop lying them Kim & Lelonya came over and was asking what happen. and Artece told them I was lying, then I though about what them two guys said they was going to do if I told on them. So I closed my eyes and start talking, mostly partly every thing I said was true but I put you in it I am sorry I did that to you. I was just thinking about our family!

I don't think you know what really happen, after we lop dropped you off John, Lynell and me, were riding round for a few minute and John saw two guys hat he knew so John pulled over and talk to hem and told them what happen and they got in he car and said lets go over their, they were haking up a plan to get back at old boy so we

when pass his house to see who was all there, John said that his crazy cousin was there and he might got a gun, the two well one of them was like so what we do to, it was just really one of them talking he most but they told John to park in front of this house that was around the block from old boy so we all get out the car, it was a bat on the floor of the back set and Lynell told me to give it to him. John an Lynell went up to old boy house first, I was on the other side of the street with the to guys one of them put on a mask and when I seen John and & old boy fighting I run across the street and hit old boy he fell against the house next to his house & I look back & seen one of John friends pointing a gun at old boy cousin so me, John Lynell was over old boy and I don't know what happen because it happen so fast but old boy cousin run in the house and he come back out side quick but right before he came out side John friend said that he was going to get his gun, right when he said gun I was out the house so I start runing and I herd un shoots so I start runing faster to the car car, Lynell ran home I went and got in the car with John and his two friends, when they was taking me home one of the guys said that if I say any thing they going to kill me and others. When I came in the house you was asking me what happen but I

didn't want to talk, that's why...
Well I'am doing all right ance I'm about
to go.

One Love
Pete Ditty

4488/6
YpSith, Mi
1342 West Marin Street
Michigan reformatory
MR. Damon Smith # 311644

5-137

DETROIT MI 482
PM
29 MAY
2001

33 USA
USA 34

sur

PATRICK Roberts
P.O. Box 349
Whitmore Lake Mi
48184




28 U.S.C. B 1746 UnSworn
DECLARATION/AFFIDAVIT

I Patrick J. Roberts, declaring, swear to before Ameenah Taylor (Notary Public) to administer oaths that the following is the truth under the penalty of perjury.

I Patrick J. Roberts now come before this Honorable Court in compliance with 28 U.S.C.B 1746 UnSworn Declaration under penalty of perjury, where:

*"Under any law of the United States or under any rule, regulation, order or requirement made pursuant to law any matter is required or permitted to be supported evidenced, established , or proved by the sworn declaration, verification, certification, statement oath or affidavit, in writing of the same ( other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public ), such matter may with 'Life force' and 'Effect' be supported, evidenced, established, or proved by the unSworn declaration, certification, verification, or statement in writing of such person which is subscribed by him, as true under penalty of perjury and dated."*

I declare under penalty of perjury that the forgoing is true and correct.

Patrick Roberts _____ Dated 8-20-09

Ameenah Taylor
AMEENAH TAYLOR
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jul 21, 2010
ACTING IN COUNTY OF Wayne

1) That I, Patrick J Roberts am an accomplice in the crime that took place on fielding street in the city of Detroit on September 9, 1999

2) That on September 9, 1999, Damon Smith did not shoot or in any other way cause the death of Darryl Towns.

3) That on September 9, 1999, Damon Smith was not involved with the tragic altercation of Darryl towns that took place on Fielding St. in the City of Detroit

4) That on September 9, 1999, Jonathan Nettles, Lynell Drake , and I dropped Damon Smith off at 15716 Pierson (Mother's House) in which he stayed, then Nettles, Drake, two of Nettles friends, and I went on fielding to confront Darryl Towns for beating-up Jonathan Nettles earlier that day, and witnessed the crime that Damon Smith is wrongfully convicted of.

5) That I was coached into corroborating against Damon Smith, and my life was threatened because Jonathan Nettles had to have revenge against Darryl Towns.

6) That Jonathan Nettles, Lynell Drake, and I conspired to accuse Damon Smith of this crime for the convenience and the avoidance of going back to jail.

7) That I am positively certain that Damon Smith did <u>not</u> perpetrate the death of Darryl towns, because he was not at the crime scene with us, and the 32. Automatic weapon that was identified and said that Damon Smith used to commit this crime was never out of the trunk of Jonathan Nettles car.

8) That Jonathan Nettles is the real cause for the death of Darryl Towns.

9) That this Affidavit was created in the interest of Justice, and in no way did Damon Smith interfere with or influence the creation of this Affidavit.

# APPENDICES
## MOTION AND STATEMENTS

| DEFENDANT'S NAME | ADDRESS WITH ZIP CODE | AGE | SEX | RACE | D.O.B. | IDENT. NO. |
|---|---|---|---|---|---|---|
| 1. DAMON LAMAR SMITH   15716 PIERSON | | 24 | M | BLK | 8-30-75 | |
| 2. JONATHAN NETTLES   9626 FIELDING | | 16 | M | BLK | 07-04-83 | NEW |
| 3. LYNELL DRAKE   9414 BRAILE | | 16 | M | BLK | 05-12-83 | NEW |
| 4. PATRICK J. ROBERTS   15716 PIERSON | | 15 | M | BLK | 07-08-84 | NEW |

(TO BE FILLED IN BY PROSECUTOR)

99-0785

| DATE OF OFFENSE | PLACE OF OFFENSE | | DATE OF COMPLAINT | COURT FILE NUMBER | JACKET NUMBER |
|---|---|---|---|---|---|
| 9-9-99 | F/O 9559 FIELDING | | 9-9-99 | | 99-316 |

| ...ANT'S NAME | ADDRESS WITH ZIP CODE | SEX | AGE | D.O.B. | RACE | RELATION TO DEF. |
|---|---|---|---|---|---|---|
| L. TOWNS   9559 FIELDING | | M | 15 | 10-7-83 | blk | ACQUAINTED |

...DING CHARGES △ #1 MURDER FIRST DEGREE - PREMEDITATED; Felony Firearm   COMPLAINANTS'S PHONE 836-7778
△ #2,3# OPEN MURDER

COMPLAINANT'S PHONE 836-7778

...) SIGN ...ATION & BELIEF

ASSISTANT PROSECUTING ATTORNEY   *Kenneth J King* P5-4983

...ption of Offense and Investigation; include Date, Time and Circumstance of Arrest and Medical Attention administered to
...ers, Defendants and Complainants. Continue on Page 2 if necessary.

...MARY:

On September 9 1999 at approximately 9:40PM, Scout 06-81 manned by P.O.'S
...rence Sims and Micheal Cook responded to 9559 Fielding concerning " A SHOOTING."
... their arrive at the scene they observed COMPL. TOWNS laying on the ground
...fering from a gun shot to the stomach. COMPL. TOWNS was conveyed to an area
...pital were he was listed at DOA. Later, the body of COMPL. TOWNS was conveyed
...the Wayne County Medical Examiner's Office Morgue File # 99-8422.

...NESS:

...A REPRESENTATIVE OF THE WAYNE COUNTY MEDICAL EXAMINE'S OFFICE, will testify
...t an autopsy was performed on the body of COMPL. TOWNS and the cause of death
... a result of multiple gunshot wounds. Morgue File # 99-8522.
...NNETTE TOWNS, will testify to indentified the body of COMPL. TOWNS and that
...PL. TOWNS was her son. Morgue File # 99-8422.
...RONALD STEWART, will testify that he saw DEF.'S NETTLES & DRAKE on COMPL.'S
...NS front porch and that both defs. were banging on COMPL. TOWNS door messing
... him. Mr. Stewart will also testify that COMPL. TOWNS came out side and that
...was telling DEF. NETTLES AND DRAKE to leave his house to go home. Both defs.
...use to leave and thats when COMPL. TOWNS AND DEF. NETTLES got to fighting and
... he along with Brandon Robinson broke up the fight. and as DEF. NETTLES was
...ving DEF. NETTLES told COMPL. TOWNS " TO WATCH IS BACK", Mr. Stewart will also

(SIGNATURE OF INVESTIGATING OFFICER)
...T. BARBARA SIMON ( HOMICIDE SECTION )

REVIEWED AND APPROVED BY
(SIGNATURE OF COMMANDING OFFICER)   DISTRICT OR BUREAU
INSP. WILLIAM RICE (HOMICIDE)

(ewriter)

only    DAMON SMITH ET AL                    Offense No.

plaint: 09--09-99                            SEP 14 1999

## DETAILS OF INVESTIGATION (Continued)

stify that later he saw DEF'S NETTLES & DRAKE along with 3 or 4 other
ys pull up and drive around the corner from COMPL. TOWNS house, Mr. Stewart
en stated he saw three guys run up the drive way and that he and Mr. Robinson
arted down to COMPL. TOWNS house when he heard three ( 3 ) gun shots and
at he saw three guys run out of the drive way and that he saw DEF. DRAKE
lso run out of the drive way and ran to his house. and that when he hear someone
ell that COMPL. TOWNS had been shot.

  BRANDON ROBINSON, will testify that he saw DEF'S NETTLES AND DRAKE sitting
COMPL.TOWNS front porch and that a few minutes later COMPL. TOWNS and DEF.
ETTLES got into a fight and that he broke up the fight and that DEFS. NETTLES
d DRAKE left and a little while later Mr. Stewart told him that he seen DEF.
ETTLES and DRAKE along with some more guys. Mr. Robinson will also tesify
at he startted down the street when he heard gun shots and the shots sound
ike they were coming from COMPL. TOWNS house and that went he got to COMPL.
WNS house some one told him that COMPL. TOWNS had been shot and that he observed
MPL. TOWNS lying on the floor suffering from a gun shot wounds.

ETHA BOATWRIGHT, will testify that she was sitting on her front porch when
e saw two young men walking down the street and that one of the young men
a base ball bat, and then she notice three more young men come up the street
d that they all went over to where COMPL. TOWNS was and that jumped on COMPL.
WNS and that she saw one of the young men pull out a gun and that she ran
the house to call the police and that's when she hear gun shots..

SEPH MARSHALL, will testify he was sitting on his Aunt Ms Boatwright porch
en three guys walked up to where COMPL. TOWNS was standing in the drive way
d that one of the guys had a baseball bat and the guy with the bat threaten
hit COMPL. TOWNS in the head and that's when the three guys jumped on COMPL.
WNS. Mr. Marshall will also testify that he went over and broke up the fight
d that when two more guys came from across the street and that the older
y pulled out a gun and pointed the gun at him and told him to stay out of
. Mr. Marshall will also testify that when the older guy walked up to where
MPL. TOWNS was laying on the ground and shot him.

ARTEECE THOMAS, will testify that DEF. SMITH came over to his house on 9-9-99
d ask him for his gun. Mr. Thomas will also testify that he gave DEF. SMITH
is gun a 32 AUTO. and that he asked DEF. SMITH why he wanted the gun and that
EF. SMITH told him that DEF. NETTLES had a fight with a guy and that he was
ping to go to the gys house and see why he jumped on DEF. NETTLES.

& 8. P.O.'S TERRANCE SIMS BADGE # 3711 & MICHAEL COOK BADGE # 3759 OF THE
TH PCT. will testify to responding to the scene to observing COMPL. TOWNS
ying lying on the ground suffering a gun shot wound to the stomach. That they
reserved the scene and made a report of their actions.

& 10. P.O.'S DANIEL DONOKOWSKI BADGE # 4582 AND BRANDON ROBINSON BADGE #
523 OF THE 6TH. PCT. will testify to responding to the scene to observing
MPL. TOWNS lying on the ground suffering from a gun shot wound and to detaining
F. NETTLES. And that they preserved the scene and made a report of their
ions.

, 12, & 13, P.O.'S PHILLIP COOK BADGE # 2004 DANIEL L. LINARES BADGE # 3780
ND DONALD PEDERSEN BADGE # 3680 OF THE 6TH. PCT. will testify to going to

RTMENT
OLICE

(pewriter)

#r only___ DAMON SMITH ET AL ___                    Offense No. _____

SEP 14 1999

omplaint:   9-9-99

## DETAILS OF INVESTIGATION *(Continued)*

T:

, DRAKE HOME TO DSATAINING DEF. DRAKE to conveying him to Homicide. And
making a report of their actions.
& 15.  LT. BILLY JACKSON & INV. JAMES FISHER OF THE HOMICIDE SECTION, will
tify to detaing DEF. ROBERTS and to making a report of their actions.
& 17, P.O.'S FRANK HORAN & EUGENE FITZHUGH OF THE EVIDENCE TECH. will testify
responding to the scene where they performed their dties as evidence technician
made a report of their actions.
SGT. THOMAS SMOOTH OF THE HOMICIDE SECTION WILL TESTIFY TO ADVISING DEF
TLES AND DRAKE of their Constitutional Rights and to taking a statement
m both DEFS.
INV. BARBARA SIMON  OF THE HOMICIDE SECTION will testify to being the
icer in charge of the case and to advising DEF. ROBERTS of his Constitutional
hts and to taking a statement from DEF. ROBERTS who stated that DEF. NETTLES
nf with DEF. DRAKE picked him and his brother DEF. SMITH up and that they
p by MR. THOMAS house and got a gun and that they talked about shooting
PL. TOWNS.

, PS/LINEUPS:  NONE.

TEMENTS/CONFESSIONS:   SEE DEFS. STATEMENTS?

DENCE:  SEE EVIDENCE LIST.

| DEPARTMENT | | | | FILE/CASE NO. | | |
|---|---|---|---|---|---|---|
| ICE | | | COMPLAINANT Darryl Downs | | | |
| ICT/SECTION | TIME 1:30A | PLACE HOMICIDE | | STATEMENT TAKEN BY SERGT C. FREDERICK | | |
| ...SEPH MARSHALL | | RACE/SEX/AGE B M 27 | D.O.B. 3-8-72 | HGT. 5-10 | WGT. 270 | |
| ...NO. | RESIDENCE | | | | PHONE BUS RES | |
| ...ER ...ONE | | DEPARTMENT | | BADGE NO. | SHIFT | |
| ...G WITH: THERESDA MARSHALL | | CHILDREN/SCHOOL: | | | | |
| ...VES/FRIENDS: | | ADDRESS | | | PHONE | |

...stopped by my aunts house to visit, I was
with Odie Boatwright. We were sitting on the
front porch & my cousin was standing in
the drive next to the porch. 3 young men
walked up from the direction of Chicago. They
came up the drive & one of them had a aluminum
baseball bat. he said he was going to hit my
cousin Darryl in the head with the bat. The
three boys jumped on my cousin & they were
hitting him with their fists. My cousin
was fighting back. I got off the porch
& stepped between them. Then one of the
boys, the one with the blue shorts raised his
arms over his head like he was giving a
signal. After he raised his hands two
guys came across the street. One of the guys
the older one had a automatic & he pointed
it at me & told me to stay out of it. Then
he walked up to where my cousin was
laying in the driveway & fired three
shots at him & I took off running. two
of the guys went up Fielding towards
longtown. the others ran but I didn't see
where they went.

Do you know any of the persons involved -
I know one of the boys that were fighting

X Joseph E Marshall Sr.

With my cousin his name is Nittles they call him John John. He lives a few Doors from my cousin.

Q. Can you describe the man that did the shooting

A. B/M 21-22 5.7 130-140 short Hair Brown Skin, He had a Black Aandana Blu Jean Shorts Dark colored Shirt. He had a Automatic Pistol

Q. Can you Describe the other three Boys

A. B/M 15 Gray Shirt Blue Shorts, one of the other Boys is also down here he has the Red Jordan Shoes on

Q. Did the guy that did the shooting Say anything to your cousin before he shot Him.

A. No

X Joseph E Marshall

SHOOTER HAD DARK COLOURED CLOTHES ON

Arces Bernard Thomas B/m/20

D.O.B. 3-7-79

...erstand that:

. I have a right to remain silent and that I do not have to answer any questions put to me or make any statements.

. Any statement I make or anything I say will be used against me in a Court of Law.

. I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement.

. If I cannot afford an attorney (lawyer), one will be appointed for me without cost by the Court prior to any questioning.

. I can decide at any time to exercise my rights and not answer any questions or make any statement.

...erstand that these are my rights under the Law. I have not been threatened or promised anything, and desire and agree to answer any questions put to me or to make a statement.

...e presence of:

| | |
|---|---|
| | _Arteo B Thomas_ |
| ...SS | SIGNATURE |
| | _9-10-99_  _11 7 m 20_ |
| | DATE  TIME |
| ...ESS | |

This certificate of notification was read to the suspect, and he/she had an opportunity to read it. Further, the suspect was given an opportunity to ask any questions that he/she might have concerning this certificate and his/her rights.

...suspect is illiterate. He/she has had the rights under the law, as defined above, explained to him/her, and has agreed to answer questions or make a statement.

...suspect can read and write. The rights, as defined above, have been explained to him/her, and he/she has agreed to make a voluntary statement but has refused to sign this certificate.

...ARKS: Mr. Thomas Can Read & Write. Mr.
Thomas Stated he Understood his Constitutional
Rights. Mr. Thomas Completed the 12th Grad
Cass Tech High School 1yr of College

| | | | |
|---|---|---|---|
| _10-59_  _11 21 Pm_ | | _signature_ (Homi) | |
| TIME | | OFFICER | PCT./SECTION |
| _00 Brombeo (5th fl)_ | | | |
| ...CE | | OFFICER | PCT./SECTION |

| | | |
|---|---|---|
| **CT/SECTION** Homicide Section | **COMPLAINANT** | **FILE/CASE NO.** |

**STATEMENT TAKEN BY** Inv. B. Sims

**TIME** 1/24 7pm— **PLACE** 1200 Baronbia

**RACE/SEX/AGE** B M 20 **D.O.B.** 03-07-79 **HGT.** 6'2 **WGT.** 170

Artece Thomas

06-2-864

**CHILDREN/SCHOOL:** Kendria Cox

**RELATIVES/FRIENDS:**

---

Mr. Thomas did Damon Smith Come to your house on 9-9-99 and a gun from you.

Yes

What time was it when Damon came over to your house to get gun

I'm not sure it was dark outside

What kind of gun did you give him

A 32 Auto

Did the gun belong to you.

Yes

Where did you get the gun from

---

X Artece Thomas

I Purchase the gun off the streets

How long had you had the

gun

for about Six Months

Who did you buy the gun from

Toz Juvin unk last Name

Mr. Thomas why did you give Damon

gun

Because Damon told me that the

Jonathan got into It with was

older guy and he (Damon) was going

go over there and See why the

jumped on Jonathan.

How many bullets was in the gun

Six

Did Damon bring the gun back to

you after the Shooting

No

X Artire Thomas

Q: Have you talk to Damon since
the shooting happen

A: Yes

Q: When did you talk to Damon
A: I talk to him last Night and
today (9-10-99) just before we
come down here.

Q: Where was Damon when you talk
to him
A: I think he was at work. He work
Nu-Nuz Barber Shop on Joy Rd
& Evergreen.

Q: When you talk to Damon did you
C him about your gun
A: Yes but he didn't tell me anything

*Arthur Thomas*

| PRECINCT/SECTION | | COMPLAINANT Darryl Towns | | FILE/CASE NO. |
|---|---|---|---|---|

| Date 9-10-99 | TIME 05 AM | PLACE HOMICIDE | STATEMENT TAKEN BY Sergt C Frederick | | |
|---|---|---|---|---|---|

| WITNESS ODETHA BOATWRIGHT | RACE/SEX/AGE B F 21 | D.O.B. 9-6-78 | HGT. 5-4 | WGT. 118 |
|---|---|---|---|---|

| SOC. SEC. NO. 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 | RESIDENCE 9368 Heyden | | PHONE BUS. RES. 835-5105 | |
|---|---|---|---|---|

| EMPLOYER Mega Market 9 Mi Greinfield | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH: Mother Antionette Boatwright | CHILDREN/SCHOOL: | |
|---|---|---|

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
|---|---|---|

I was sitting on the Porch with Joe. Darryl was standing in the driveway next to the Porch. Two young men were walking up Fielding from Chicago. one of them had a baseball bat. Darryl asked the boy with the bat if he was going to hit him. The boy that was with the guy who had the Bat told him to take care of his bussiness. Then three more guys came across the strett & they Jumped on Darryl. I told them not to hit Darryl with the bat. One of the guys pulled out a Handgun & I ran to the first house north of Darryls & I called the Police.

Q Did you see the man with the gun shoot Darryl
A No I heard a shot in the Drive & I ran. Then I heard another shot.

Q Do you know any of the People that were Beating Darryl
A NO

Q Did you see any of the Boys after the shooting
A Down here the little boy with the Gray Shirt & Blue Jeans told me he was one of the Boys fighting with Darryl befor the shooting

X Odetha Boatwright

C of D—72-ST (4-76)

D-10 3 (REV. 4-76)

Q Can you Describe the Person with the Gun?

A. B/M/ 5-8 Med Build Re Had it Black + Scarf w/ white letters, a navy Blue Jacket w/ A Hood + Jeans, He had something Dark over his mouth

Q Can you Describe the other People there?

A. one was 16-17 thin Build Lt Gray Sweat Shirt w/ Red Trim Lt Blue Pants. The Guy that carried the Bat was B/M 17 Red Shirt Red/W Rite shirt with Red Printing on it

Q Did Darryl Have a Weapon

A. NO.

               Odetta Boatright.

REPORT ON: FATAL "SHOOTING"

ASSIGNED TO (NAME AND BADGE NO.)

INCIDENT NO. 99-137852

COMPLAINT NO.

PLACE OF OCCURRENCE
ON / STREET #'S 9559 FIELDING

NAME AND TYPE OF BUSINESS: PRIV. RES.

TYPE OF BLDG. (APT., HOTEL - PRIV. RES. - SINGLE FAMILY, ETC.)

OCCURRED ON OR BETWEEN: MO. 9 DAY / YR. / DAY OF WK / TIME 9:30

AND: 9

REPORTED TO POLICE ON: 99 THUR 9:40

PERSON REPORTING OFFENSE
ADDRESS
PHONE

DAY □ / NIGHT □ / UNK. □ 2 / UNK □ 3

CENSUS TRACT

SCOUT CAR AREA

AGE / SEX / RACE

COMPLAINANT'S NAME: SHARK VI... UREN...
ADDRESS: 9559 FIELDING

PHONE BUS. / RES. 836-7778

AGE 15 / SEX M / RACE B

WAS COMPLAINANT WORKING? ☒ YES □ NO — OCCUPATION, BUSINESS NAME AND ADDRESS

COMPLAINANT INJURED? ☒ YES □ NO — D.O.A.

METHOD OF ENTRY: □ UNK

METHOD OF ESCAPE: ☒ UNK — ON FOOT / GREEN CONTOUR

DESCRIBE WEAPON: ☒ UNK.

NO. OF PERPETRATORS: 5 □ UNK. / DESCRIBE ☒ MALE □ FEMALE ☒ JUVENILE / □ UNK. ☒ ADULT / □ WHITE / ☒ BLACK / □ OTHER / □ UNK.

TOTAL VALUE $

VICTIM — PERPETRATOR RELATIONSHIP: □ RELATED □ ACQUAINTED ☒ STRANGERS □ UNK.

UNIT(S) NOTIFIED: HOMICIDE CONTROL

NAME: SGT J VISBARO / SGT ROLAND

TIME 1060

DATE 9-9-99

## WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER)

| ARREST(S) | DESCRIPTION(S) OF PERPETRATOR(S) | WITNESS(ES) | VEHICLE LICENSE NUMBER(S) | PHYSICAL EVIDENCE |
|---|---|---|---|---|
| ☒ YES □ NO | ☒ YES □ NO | ☒ YES □ NO | ☒ YES □ NO | □ YES ☒ NO |

"A PERP #1 (IN CUSTODY) JOHNATHAN NETTLES B/M/16 OF ▓▓▓▓▓

DRIVING A 96 CONTOUR GREEN — 99/MI KWT 35

PERP #2-5 — UNK B/M'S, WEARING DARK CLOTHES AGES 16-20

P/R — SHOOTING"

WPT MADE LOC OBSERVED COMPLT LYING ON THE GROUND ON THE SIDE OF ABV LOC. BLEEDING FROM A GUN SHOT WOUND THE LEFT SIDE OF HIS STOMACH. MEDIC 5 MADE LOC & CONVEYED GRACE COMPLT D.O.A. CHART # 860395097 DL. ADAMS, WGT T/T WITNESS ODIE BOATWRIGHT B/F DOB ▓▓▓▓▓ WHO STATED SHE WAS ON THE PORCH WHEN (5) UNK B/M'S APPROACHED COMPLT & BEGIN FIGHTING W/ COMPLT. WITNESS STATED B/M WEARING ALL BLACK A "HOOD" SHOT COMPLT TWICE.

REPORTING OFFICER (PRINT OR TYPE): TERRENCE ... / BADGE / COMMAND / FURLOUGH S/T

OTHER OFFICERS INVOLVED: MICHAEL COOK 3759 6 5/T

COMMAND / ASSIGNMENT 6-81 / FURLOUGH 5/T

SUPERVISOR CHECKING REPORT (PRINT OR TYPE): RANK Sgt / SIGNATURE C Frederick

COMPUTER ENTRY BY

T/T (WITNESS) RONALD STEWARD B/M/18 of 9636 FIELDING #836-1891 STATED HE SAW (3) UNK B/M's FIGHTING WITH COMPLT. BUT HE WAS DOWN THE STREET & HEARD THE SHOTS. WITNESS STATED COMPLT GOT INTO A ALTERCATION WITH PERP'S EARLIER IN THE DAY. WIT T/T (WITNESS) JOSEPH MARSHALL B/M/27 of 16746 MANSFIELD #837-0394 STATED THREE UNK B/M APPROACHED COMPLT & BEGIN FIGHTING W/COMPLT THEN (2) OTHER UNK B/M's CAME FROM ACROSS THE STREET, ONE WEARING ALL BLACK POINTED THE GUN AT JOSEPH MARSH & THEN POINTED THE GUN AT COMPLT & FIRED TWO TIMES. 0800 MADE LOC HOMICIDE MADE LOC, CODE 4703 MADE LOC

## WITNESS STATEMENT
### CASE PROGRESS

| | | | FILE/CASE NO |
|---|---|---|---|

| CT/SECTION | | COMPLAINANT | | | | |
|---|---|---|---|---|---|---|
| ai·ide Section | | Darryl Towns | | | | |
| | TIME | PLACE | STATEMENT TAKEN BY | | | |
| -99 | 1:35AM | 5 th fl. Homicide Section | Sgt. Ronald Vishara | | | |
| | | RACE/SEX/AGE | D.O.B. | | HGT. | WGT. |
| NALD ALVIN STEWART | | B M 18 | 1-4-81 | | 6-3 | 220 |

| | | RESIDENCE | | | PHONE | BADGE NO. | SHIFT |
|---|---|---|---|---|---|---|---|
| | | | | | BUS.<br>RES. | | all Shifts |

| YER) On Telegraph & Chicago) | DEPARTMENT | | | |
|---|---|---|---|---|
| ng with:  er & Father, Louise & Ronald Stewart | CHILDREN/SCHOOL:  (0) | | PHONE | |
| IVES/FRIENDS: | ADDRESS | | | |

tion: What can you tell me about the fatal shooting of your best friend
yl Towns this evening at his home at 9559 Fielding?

I wasn't there when it happened. But I was with Darryl earlier and his
. He was home with two girls (Theresa Berry & Kayla Jones 15) and John-John
les and his friend Lionel Drake kept pounding on Darryl doors just to mess
him. I was taking some movies back to Darryl at about 7:00PM and I was with
don Robinson 18 b/m (who lives right across the street from me). I had been
the neighbors Next door to Darryl earlier and I saw that John-John and
e were banging on Darryl's door and trying to mess with him. I told ther
don't you just leave him alone but they didn't leave and they were sitting
arryl's porch at that time and Hollering out his name and saying Let us in
us in. But Darryl wouldn't open the door while I was there. So I left and
back home and called Darryl and he said that he was getting tired of them
n-John & Lionel) banging on his door and that he was going to go out and
t with John-John. I told him not to go fight him, Its not even worth it.
aid all right and that he'd call me back. Then right after I got off the
e with Darryl his girlfriend Theresa Berry 14 or 15b/f, called me right bac
said that Darryl was going to go out there and fight John-John. Then I talke
Darryl for a second and I told him not to go out there until I got down ther
Brandon & I went down to Darryl's and went inside (John-John and Lionel
in Darryl's back yard playing Basketball. I went inside and Brandow was
ling them to go home. Darryl was mad and upset and his girlfriend was holding
back. Ikept telling him to calm down but he wouldn't. So Darryl went outside
his back yard where John*john was and Darryl hit him with his fist and they
a fight. Brandon & I tried to break it up and Lionel was just standing there
ke up the fight and I took Darryl inside and Brandon took John-John and
nel to John-John's house and told him to calm down. Then John-John told Darry
watch his back and he was going to get his cranium cracked and John left.

ayed with Darryl a few mir tes and calmed him down, and I told him I'd be
and I went home to get my sweatshirt on, and Brandon was in front of my
waiting on me. Brandon told me that John-John, and Lionel were going to
  s. I saw John-John pull out of his drive-way in a green Ford Contour.
Brandon and I went back to Darryl's house and talked and then we went back
de. I was still outside talking to Brandon and Darryl when I saw John-John's
ome back home and Lionel was still in the front seat with him but but there
3 or 4 others guys in the back seat now, and they went around the corner.
t home with Brandon to see what calls I had got, so I brought the phone
n the porch and Brandon was out there. Then I saw three guys come around
orner from Chicago and Fielding. They didn't look right to me and I told
d Brandon that they were coming to get Darryl. I live about 8 or 9 houses
Darryl's when Brandon and I started down to Darryl's, I had seen the 3 guys
up Darryl's drive-way. Brandon and I were about 1/2 to Darryl's house
I heard 3 or 4 gun shots from Darryl's drive-way, and I saw about 3 guys
cowards Chicago and Lionel ran to his house. Then I heard b/m yelling
yl's been shot, and then I heard a Female Voice say the same thing. I asked
 was and they told me in the house. I went in and Darrly was laying on his
in the kitchen and he was just mumbling, and EMS came and told him away.
 you know why Darryl was shot?
ecause he embarrassed him in front of his friend Lionel.
  Darryl have weapons this day?
o  ...
id you see who had the silver basebat bat?
 ,I don t.
ave you or Darryl had other problems with John*John?
o, but he tries to show off in front of his cousin's and his friend Lionel.
ave you heard who shot Darryl?
o, but I heard that John-John told the guy with the gun to shoot Darryl.
 I heard the guys were older than me.
hat was Lionel wearing this evening?
e had on a blk Dew-rag on, Red shorts, Wht T-Shirt, white and Red Air Jordan
es, and a gold necklass
ere Darryl's two females still there when this happened?
o, thye had gone home after Darryl had fought with John-John and Darryl Won.
o you know anyone who drives a red Ford Escort?
o. But Lionel's moma has a red Pontiac. Bonneville.
ave you ever seen any guns down at John-John's house?
  , and his parents are real religious.

X Ronald Stewart

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

People of the State of Michigan,

                    99-10166
          Plaintiff,

-v-

                    Hon. Warfield Moore
Lynell Drake,
                    Hearing: 12/10/99
          Defendant.
                                        /

| | |
|---|---|
| Kenneth J. King, | Michelene T. Sager, P47137 |
| Attorney for Plaintiff | Attorney for Defendant |
| 1441 St. Antoine, 11th Floor | 719 Griswold, Suite 1300 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 224-6712 | (313) 967-0200 |

                                        /

### MOTION TO SUPPRESS STATEMENT

NOW COMES Lynell Drake, Defendant herein, by and through his attorney, Michelene T. Sager, and moves this honorable court to suppress his post-arrest statement for the following reasons:

1.    Defendant is a juvenile.  On Thursday, September 9, 1999, Defendant was arrested in his home, without a warrant, and taken into custody.  No civilian adults were present.

2.    Defendant was not immediately taken before the juvenile court as required by MCL 764.27; MSA 28.886.

3.    A warrant request, charging Defendant Drake with one count of Open Murder, was not produced until Sunday, September 12, 1999.

4.    On September 9, 1999, at approximately 9:25 p.m., Detroit Police officers responded to a call on "a shooting" at 9569 Fielding.

1

**RECEIVED BY**

DEC - 3 1999

CHIEF RECORDER'S COURT
WAYNE COUNTY
PROSECUTING ATTORNEY'S OFFICE

5. At 11:40 p.m., when officers came to Defendant's home, the Defendant, who is 16, and his 12 year old brother were the only ones home. Officers knocked on the door, and Defendant opened the big, inside door. Officers then opened the closed storm door and came inside the home uninvited.

6. Defendant identified himself as Lynell Drake, and without a warrant, police arrested and handcuffed Defendant inside his own home without a parent or other adult present.

7. Defendant was taken to 1300 Beaubien. His mother came, but was prevented from seeing or speaking with defendant.

8. From approximately 11:45 p.m. to approximately 2:20 a.m., defendant was held in an inside, windowless, chairless room, made to sit on the floor, handcuffed, alone. He was denied his request for something to eat and/or drink.

9. At approximately 2:20 a.m., defendant was taken to Detroit Police Sgt. Thomas J. Smoot's office, and Sgt. Smoot asked defendant if he was "ready to come clean."

10. Defendant's mother was brought in, and she asked to speak with her son privately, but was refused this request.

11. Sgt. Smoot presented defendant and his mother with the Constitutional Rights Certificate of Notification. Defendant's mother was told that if defendant made a statement now without a lawyer, he could go home.

12. At approximately 2:30 a.m., Sgt. Smoot began his interrogation of defendant.

13. Sgt. Smoot wrote five pages of questions and answers, which defendant and his mother reviewed and both pointed out that defendant's answers did not appear to

2

be complete and accurate.

14.    Sgt. Smoot acknowledged that he did not write down every single thing that defendant said, but that the items he left out were not relevant and not important, and directed them where to sign on the pages.

15.    Defendant and his mother signed where directed.

16.    Defendant was illegally arrested in his home, and any statement flowing from that illegal arrest must be suppressed. Payton v. New York, 445 US 573; 100 Sct 1371 (1980); U.S. v. Johnson, 457 US 537; 102 Sct 2579 (1982); People v. Oliver, 417 M 366 (1983); People v. Parker, 417 M 556 (1983); cert den 466 US 962 (1984).

17.    Defendant was not immediately taken before the Juvenile Court, contrary to MCL 764.27; MSA 28.886.

18.    Defendant's statement was obtained in violation of Miranda v. Arizona, 384 US 436 (1966).

19.    Defendant's statement was not otherwise voluntary.

20.    Defendant requests an evidentiary hearing pursuant to Jackson v. Denno, 378 US 368 (1964); and People v. Walker, 374 M 331 (1965).

WHEREFORE, Defendant Lynell Drake prays this honorable court will suppress his post arrest statement from the evidence.

Date 12-3-99

Very truly yours,

_Michelene Sager_

Michelene T. Sager, P47137
Attorney for Defendant Drake

3

## BRIEF IN SUPPORT OF
## MOTION TO SUPPRESS STATEMENT

At a hearing pursuant to People v. Walker, 374 M 331 (1965) to determine the

validity of Miranda warnings and/or waiver, and the voluntariness of a statement, the

prosecution bears the "heavy burden" of proving that the defendant was informed of his Miranda

warnings and that he had a meaningful opportunity to exercise those rights, People v. Sears, 124

MA 735 (1983); that the defendant knowingly and intelligently waived his privilege against self-

incrimination and his right to the assistance of counsel, People v. Parker, 84 MA 447 (1978); and

that the statement was not the product of coercion, explicit or tacit, People v. Stewart, 75 M 21

(1889); People v. Boyce, 314 M 608 (1946); People v. Ziegler, 358 M 355 (1960); and People v.

Harris, 110 MA 636 (1981).

STATEMENT OF FACTS

On Thursday, September 9, 1999, at approximately 9:30 p.m., defendant Lynell

Drake was at home with his mother, Mrs. Carmen Davis, and his 12 year old brother, Ricky. At

approximately 11:00 p.m., Mrs. Davis left the home to pick up her husband at work, leaving

defendant, 16 years old, and Ricky in the home. At approximately 11:30 p.m. there was a loud

banging on the front door of defendant's home. Through the closed big wooden door and screen

door, defendant called out, "who is it?" The police answered, "Police, is Lynell Drake here?"

Defendant answered, "yes." Defendant then opened the inside wooden door. From outside the

storm door, police asked defendant, "are you Lynell Drake?" Defendant answered, "yes."

Police then opened the storm door and entered the home uninvited. There were at least five

4

police officers, two in uniform. They immediately put defendant up against the living room wall while other officers spread out in the house, going into rooms both upstairs and downstairs. Defendant asked them if they could just come in his house and go through it like this. Defendant then asked them for a warrant. The police had none. Defendant was handcuffed.

During this period of time, Ricky came up from the basement and was ordered to show the officers the defendant's room, which he did. They then ordered Ricky to get defendant's shoes as the police prepared to take defendant out of the house. However, Ricky had contacted his mother by cell phone, and she then spoke with the police. Mrs. Davis, who was then 8 ½ months pregnant, arrived at the home before they had taken her son away, and after her arrival the police announced for the first time why they were there and why defendant was being arrested. Defendant was then placed in the rear of an unmarked police car and transported to the First Precinct.

Defendant was seated in the rear seat of the police car with a plain clothes officer, with two officers in the front. One of the officers told defendant that he was about to get life, so he might as well get used to it and that he should say good-bye to the world.

Once at the First Precinct, defendant was placed inside a windowless room with a desk but no chairs or anything to sit on. He was still handcuffed. Police left in him that room by himself and closed the door. After a significant period of time passed, defendant went to the door and asked how much longer, and could he get some water or something to eat. He was told, "you don't get nothing to eat - you're locked up - just sit there and wait." Sometime later, an officer came into the room, removed defendant's handcuffs and took him to Sgt. Smoot's office. Someone brought in defendant's mother, Mrs. Davis, who immediately asked if she

5

could speak privately to her son. This request was refused, but Mrs. Davis was told that she could have a conversation with her son in the presence of Sgt. Smoot.

Sgt. Smoot then slid the "Constitutional Rights" form across the desk and asked defendant to read each one out loud and initial beside it if he understood the right. Sgt. Smoot then told defendant and Mrs. Davis that defendant could make a statement now without a lawyer or wait until he had a lawyer. Mrs. Davis asked Sgt. Smoot what is the difference, and if they should get an attorney. Defendant's mother felt in such an emotional state that she insisted she be allowed to consult with her brother, who was in the hallway, before she could make a decision about whether her son should make a statement.

While Mrs. Davis was out in the hallway conferring with her brother, Sgt. Smoot came out and demanded to know what she was going to do. At this point, Mrs. Davis asked if her brother could come in to advise her son because she felt so confused and that she was in no condition to be handling this situation. Sgt. Smoot stated that the brother could not do this, it had to be the mother.

Mrs. Davis came back to Sgt. Smoot's desk and asked Sgt. Smoot whether defendant could come home if he made a statement now without a lawyer. Sgt. Smoot said that he could.

At this point, defendant began making his statement, with Sgt. Smoot verbally asking his question and then writing it down, and then defendant answering the question, and Sgt. Smoot writing it down. Both defendant and his mother were across the desk from Sgt. Smoot and watched him write down defendant's answers. Sgt. Smoot did not write down a portion of defendant's answer explaining how he came to have possession of the bat, and both

6

defendant and his mother took exception to this. Sgt. Smoot told them that it was not important since the victim was not killed with a bat. Sgt. Smoot did not write down the portion of defendant's answer stating that when defendant realized that the gunman had a gun and what he intended to do, he asked to get out of the car, and then the gunman pointed the gun at him (defendant) and threatened to shoot him if he didn't come along. Both defendant and his mother took exception at this omission, but were told that this was not solid evidence and was not important, anyway.

At the end of the statement, defendant and his mother were instructed to look over the statement and then sign on each page at the bottom. They hesitated and Mrs. Davis told Sgt. Smoot that she was relying on his advice and if he was sure that the omitted information was not important. He answered in the affirmative. They signed the statement.

Once the statement was signed, Sgt. Smoot informed Mrs. Davis that defendant would be transported to the Juvenile Home. Mrs. Davis said, "I thought he'd be going home. You said he could go home." Defendant did not go home.

## VIOLATION OF MCLA 764.27; MSA 28.886

MCLA 764.27 mandates:

> Whenever any child under the age of 17 years is arrested with or without a warrant, such child shall be taken immediately before the family division of the circuit court . . . .

MCLA 600.606; MSA 27A.606, however, divests the family division of jurisdiction and gives this court jurisdiction over this juvenile since the prosecutor filed a complaint and warrant instead of a petition in the family division. Thus, according to the rule, the juvenile need not be taken before the juvenile court. However, the court in People v. Parrish,

216 MA 178 (1996), in examining the "automatic waiver" rule, held that

> "[c]ontrary to the nomenclature associated with this statute, the waiver of juvenile
> defendants from the probate court to the circuit court is not automatic even
> though the juvenile is charged with one of the enumerated offenses. Indeed, the
> Legislature has given the prosecutor discretion to try juveniles in either forum:
>
> > The juvenile division of the probate court has jurisdiction..... only
> > if the prosecutor files a petition in juvenile court instead of authorizing a
> > complaint and warrant.... (citations omitted).
> > If the prosecuting attorney has reason to believe that a juvenile 15
> > years of age or older but less than 17 years of age has violated [one of the
> > enumerated felonies], the prosecuting attorney may authorize the filing of
> > a complaint and warrant on the charge with a magistrate concerning the
> > juvenile.....(citations omitted).

Parrish at 180-181.

Further, MCR 6.907 governs the timing of either the authorization of a complaint

and warrant in order to "automatically waive" a juvenile to be tried as an adult, or the filing of a

petition in juvenile court for juvenile adjudication.

It is clear, then, that the prosecutor must do one or the other and that the juvenile

is under the jurisdiction of the juvenile court until the prosecutor decides to charge the juvenile

as an adult and "automatically waive" him/her for adult prosecution of one of the enumerated

felonies. Here, defendant was taken into custody on Thursday, September 9, 1999, and the

decision to "automatically waive" him under MCLA 600.606 was not made until four days later.

During that four day period of time, the traditional juvenile rules applied, and this juvenile

should have been immediately taken before the juvenile court. This procedure for the handling

and due process of juveniles would have tended to prevent the police from interrogating and

attempting to obtain an incriminating statement from the defendant. The courts in People v.

Roberts, 3 MA 605 (1966), and People v. Wolff, 23 MA 550, 552 (1970) held that a failure to

8

take a juvenile arrestee before the juvenile court *immediately* vitiates any confession obtained during the detention. (Emphasis in original.) The prosecution should not now be able to bootstrap an otherwise illegally obtained statement into this case by circumventing the "immediacy rule" of MCLA 764.27 by way of a delayed waiver under MCLA 600.606. Accordingly, defendant's statement should be suppressed.

## MIRANDA VIOLATION - INEFFECTIVE WAIVER

Under the facts as related above, there is no question that defendant was in custody and that his Miranda rights had attached. He was, in fact, Mirandized. However, the decision to waive his Miranda rights and make an immediate statement to Sgt. Smoot should be deemed ineffective because his mother first asked Sgt. Smoot if they should get a lawyer, and then unequivocally stated that she felt she was not competent to decide whether a lawyer was necessary or whether he son should make a statement at all. Further, she was assured that her son could go home if he made a statement now without a lawyer.

The essence of Miranda is not merely that every person interrogated by the authorities have recited to him/her the four warnings delineated by that decision, but that "fully effective means" be devised to inform accused persons of those rights. In the case of a juvenile, this extends to the juvenile's parent or guardian. If the circumstances undermine the Miranda warnings, a waiver of them is deemed ineffective. See People v. Irby, 129 MA 306 (1983), where the court stated that, if the person interrogated is a juvenile...... interrogation should not occur without the presence of a competent parent, guardian, or other friendly adult. Here, the juvenile defendant's mother asked to have her brother come in to advise her son because she did not feel she could do it. This request was refused, and this condition, together with other the

9

other factors addressed herein, invalidate the validity of the waiver.

Moreover, Mrs. Davis asked Sgt. Smoot if they should get a lawyer before any questioning began. Although this is not a clear refusal to speak without a lawyer present, the court in Wayne Prosecutor v. Recorder's Court Judge, 79 MA 495 (1977), lv app den 402 M 879 (1978), held that all questioning must cease until counsel is obtained if the defendant asks if he/she should consult with an attorney. Defendant's mother's question, then, about whether they should have a lawyer was enough to invoke the right to counsel, and Sgt. Smoot should have ceased all efforts to get a statement from the defendant. He did not, however, and amid his refusal to let the juvenile's uncle advise him and his promise to release the defendant after he made a statement without a lawyer, Sgt. Smoot obtained an incriminating statement from the juvenile. Thus, the defendant's waiver of his right to remain silent and his right to have a lawyer present during questioning was ineffective, violated Miranda, and his subsequent statement should be suppressed.

## VOLUNTARINESS

While the giving of Miranda warnings is a necessary prerequisite to the admissibility of statements, they are not sufficient to assure admissibility. Voluntariness must also be proven. Westover v. United States, 384 US 436; 86 Sct 1602; 16LEd2d 694 (1966); People v. Paintman, 412 M 518, 526 (1982). A statement is considered voluntary if made under circumstances which show that it was the product of the person's free will and was made with a full understanding of its consequences. Schneckloth v. Bustamonte 412 US 218, 224-226; 93 Sct 2041, 2046-2047; 36 LEd2d 854 (1973), and People v Brockett, 195 M 169 (1917).

For purposes of evidentiary prohibition, the totality of the circumstances must be

10

considered. <u>Colorado v. Connelly</u>, 479 US 157; 107 Sct 515; 93 LEd2d 473 (1986). A non-exhaustive list of factors to be considered in judging whether a statement was voluntary are:

a. Whether the juvenile defendant was advised of his/her rights *and* clearly understood and waived them;

b. The degree of police compliance with applicable statutes and court rules; (including the "immediacy" rule);

c. The presence of an adult parent, custodian or guardian;

d. The juvenile's personal background;

e. The defendant's age, education, intelligence level and prior experience with the police. <u>Spano v. New York</u>, 360 US 315; 79 Sct 1202; 3 LEd2d 1265 (1959), and <u>Turner v. Pennsylvania</u>, 338 US 62; 69 Sct 1352; 93 Led 1810 (1949);

f. The length of detention before the statement was made;

g. How long was the questioning and was it of a repeated nature;

h. Whether the juvenile was injured, intoxicated, in ill health, or deprived of sleep, food or medical attention;

 <u>People v. Good</u>, 186 MA 180, 186-90 (1990). See also <u>People v. Rode</u>, 196 MA 58, 69-70 (1992) and

i. Whether the reason for not taking the juvenile defendant before a Family Division judge or referee was to obtain a statement. If it was, the statement is inadmissible, even if voluntary. <u>People v. Strunk</u>, 184 MA 310, 318 (1990), <u>lv app den</u> 437 M 979 (1991).

For purposes of constitutional law, a statement is involuntary if the product of coercive police activity. If the authorities either expressly commit to a defendant or intimate that, in return for a statement, they will aid him/her to gain something of importance which he/she might not otherwise be able to obtain, any statement given in response to such inducements is considered involuntary. <u>People v. Gallego</u>, 430 M 443, 457-458 (1988).

11

Under Michigan Constitution 1963, Art. 1, Sec. 17, if a criminal defendant's confession is induced by a law enforcement official's promise of leniency, that is one factor in determining whether the confession is involuntary and inadmissible. If the defendant reasonably understood the official's statements to be a promise of leniency, and if the defendant relied on that promise in deciding to inculpate himself and in making the specific statement in question, the statement is involuntary and inadmissible. People v. Conte, 421 M 704, 739-43 (1984), and People v. Givans, 227 MA 113, 119-20 (1997) (case involving a 16 year old defendant).

Examining the factors under the "totality of the circumstances" test:

a. It is clear that the juvenile defendant was not effectively advised of his rights and clearly understood and waived them because of his mother's unequivocal statement that she did not feel competent to handle the situation.

b. Police did not comply with the "immediacy" rule prior to the prosecutor authorizing the so-called "automatic waiver" so that the circuit court would have jurisdiction over the juvenile.

c. A competent adult was prevented from advising the juvenile, even after his mother requested same.

d. The juvenile has an unremarkable background.

e. The juvenile is 16 years old, is an honor student in school, and has absolutely no prior experience with police - neither does his mother.

f. The juvenile was held for three house before the statement.

g. It is unknown how long the questioning took.

h. The juvenile was deprived of a place to sit, food and water.

i. The failure to take the juvenile before a Family Division judge or referee was so that Sgt. Smoot could attempt to obtain a statement from him.

Thus, under the totality of the circumstances, the statement obtained from the

12

defendant has to be deemed involuntary, and thus inadmissible in the evidence.

Moreover, defendant's statement was given upon Sgt. Smoot's promise that if he gave a statement now without a lawyer, he could go home. This is certainly a promise for "something of importance which he/she might not otherwise be able to obtain," and "any statement given in response to such inducements is considered involuntary" and inadmissible. Gallego, supra; Conte, supra; and Givans, supra.

FRUIT OF THE POISONOUS TREE:
Statement Made While in Custody Resulting from an Illegal Arrest/Detention

Defendant was arrested in his own home without a warrant and without an exception to the warrant requirement. There were no exigent circumstances, there was no public safety exception and there was no consent, valid or otherwise, for the police to enter his home. Thus, his arrest was illegal. Payton v. New York, 445 US 573; 100 Sct 1371 (1980).

Any statement made while in custody resulting from an illegal arrest or other illegal detention must be suppressed "....when an 'unlawful detention has been employed as a tool to directly procure any type of evidence from a detainee'..." People v. Kelly, 231 MA 627, 634 (1998), quoting People v. Mallory, 421 MA 229, 240-241,243, fn8 (1984), and Brown v. Illinois, 422 US 590; 95 Sct 2254; 45 LEd2d 416 (1975).

The court in Wong Sun v. United States, 371 US 471, 486; 83 Sct 407; 9 LEd2d 441, 454 (1963), held that confessions which are preceded by proper Miranda warnings and were not obtained by coercion may nonetheless be inadmissible as the "fruit of the poisoned tree."

A confession made after a defendant has been illegally arrested is to be excluded as a fruit of that arrest, even if the defendant was properly advised of his/her rights, and even if

13

the statement is otherwise voluntary. People v. Mosley (after rem), 400 M 181 (1977); People v. Nabers, 103 MA 354, 378 (1981); People v. Spinks, 206 MA 488, 496 (1994); and People v. Martin, 94 MA 649 (1980). The causal nexus between the arrest and the confession is to be determined by examining: 1) the time elapsed between the illegal arrest and the confession, 2) the flagrancy of the official misconduct, 3) any intervening circumstances, and 4) any circumstances antecedent to the arrest. People v. Spinks, 206 MA 488, 496 (1994).

The time elapsed between the illegal arrest and the confession was approximately three hours. The police exhibited flagrant misconduct in that they illegally arrested the defendant, told him he was going to get life and that he should say good-bye to the world, and then held him for approximately three hours in a small inside room, handcuffed, alone, with nothing to sit on, deprived of food and water, and deprived of his mother's or uncle's counsel. Kelly states that intervening circumstances can break the causal chain between the unlawful arrest and inculpatory statements, thus rendering the confession "sufficiently an act of free will to purge the primary taint' of the unlawful arrest," but there was no intervening circumstance here that broke the causal nexus. In fact, defendant's mother specifically stated that she did not feel capable of advising her son and thus her involvement in the rights and interrogation procedure could not be such a circumstance. Antecedent to the arrest there was an altercation which resulted in the death of Darryl Towns, and which the defendant was trying to avoid, defendant got home at approximately 9:30 p.m. He remained in the home with his mother and brother for at least two hours before police arrived. During that period of time, police had developed defendant's name and address and had enough time to get a warrant for his arrest. They did not, and instead commandeered their way into his house while no adult was present,

14

terrorized him and the 12 year old Ricky and handcuffed him and were about to take him away when his mother arrived. They told defendant that he should say good-bye to the world and refused contact between him and his mother, and so on as previously stated.

There was much here to pressure and overbear both the defendant and his mother so that an incriminating statement could be taken, not the least of which were the omissions that Sgt. Smoot assured were not important, and nothing to break the causal chain of illegal arrest - deprivation - pressure - promises - invalid waiver of <u>Miranda</u> - incriminating statement. Thus, defendant's unlawful detention was a very effective tool in procuring the incriminating statement from the defendant, and must be suppressed.

WHEREFORE, defendant prays this Honorable Court will GRANT his motion and suppress his statement from the evidence.

Respectfully submitted,

Date: 12-3-99

Michelene T. Sager, P47137
Attorney for Defendant

15

# APPENDICES
## PRESENTENCE INVESTIGATION REPORTS,
## EVIDENCE SHEETS,
## CRIMINAL DEFENSE NEWSLETTERS.

4835-6345
Rev.(03)1999 CFJ-145

| | | | | | Sentence Date: 05/04/2000 | | |
|---|---|---|---|---|---|---|---|

Honorable: **WARFIELD MOORE, JR.**   County: **WAYNE**
Attorney: **STEPHEN TARATUTA**   Status: **APPOINTED**
Defendant: **DAMON LAMONT SMITH**   Age: **24**   D.O.B.: **08/30/1975**

## CURRENT CONVICTION(S)

| Docket # | First Charge(s) | | Attempt | Max | Jail Credit | Bond | Proposal B |
|---|---|---|---|---|---|---|---|
| 99-10166 | FIRST DEGREE MURDER | | No | L | 230 | No | Yes |
| | Convicted by: JURY | Date of Conviction: 04/11/2000 | | | Habitual: No | | |
| 99-10166 | WEAPONS - FELONY FIREARMS | | No | 2 | 230 DAYS | No | Yes |
| | Convicted by: JURY | Date of Conviction: 04/11/2000 | | | Habitual: No | | |

Pending Charges:   Pending Where:
NONE   N/A

Plea Agreement: NONE

## PRIOR RECORD

| Convictions: # Felonies 0 | | Juvenile Record: No |
|---|---|---|
| Probation: Active No | Former: No | Pending Violations: No |
| Parole: Active No | Former: No | Pending Violations: No |
| Current Michigan Prisoner: No | MDOC#: NONE | |
| Currently Under Sentence: Offense NONE | Sentence N/A | |

## PERSONAL HISTORY

| | Where: N/A | | |
|---|---|---|---|
| Education: 12 | Employee: No | Marital Status: SINGLE | |
| Psychiatric History: No | Physical Handicaps: No | Alcohol Abuse: No | How long: N/A |
| Substance Abuse: Drugs No | How long: N/A | | PA511 ELIGIBLE: No |

Investigating Agent: **BASSETTE D**   Agent Phone: **224-2524**   Caseload No.: **1515**

## DEPARTMENT OF CORRECTIONS RECOMMENDATION

INCARCERATION IS MANDATORY.

CONSECUTIVE SENTENCING APPLIES.

RESTITUTION IS SET AT $3,280 FOR FUNERAL EXPENSES.

Approval: _____   Date: _____

Supervisor: **AGNELLO G**   Supervisor Phone: **224-2643**

Local Computer #: 2080667-1
1535.00
04/26/2000

---

## EVALUATION AND PLAN:

The defendant, Damon Lamont Smith, is a 24 year old single father of two children. He claims to have attended high school in Kentucky at a Baptist seminary. This information could not be verified. After completing high school, the defendant returned to Detroit and was employed as a hairstylist at a hair salon located on Joy Rd, Detroit, MI. This information could not be verified. The defendant is in good health and he denies use of drugs or excessive drinking of alcohol.

In the case now before Your Honor, the defendant denies his guilt. He does not have a juvenile record and he owes $328 for a suspended license ticket and $195 for a speeding ticket in the 34th District Court, as well as $370 for a suspended license ticket in 34th District Court, Dkt. #99-70490, 99-18039SA, C3984616.

Favorably speaking, the defendant has the support of his family and his parents are both concerned about his welfare and the defendant was a musician in his church choir.

Negatively speaking, the convictions now before Your Honor require a mandatory term of imprisonment.

The defendant is not eligible for community probation programs and there are no guidelines in either felony conviction.

Restitution has been determined at $3,280, payable to the deceased complainant's family for funeral expenses. This amount should be equally divided among the four co-defendants, which would result in an $820 responsibility for each co-defendant.

Consecutive sentencing applies.

## AGENT'S DESCRIPTION OF THE OFFENSE:

On 9/9/99, at approximately 9:40 p.m., officers from Detroit P.D. responded to 9559 Fielding, Detroit, MI concerning a shooting. Upon their arrival at the scene, the officers observed 15 year old complainant, Darryl Towns, laying on the ground from a gunshot wound to the stomach. Towns was conveyed to the Wayne County Medical Examiner's Office. An autopsy was performed and the cause of death was a result of multiple gunshot wounds.

Witnesses reported that they saw Jonathan Nettles and Lynell Drake on complainant's porch and that both Nettles and Drake were banging on complainant's door messing with him. The complainant came out the side door and was telling Nettles and Drake to leave his house and go home. Both subjects refused to leave and Nettles and the complainant got into a fight. The witness and another person broke up the fight. As Nettles was leaving, he told the complainant

to, "Watch his back". The witness reported that later he saw Nettles and Drake, along with three or four other males, pull up and drive around the corner from the complainant's home. The witness then saw three males run up the driveway and that he and another person started to go to complainant's home. He then heard three gunshots and then saw the males run out of the driveway and saw Drake also run out of the driveway and run to his home. He then heard someone yell that the complainant has been shot.

Another witness reported that he was sitting on a porch down the street from complainant Towns' home. He saw three males walk up to the complainant, who was standing in the driveway. One of the men had a baseball bat. The man threatened to hit the complainant in the head, and then three men jumped on the complainant. This witness went over and broke up the fight an then two other males came from across the street. An older male pulled out a gun and pointed the gun at the witness and told him to stay out of it. The witness stated that the older man walked up to where complainant was laying on the ground and shot him.

Artice Thomas stated that defendant, Damon Smith, came over to his home on 9/9/99 and asked him for a gun. Thomas gave Smith a .32 caliber automatic. When Thomas asked why he wanted the gun, Smith said that Jonathan Nettles had a fight with a guy and that he was going to the guy's home and see why he jumped on Nettles.

The defendant, Damon Smith, was arrested and charged with Murder First Degree, Premeditated and Felony Firearm. Jonathan Nettles, Lynell Drake, and Patrick Roberts were charged with Open Murder.

Co-defendant Lynell Drake pled Nolo contendere to Felonious Assault on 3/30/00. On 4/27/00, he was sentenced by the Hon. Warfield Moore under Dkt. #99-10166-03.

Co-defendant, Patrick Roberts, pled guilty to Involuntary Manslaughter on 4/3/00. He is scheduled to be sentenced by the Hon. Warfield Moore on 5/23/00, Dkt. #99-10166-04.

Co-defendant, Damon Smith, was found guilty, by jury, of Murder First Degree on 4/17/00. He is scheduled to be sentenced on 5/4/00 by the Hon. Warfield Moore, Dkt. #99-10166-01.

Co-defendant, Jonathan Nettles, pled guilty to Involuntary Manslaughter on 3/31/00. He is scheduled to be sentenced by the Hon. Warfield Moore on 5/23/00, Dkt. #99-10166-02.

CONSECUTIVE SENTENCING:

Consecutive sentencing is applicable.

---

DEFENDANT'S VERSION OF THE OFFENSE:

The defendant denies his guilt in the case now before Your Honor. He declined to make a statement about his actions in this case.

CRIMINAL JUSTICE:

Juvenile History:

None.

Adult History:

| | |
|---|---|
| Arrest Date: | 04/07/99 |
| Arresting Agency: | Redford P.D. |
| Arresting Charge: | Suspended License, Speeding 11 to 15 MPH Over Limit |
| Court of Jurisdiction: | |
| Final Charge: | Same |
| Conviction Date/Method: | 10/29/99; found guilty |
| Sentence/Disposition: | $195 fines for speeding and $328 for suspended license |
| Sentence Date: | 10/29/99 |
| Attorney Present: | Unknown |
| Discharge Date: | Unknown |

The defendant has not paid this amount as ordered by the Court and a Show Cause warrant was signed on 11/9/99 and is currently outstanding, Dkt. #99-70490.

| | |
|---|---|
| Arrest Date: | 05/05/99 |
| Arresting Agency: | Romulus P.D. |
| Arresting Charge: | Suspended License |
| Court of Jurisdiction: | 34th District Court, Dkt. #C98-4616 |
| Final Charge: | Same |
| Conviction Date/Method: | Pled guilty |
| Sentence/Disposition: | $370 fine |
| Sentence Date: | 8/99 |
| Attorney Present: | Unknown |
| Discharge Date: | Unknown |

As of 4/25/00, the defendant has not paid this fine and a bench warrant has been issued, Case #C98-4616

## GANG INVOLVEMENT:

The defendant denies any present or past gang involvement.

## CREDIT FOR TIME SERVED:

| Time Served | Location | Dates | Total Days |
|---|---|---|---|
| Instant Offense | D.P.D./W.C.J. | 09/17/99-05/04/00 | 230 |
| | | TOTAL JAIL CREDIT | 230 days |

## FAMILY:

FATHER:     Melvin Taylor, 52, 616 Easley St., Westland, MI, TX 734-722-3145.

MOTHER:    Patricia Roberts, 48, 15716 Pierson, Detroit, MI, 794-1953.

SISTER:      Kimberly Smith, 29, Walton St.

SISTER:      LaTonya Smith, 28, Walton St.

SISTER:      Destiny Smith, 21, resides with mother.

The defendant was born and raised in Detroit, MI and remained with his parents until they separated when the defendant was approximately ten years. He states that he remained with his mother who moved twice during his adolescence. The defendant's father indicated that at the age of 15, they sent their son to a Baptist school in Kentucky, where he graduated from high school and returned to Detroit at age 18.

The defendant indicates that he was living with his mother at the time of his arrest. This writer has not been able to verify the residence due to the fact that the mother is employed at a manufacturing company during the day time, as well as the father who works during the day. There is a 15716 Pierson St. residence.

## MARRIAGE:

The defendant is unmarried and admits to fathering two children. The defendant did not elaborate as to the names or ages of his children.

E.T.# 495 233

20 by: P.O. C. Phipp     Item: Misc. Clothing

MPO BY:

From: Grace Hospital

Sc. Lab by:

E.T.# 495 235

Conf. by: P.O.C. Phipp     Item: Misc. Papers

MPO BY:

From: Grace Hospital

Sc. Lab by:

E.T.# 495 236

Conf. by: P.O. Phipp     Item: Metal Bat (Base ball)

MPO BY:

From: 9559 Fielding

Sc. Lab by:

E.T.# 495 237

Conf. by: P.O. Phipp     Item: (1) Rt - Rock Port Shoes

MPO BY:

From: 9559 Fielding

Sc. Lab by:

J 495 238

nf. by: P.O. Phipp     Item: (1) Towel

BY:

From: 9559 Fielding

Sc. Lab by:

.#

. by:     Item:

BY:

From:

Sc. Lab by:

by:     Item:

From:

Sc. Lab by:

No Empty Cartridges

STATE OF MICHIGAN

THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,          Case No.

        -vs-                            99-10166-01

DAMON SMITH,

                    Defendant.

_____/

VOLUME III
TRIAL

PROCEEDING HAD and taken in the above-entitled cause before the HONORABLE WARFIELD MOORE Jr., Judge of the Third Judicial Circuit Court Criminal Division for the County of Wayne in Detroit, Michigan, on Wednesday, April 5, 2000.

APPEARANCES:

KENNETH J. KING   P54983
1441 St. Antoine  12th Floor
Detroit, Michigan  48226-2302
(313) 224-5777
WAYNE COUNTY PROSECUTING ATTORNEY

    Appearing on behalf of People.

STEPHEN M. TARATUTA   P46935
65 Cadillac Square  Suite 3700
Detroit, Michigan  48226
(313) 964-5777

    Appearing on behalf of Defendant.

FEB 13 2001

---

I N D E X

PEOPLE'S WITNESSES:                                    PAGE

CARL SCHMIDT
  Direct Examination by Mr. King                         7
  Cross-Examination by Mr. Taratuta                     17
  Redirect Examination by Mr. King                      18

RONALD STEWART
  Direct Examination by Mr. King                        19

JONATHAN NETTLES
  Direct Examination by Mr. King                        35
  Cross-Examination by Mr. Taratuta                     52
  Redirect Examination by Mr. King                      59
  Recross-Examination by Mr. Taratuta                   60

ARTEECE THOMAS
  Direct Examination by Mr. King                        62
  Cross-Examination by Mr. Taratuta                     73

JONATHAN NETTLES
  Further Examination by Mr. King                       81
  Further Examination by Mr. Taratuta                   85

JOSEPH MARSHALL
  Direct Examination by Mr. King                        85
  Cross-Examination by Mr. Taratuta                     97
  Redirect Examination by Mr. King                     100

LYNELL DRAKE
  Direct Examination by Mr. King                       105
  Cross-Examination by Mr. Taratuta                    119
  Redirect Examination by Mr. King                     127
  Recross-Examination by Mr. Taratuta                  128
  Further Direct Examination by Mr. King               129

PATRICK ROBERTS
  Direct Examination by Mr. King                       131
  Cross-Examination by Mr. Taratuta                    141
  Redirect Examination by Mr. King                     144

---

DEFENSE WITNESS:                                       PAGE

DAMON SMITH

Direct Examination by Mr. Taratuta                     151

Cross-Examination by Mr. King                          163


E X H I B I T S

PEOPLE'S

NUMBER            IDENTIFICATION              PAGE

2                    Report                    15

NO EMpty CartRidges

# Criminal Defense Newsletter

December, 2007
Volume 31, Number 3



## Features

Congress Considers Law School Debt..............5
Georgia Strikes Down Housing Restrictions......6
Nickel and Diming Update............................4
Renew Your Subscription Now!....................7
Right to Counsel at Public Expense..............1

## Departments

Circuit Court Opinion of the Month: "Holdi's Law"......11
  Unconstitutional as Applied.........................11
Criminal Defense Online..............................8
U.S. Update..........................................22
From Other States....................................8
Legislative Update...................................11
New and Interesting in the Online Brief Bank.......12
Practice Tips:
  Investigation of Insanity Defense................10
Reports and Studies..................................9
Spotlight on Mary LaGrasta..........................11
Technical Tip: Virtual Memory.......................24
Training Calendar....................................18
Training Events......................................18

## Appellate Courts

Michigan Court of Appeals
  Published Opinion Summaries.......................20
  Unpublished Opinion Summaries.....................22
United States Court of Appeals
  Sixth Circuit Opinion Summaries..................18
United States Supreme Court
  Opinion Summary...................................20
  Certiorari Granted Summaries......................18

**On the Web at www.sado.org**

*Serving Michigan's Criminal Defense Community Since 1977*

## The Right to Counsel at Public Expense – A Hollow Promise in Michigan?

It is worth repeating that "in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth." *Gideon v Wainwright*, 372 US 335, 344 (1963). Many jurists view as sacrosanct the *Gideon* right to counsel, that is to report that its high legacy has received far from kid-glove treatment in Michigan. An example can be found in the common practice of charging poor defendants for the services of their court-appointed lawyers through reimbursement or contribution orders.

### Overview

When a defendant requests a lawyer and claims financial inability to retain one, the trial court must determine whether the person is indigent using the criteria set forth in MCR 6.005(B). A defendant who is not wholly impoverished may still qualify as indigent for purposes of this rule, as it is recognized that the financial burden of hiring competent counsel is significant. MCR 6.005(B); see also *People v Nowicki*, 213 Mich App 383 (1995). Even if a defendant is not indigent to pay counsel, the court should still determine whether they are entitled to court-appointed counsel. MCR 6.005(C). The court is authorized to establish a plan for collecting such contribution. *Id.* Michigan courts have recognized judges' inherent authority and discretion to "apply known assets of an alleged indigent toward defraying - in some part - the public cost of providing for the indigent the assistance [of counsel]." *People v Nowicki*, 213 Mich App 383 (1995), *Davis v Oakland Circuit Judge*, 383 Mich 717, 720 (1970). In 2006, the Michigan Legislature adopted MCL 769.1k, authorizing assessments for "the expenses of providing legal assistance to the defendant."

The appointment of counsel is handled in very different ways in this state. Some courts liberally grant requests for appointed counsel, while others may appoint counsel only sparingly. Many jurisdictions require some sort of contribution and/or reimbursement of court-appointed attorney fees. What is apparent, however, is that these programs are too-often implemented without sufficient inquiry into defendants' actual ability to pay, currently or in the future.

### Tension with Gideon Promise

Without an accurate system for determining ability to pay, the practice of collecting assigned counsel fees from the poor through contribution or reimbursement is antithetical to the *Gideon* right to counsel at government expense. That right has been interpreted to mean that repayment for counsel cannot be demanded so long as the defendant remains indigent. *Alexander v Johnson*, 742 F2d 117, 124 (CA 4, 1984), accord *People v Dunbar*, 264 Mich App 240, 256 (2004). Any attorney fee recoupment program must therefore be narrowly drawn to avoid either chilling the right to counsel or discriminating based on poverty. See *Fuller v Oregon*, 417 US 40, 47-53 (1974); *James v Strange*, 407 US 128 (1972).

There are three general limitations on the government's right to seek recoupment of court-appointed attorney fees. First, any recoupment scheme must contain protections to preserve the right to counsel, and may not inflict substantial hardship on poor defendants. *Fuller, supra* at 47-53. Second, collection practices than other civil debtors without running afoul of the equal protection clause." *James, supra* at 135-39. And third, a defendant who fails to comply with a reimbursement order can never be imprisoned if the non-compliance is based on poverty. *Bearden v Georgia*, 461 US 660 (1983).

In *People v Dunbar*, the Michigan Court of Appeals regarded these principles to articulate five constitutional requirements for attorney fee recoupment programs in Michigan:

1. The program under all circumstances must guarantee poor defendants' fundamental right to counsel without cumbersome procedural obstacles designed to determine whether they are entitled to court-appointed counsel.

2. A decision to require repayment must not be made without providing notice of the contemplated action and a meaningful opportunity to be heard.

3. The entity deciding whether to require repayment must take cognizance of the individual's resources, the other demands on his own and his family's finances, and the hardship to the defendant or the defendant's family if repayment is required. The purpose of this requirement is to assure that repayment is not required so long as the defendant remains indigent.

4. A defendant accepting court-appointed counsel cannot be exposed to more severe collection practices than the ordinary civil debtor.

5. A defendant ordered to repay court-appointed attorney fees, as a condition of work-release, parole, or probation cannot be imprisoned for failing to pay as long as any default is attributable to poverty, not contumacy. *Dunbar, supra* at 254 (quoting *Alexander, supra* at 124) (internal citations omitted).

Defense lawyers are most likely to encounter problems with the third *Dunbar* requirement. The *Dunbar* court explained that in order to fulfill that requirement, the trial court must expressly consider, on the record, the defendant's ability to pay before ordering reimbursement for court appointed counsel. *Id.* at 254-55. The court stressed that defendant's current ability to pay, as well as foreseeable ability to pay in the future, must be taken into account because a "defendant's apparent inability to pay at the time of sentencing is not necessarily indicative of the propriety of requiring reimbursement . . ." *Id.* at 255. Courts have broad discretion in how to conduct such inquiries, and it appears that decisions on ability to pay can be made without formal evidentiary hearings. *Dunbar, supra* at 255, n 1. However, a showing must be made which includes both ability to pay and burden of proving a defendant has the ability to pay, as well as the full extent of the findings needed. Finally, any attorney fee award must be set forth in an order separate from the defendant's judgment of sentence. *Dunbar, supra* at 256; *Nowicki, supra* at 386-88.

Unfortunately, it appears that many courts have disregarded *Dunbar*'s teachings in the three-plus years since the case was decided. Indeed, it is not unusual to see a trial court simply order attorney-fee reimbursement at sentencing by rattling off a pre-set total from a list of other fees, costs, and fines in the presentence report, with no mention of the defendant's ability to pay. In some cases, the issue is not even mentioned by the judge - the reimbursement order just

appears as a notation in the judgment of sentence or in a separate order, after sentencing. Trial and appellate counsel should be alert to such missteps, and it is important to object when short-shrift has been given to the important due process requirements emphasized in Dunbar. Objection could result in the striking or vacation of an attorney fee order, a reduction in the fees awarded, or a waiver of later fees provisions that routinely accompany such orders. At the very least, raising Dunbar objections encourages judges to give some thought to whether defendants will actually be able to pay the county back for their lawyers' services.

### Timing of Payment Order

As indicated above, "contribution" must be distinguished from "reimbursement." Contribution, which is authorized by MCR 6.005(C), occurs when a defendant with some financial means makes payments for the representation provided. This can be done at the time counsel is first appointed or during the course of the trial proceedings. See ABA Standards for Criminal Justice 5-7.2(d) and 5-7.2(e). Reimbursement is made at the end of the proceedings, when the defendant is ordered to repay the appointing authority for the costs of the representation that was provided. Id.

Some courts have expressly disproved of the practice of conditioning representation for indigents before conviction. See People v Washburn, 56 Mich App 622 (1976); Nowdell, supra at 388, n4. The dangers of such a practice are many. Imposing financial burden for counsel at the onset of criminal proceedings could financially intimidate poor defendants into foregoing jury trials and accepting early plea offers. The practice also could chill the exercise of constitutional rights or deter a poor defendant from pursuing meritorious defenses or pursuing costly or time-consuming investigations.

Despite this, some courts seem to utilize MCR 6.005(C) as a "pay-as-you-go" system by charging poor defendants through certain contribution orders entered at every stage of the proceedings. Defendants then watch their attorney-fee meter run higher as trial moves forward. Other courts enter judgment that require defendants to agree to make weekly payments of a set amount for their attorneys. See e.g., People v Charles Chandler, unpublished opinion (#206690, 9-8-00), p 1, n 1.

It is important to remember that MCR 6.005(C) authorizes only contribution toward court-appointed attorney fees, and only where the defendant is "able to pay part of the cost of a lawyer." Thus, by its terms, the rule does not authorize full reimbursement, nor

does it permit contribution orders when the defendant lacks any ability to pay. A pretrial contribution order would therefore be objectionable on the ground that the defendant is wholly indigent and will remain that way throughout the proceedings. Counsel should be alert to such premature orders so that decisions regarding important trial rights are not unduly influenced by financial considerations.

### Constitutional Underpinnings of Dunbar

The Michigan Supreme Court has not definitively ruled on the Dunbar requirements. While a June 2007 order seemed to endorse Dunbar, see People v Arnone, 478 Mich 908 (2007), that ruling prompted procedures to mount a challenge to the simple requirement that courts consider ability to pay before ordering recoupment. Recently, the Supreme Court ordered briefing on whether "the constitutional underpinnings of [Dunbar] are sound." People v Steven Michael Curtis, Supreme Court No. 134607 (Order November 21, 2007). Early next year, the Court will hear argument on whether leave should be granted to decide the issue.

The constitutional underpinnings of the Dunbar rule appear sound indeed. In Fuller v Oregon, the United States Supreme Court made clear that to avoid constitutional problems, a recoupment statute should be tailored to "impose [a financial] obligation only upon those with a foreseeable ability to meet it; and to enforce that obligation only against those who actually become able to meet it without hardship". (Emphasis added). Fuller, supra at 54. Consistent with that requirement, the Court approved a state recoupment statute that was:

Directed only at those convicted defendants who [were] indigent at the time of the criminal proceedings against them but who subsequently gain[ed] the ability to pay the expenses of legal representation. Defendants with no likelihood of having the means to repay [were] not put to any conditional obligation. [was] imposed [were] not subject to collection procedures until their indigency[had] ended and no "manifest hardship" [would] result. (emphasis added) Id. at 46.

Dunbar is thus entirely supported by the Supreme Court's requirement that recoupment be limited to defendants with a foreseeable ability to pay. The only way to enforce that is to require trial courts to give some consideration to defendants' foreseeable ability to pay before ordering reimbursement.

The concept of routinely charging the poor for their Gideon rights is disturbing to say the least. It has been commented that:

There are compelling policy reasons for not routinely requiring defendants to reimburse the state local treasury for the cost of their representation. The offer of free legal assistance is rendered hollow if defendants are required to make payments for counsel several years following conviction. Reimbursement requirements also may serve to discourage defendants from exercising their right to counsel, and long-term duties to make payments for representation may interfere with the rehabilitation of defendants. ABA, Standards for Criminal Justice 5-7.2(d) and 1992) Staff Commentary.

Cavalier or sloppy application of attorney fee contribution and reimbursement systems will only exacerbate this danger, and serve to cheapen and violate the Gideon right. Practitioners must be vigilant to protect that right, and ensure that the above-discussed requirements of due process and equity are observed at every stage of the criminal proceedings.

*by Michael Mittlestat,*
*Assistant Defender, SADO*

*Editor's Note: Attorney fees reimbursed by court order for assigned counsel services remain in county coffers, Michigan is one of a handful of states nationwide which does not provide state funding for a trial-level defense services system, leaving the burden on the counties. For perspective on attorney fee reimbursement, as part of a growing list of fees and costs authorized in criminal cases, see "Nickel and Diming the Criminal Defendant: A Look at Financial Penalties in Felony Cases," by Anne Yantus, Criminal: Defense Newsletter, November, 2007. The list is updated in this issue, at page 5. The Editor.*

### Endnotes

1. MCR 6.005(B) provides that "the determination of indigency must be guided by the following factors:

(1) present employment, earning capacity and living expenses;
(2) outstanding debts and liabilities, secured and unsecured;
(3) whether the defendant has qualified for and is receiving any form of public assistance
(4) availability and convertibility, without undue financial hardship to the defendant and the defendant's dependents of any personal or real property owned; and

(5) any other circumstances that would impair the ability to pay a lawyer's fee as would ordinarily be required to retain competent counsel.

The ability to post bond for pretrial release does not make the defendant ineligible for appointment of a lawyer.

2. While the practice has been upheld in the face of constitutional challenge, see Fuller v Oregon, 417 US 40 (1970), it is disfavored. The American Bar Association recommends that attorney fee reimbursement be required only "on the ground of fraud in obtaining the determination of eligibility [for court appointed counsel]". ABA, Standards for Criminal Justice 5-7.2(e).

3. Fees in the range of $500 - $700 are common, and larger assessments have been seen.

4. The Dunbar panel urged the Legislature to codify procedures for implementing attorney fee reimbursement programs, including rules governing the inquiry into the defendant's ability to pay. Dunbar, supra at 254, n12. To date, no such procedures have been enacted.

5. The ABA has expressly approved of this practice. See ABA Standards for Criminal Justice 5-7.2(d 4d 1992) Staff Commentary.

6. This distinction was analyzed by the Court of Appeals in People v Charles Chandler, unpublished opinion (#206690, 9-8-00) as a previous addition of this newsletter. See V.Newman, A. Schulte, and J. McCann, "Reimbursement or Contribution: An Indigent's Assumption of Counsel Costs," Criminal Defense Newsletter, Vol. 24, Nos. 6-7, March-April, 2001.

7. Such arrangements are inherently coercive, as defendants are likely to feel they have no choice but to sign an agreement to make payments out of fear that they may be denied counsel if they refuse.

8. This article draws liberally from-the briefing and research found on SADO's brief bank and website. The works of SADO attorneys Valerie Newman, Jeanice Dagher-Margosian, and Anne Yantus are particularly worthy of mention.

---

## Renew Your Subscriptions Now!

A new subscription year began on October 1, 2007 for all services offered by the Criminal Defense Resource Center, including the Criminal Defense Newsletter, Defender Books, the Forum, and Web Databases. An order form and description of services appears on our web site, www.sado.org.

# Criminal Defense Newsletter

PROPERTY C LIBRARY

May, 2007
Volume 30, Number 8

### Features

CDAM Trial Practice College Scholarships........7
Duncan, et al. v State of Michigan.........5
Public Defense Hotspots...............2
Public Defense Snapshot..............3
Public Defense System Lawsuit.........4
Public Defense Under the Microscope.......1
Wayne County Kids Say Chief Judge........6

### Departments

DUI Defense Column.................8
From Other States.................12
Right to Counsel in District Court.........7
From the Michigan Supreme Court:
New and Interesting in the Online Brief Bank....11
Reports and Studies................10
Technical Tips..................20
Training Calendar.................14
Training Events...................14

### Appellate Courts

Michigan Court of Appeals
Published Opinion Summaries...........15
Unpublished Opinion Summaries.........17
United States Court of Appeals
Sixth Circuit Opinion Summaries.........15
United States Supreme Court
Certiorari Granted Summary...........15

## Michigan Public Defense Comes Under the Microscope

There is now no denying that Michigan's system of providing counsel and resources to indigent criminal defendants is under intense scrutiny. While some questioned the suggestion that the system is broken last fall, when the State Bar of Michigan presented a program, the debate has now moved on to the details. Significantly, the focus is not simply on attorney fees, but rather on total resources devoted to adequate representation of those who cannot afford to retain counsel. And, we're talking about any case in which the government provides counsel, including misdemeanors, probation violations, and juvenile matters. So much is happening that we will present a monthly snapshot to inform criminal defense lawyers, judges, prosecutors and the public.

On some points there is consensus, including that Michigan is one of just a few states that provide no state funding for indigent defense at the trial level. Counties pay, and the CDRC's annual survey reveals a patchwork of systems used to provide counsel (see www.sado.org/publicdefense). While a small number fund full-time public defender offices, and a few more operate rosters that counties now enter contracts for defense services. The contracts vary widely in cost per case, most lack caseload limits, and few preclude other legal practice. In most cases, they fall short of the standards for defense contracts set by the National Legal Aid and Defender Association, http://www.nlada.org/Defender/Defender_Standards/Standards_For_The_Administration, http://www.sado.org/publicdefense/model_contract.pdf.

While we will focus on the Michigan experience, there is much about nationally. A good recent piece appears in Governing Magazine ("Rights of Defense," January, 2007), detailing reforms in Montana and Louisiana. This is important. Stay tuned and get involved. The Editor.

**On the Web at www.sado.org**
Serving Michigan's Criminal Defense Community Since 1977

---



Please submit new information to: dawn@sado.org

# Public Defense Snapshot - May, 2007

## Statewide

The Michigan Public Defense Task Force, a statewide coalition of citizens and organizations, continues its examination of potential remedies, serves as a clearinghouse for information, and educates the public on indigent defense issues. See www.michiganpublicdefense.org.

SCR 39, adopted in 2006 by the Michigan Senate and House, asks the National Legal Aid and Defender Association to study and report back on the public defense systems in a representative sample of Michigan counties. Teams will finish data collection and site visits in May, with a report anticipated in early fall of 2007.

The Criminal Defense Resource Center (CDRC) maintains a collection of public defense resources, including pleadings and studies.

The Criminal Defense Attorneys of Michigan (CDAM) operates a Task Force on Attorney Fees, supporting criminal defense attorneys who seek reasonable fees on individual cases. See www.cdam.net.

Appellate attorneys litigate cases from various circuits in which trial courts fail to inquire into indigent defendants' ability to pay the costs of their appointed counsel, applying People v Dunbar, 264 Mich App 240 (2004). Cases [all resulting in unpublished Court of Appeals opinions granting relief to the defendants] have arisen in Wayne County [People v Blake, CA #266094, 5-27-07]; Tuscola County [People v Fisher, CA #266294, 10-31-06]; Lapeer County [People v Harris, CA #266938, 8-8-06]; Macomb County [People v Roupe, CA #265962, 11-28-06]; and Monroe County [People v Rhodes, CA #265941, 10-12-06].

Doyorn B., et al v Granholm, et al, #205-cv-13548, a civil rights class action complaint was filed on August 8, 2006, in the United States District Court for the Eastern District of Michigan. The suit is on behalf of all children who are now or will be in the foster care custody of the Michigan Department of Human Services, and seeks declaratory and injunctive relief. Among other claims, the complaint alleges that the quality of legal representation provided by many lawyers and guardians ad litem is impaired by oppressive caseloads.

## Local

Trial Lawyers Association of Wayne County Juvenile Court, et al, v Kelly, #135616, complaint for superintending control filed April 10, 2007, in the Michigan Supreme Court, seeking reinstatement of lawyers removed as appointed counsel for their juvenile clients under a new local administrative order. The new order, LAO 2005-08, awards contracts to attorney groups, for future and pending matters. The complaint alleges violations of the children's due process right to counsel and effective representation.

Duncan v State of Michigan, #07-242-CZ, a civil rights class action filed in Ingham Circuit Court on February 22, 2007, alleges constitutional deficiencies in systems for providing defense services in Berrien, Genesee and Muskegon Counties. The suit, filed by the Michigan Coalition for Justice, seeks declaratory and injunctive relief against the State of Michigan and Governor Granholm to prevent violations of the plaintiffs' legal rights and to remedy defendants' continuing failure to ensure that plaintiffs receive constitutionally adequate legal representation. See www.micoalitionforjustice.org.

Kalamazoo defense attorneys left the local appointment list over a dispute in pay, expressing concern that new attorneys may be less experienced and competent. See "Lawyers pay dispute may hurt poor clients," Kalamazoo Gazette, February 3, 2007. One of those lawyers, in a Letter to the Editor, emphasizes that the system forced lawyers to cut so many corners that they could not provide adequate representation. She adds that money collected by the county from indigents for attorney fees could fund the system adequately, if applied to that budget category instead of the county's general fund. See "Letters to the Editor: Changes hurt victims, poor defendants," Kalamazoo Gazette, March 8, 2007.

In Shiawassee County, commissioners expressed concern in January about bills for indigent defense services going over budget in 2006 by at least $16,000. See "Public defender fees stain budget," Jackson Citizen Patriot, January 15, 2007. By April, they announced that the 2007 budget will be controlled by letting the work out for bidding among attorneys, on a contract basis. "Lawyers will jockey to represent clients," Jackson Citizen Patriot, April 11, 2007.

# Lawsuit Asks the Court to Order the State to Provide a Public Defense System

On Thursday, February 22, 2007, the Michigan Coalition for Justice filed a lawsuit against the State of Michigan and Governor Granholm in the Ingham County Circuit Court. The lawsuit asks the court to order the defendants to fund and fix the broken public defense systems in four counties – Muskegon, Berrien, and Genesee. After decades of participating in advocacy and lawsuits trying to change our public defense system, I volunteered to be counsel of record, along with Michael Steinberg of the ACLU. We are ably assisted by the New York firm of Cravath, Swaine & Moore LLP, who will also seek to become counsel of record.

This lawsuit targets the State of Michigan, not defense attorneys. It is the constitutional mandate of our state government pursuant to Gideon v Wainwright to step up and fulfill its obligation of due process and to provide effective assistance of counsel to those that cannot afford private counsel. The lawsuit seeks a declaration that the state's failure to do this violates plaintiffs' right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution, and an injunction requiring the state to provide a system that fully protects plaintiffs' right to counsel.

Why did we file in state court? The abstention doctrine of Younger v Harris makes it virtually impossible to pursue a deprivation of rights claim against the state in federal court.

Duncan, et al, v State of Michigan pleads the facts of defendants caught up in the systems of the three counties named in the lawsuit. The facts are startling: clients meeting their lawyers for the last time before the bars in the lock up behind the court, lawyers not providing discovery to clients, rights being waived and pleas being entered without investigation of the prosecution's case, lawyers twisting client's arms to plead, and more. The facts plead demonstrate that criminal defendants do not receive effective counsel; they cannot afford private counsel. In Michigan, all court-appointed lawyers have overwhelming caseloads, lack support staff and consistent training, have no resources to hire investigators or experts, and are not paid for jail visits, preparation, or other necessary work. There are no standards for licensing court-appointed counsel, and many lawyers are assigned to cases for which they do not have the necessary experience. Defendants forego their right to trial, are detained unnecessarily or

for prolonged periods of time, are compelled to take inappropriate pleas, face harsher sentences than guidelines suggest, are assessed reimbursement that they cannot pay, and sometimes, are wrongfully convicted.

As I have stated before in articles in the Michigan Bar Journal, a state-funded public defense system that provides comprehensive standards, oversight and funding is where Michigan must go, as most other states have gone. A reformed system must abide by the Eleven Principles of a Public Defense Delivery System, adopted by the State Bar of Michigan's Representative Assembly in 2002, and based on the ABA's Ten Principles. These Eleven Principles are a concise set of recognized standards for the design of a public defense delivery system. The systems we see in our suit do not meet these standards. Much of the problems we see in Michigan's public defense occur because the funding for public defense comes from the counties.

March 18th marks the anniversary of the unanimous Supreme Court decision in Gideon that presents an opportunity to reflect on both the failures of Michigan's current public defense system and the model for reform that we all know is needed. Just as it is the State's responsibility to provide a constitutionally sound public defense system, it is our duty as criminal defense attorneys to advocate for such a system that is fair to all and in which we have the resources to provide effective assistance of counsel regardless of how our money is or is not in our pocket. As a defense attorney you are advocates in every one of your cases for the funding and assistance you need to provide a proper defense and for the reasonable fees guaranteed to you by MCL 775.16.

If your efforts to receive the funding, fees and assistance that you need are rebuffed by the courts, you may have to make a decision of conscience. Maybe it is time to advocate for fixes of the current system in which you cannot investigate, enlist the help of experts, or communicate with your client in private. You decide. Do what your conscience directs.

*by Frank D. Eaman,*
*Detroit, Michigan*

OCT 19 2007

# Criminal Defense Newsletter

PROPERTY OF
SCF LIBRARY

State Appellate Defender Office · Criminal Defense Resource Center · www.sado.org

September - October, 2007
Volume 30, Number 12
Volume 31, Number 1

### Features

2007 Assigned Trial Counsel Fee Survey............ 1
Recording Custodial Interrogations........................ 21

### Departments

DUI Defense Column........................................ 19
From Other States ........................................... 25
New and Interesting in the Online Brief Bank....... 24
Practice Note:
Waive Your Federal Jury?................................ 21
Reports and Studies........................................ 22
Spotlight on: Richard L. Cunningham ................ 22
Technical Tips.................................................. 24
Training Calendar............................................. 40
Training Events................................................ 28

### Appellate Courts

Michigan Court of Appeals
Published Opinion Summaries ........................ 35
Unpublished Opinion Summaries .................... 38
Michigan Supreme Court
Opinion Summaries.......................................... 33
United States Court of Appeals
Sixth Circuit Opinion Summaries ..................... 29

## 2007 Assigned Trial Counsel Fee Survey

*We feature this month our annual survey of fees paid to assigned trial counsel, statewide. For many years, this survey has been the sole source of information about how each circuit fulfills its constitutional obligation to provide counsel to indigents. Prior surveys are posted on the CDRC's web site, www.sado.org, in the "Public Defense Resources" section.*

*The survey provides a partial picture: some circuits failed to provide the information requested, and some excluded juvenile and district court services. What emerges, however, is the best overview currently available, complete with links to the underlying documentation. Corrections/additions are welcome, and should be addressed to dawn@sado.org.*

*Contracts for assigned defense services remain the most common delivery method, with some growing in amounts paid to attorneys. In one circuit (the 36th), budget constraints led to a change from an hourly to flat fee according to crime type. The adequacy of this mixed, and county-funded, delivery system is the subject of much attention as statewide groups debate and national groups call for reform. An in-depth study of 10 Michigan counties undertaken by the National Legal Aid and Defender Association this year, pursuant to Senate Concurrent Resolution 39 of 2006, will soon be released.*

*The Editor.*

**On the Web at www.sado.org**
**Serving Michigan's Criminal Defense Community Since 1977**

## Trial Assigned Counsel Fees by Circuit
### April, 2007

| *Circuit* | *Basis* | *Fee Set* | *Rate* | *Expenses* | *Comments* | *Changes in 2007* |
|---|---|---|---|---|---|---|
| 1st Hillsdale | Contract with 3 attorneys | 2007 | Attorney #1 (40%): $46,200<br>Attorney #2 (20%): $23,100<br>Attorney # 3 (40%) $46,200<br>Includes all district & circuit court cases, PPO violations, nonpayment of support & probation violations. Excludes appeals. | Additional for expert witnesses, transcripts, subpoena and witness fees, costs of venue change, upon application. | More than 8 hours on life offense: $70/hr.<br>Deductions taken from contract amount for conflict cases over 10 per year. | Contract total increased 8% (from $106,800 to $115,500). |
| 2nd Berrien | Contracts with 4 attorney groups | 2007-09 | Drug Court cases: $120,000/year. | | Conflict attorneys paid within group contract. | |
| | | 2007-09 | Niles Division cases: $120,000 - $140,000/year. | | | |
| | | 2004-08 | St. Joseph Division cases: $420,000/year. | | | |
| | | 2004-08 | Neglect/abuse cases: $214,000/year. | | | |
| 3rd Wayne | Event, scaled to max. sentence exposure, and defender office | 2003 | Prelim.: $90 - $250<br>Arraignment: $40 - $100<br>Invest./prep.: $110 - $270<br>Plea: $110 - $260<br>Motion: $60 - $140<br>Evid. hrg.: $80 or $160<br>Cal. conf.: $50<br>Final conf.: $40 - $100<br>Trial, half-day: $90 - $210<br>Trial, full-day: $180 - $420<br>Sentencing: $60 - $140<br>Diversion, pre-prelim: $100 | Additional for experts: $300-$500 (interview and eval.); $250-300 (court appearance).<br>Jail visits: $50, max. of 2 visits in capital case.<br>Show-ups: $50/hr.<br>Extraordinary fees with court approval. | New rules on assignments (AO 1998-7) limit number of assignments per attorney; judges not to assign relatives.<br>Amount cut in 2002, (10%), restored in 2003.<br>Legal Aid & Defender handles 25% of cases. | |
| 4th Jackson | Contract/Event with 7 firms | 2006 - 2007 | Formula divides case assignments, each firm to get percentage of murder, capital, non-capital and miscellaneous. Excludes appeals. Monthly fee advance totals $32,000 to all under contract. Murder case: $1,850. Trial | Additional for transcripts, witness fees, service, polygraph, psychiatric exams, with court approval. | Includes paternity determination, POC, contempt, PPO defense.<br>Firms receive monthly draw, to be applied against fees earned. Refund excess at contract end. Court must approve subcontractors. | Event fees adjusted each year based upon what the county has allowed for its non-union employees. 3% increase in 2006. |

implementation and design, with financing provided by the Michigan State Bar Foundation, the Grand Rapids Community Foundation, the Open Society Institute, and the Justice, Equality, Human Dignity, and Tolerance Foundation. The State Bar's Criminal Issues Initiative (CII) also assisted with the website's

## Public Defense Updates

*As activity continues to mount on reform of Michigan's public defense system, we will continue to provide updates to our readers. These updates will include those addressing attorney fees.*

### Lawsuit Targets Reform of Michigan's Public Defense System

The Michigan Coalition for Justice (MCJ) filed on February 22, 2007, a lawsuit on behalf of individual criminal defendants in three Michigan counties against the State of Michigan and Governor Jennifer Granholm. The suit, filed in Ingham County Circuit Court, alleges that the defendants have failed to fulfill their constitutional obligation to provide adequate defense services to those who cannot afford to hire private counsel. Monetary damages are not demanded. Instead, plaintiffs call on the court to declare the public defense systems in the three counties unconstitutional and to compel the state to provide representation consistent with national and constitutional norms. *Duncan et al v State of Michigan #07-242-CZ*, filed 2-22-07.

The Coalition's executive summary of the lawsuit follows, and more information is available at the MCJ website, www.micoalitionforjustice.org. SADO's Criminal Defense Resource Center maintains a comprehensive collection of information, documents and pleadings on public defense, located at www.sado.org/publicdefense.

### Duncan, et. al. v State of Michigan Executive Summary

The State of Michigan has a constitutional obligation to provide all persons accused of a crime that cannot afford to hire an attorney with counsel. The mere presence of an attorney is not enough. The State must ensure that the attorney has the resources to provide competent and effective representation.

The State of Michigan has long dedicated this constitutional duty by failing to fund or provide oversight for public defense services. Instead, Michigan has delegated to each of its 83 counties the responsibility for funding and administering the right to counsel in trial courts within their borders. As a

development. The CII operates under the Bar's umbrella volunteer committee, Justice Initiatives, which has assumed the challenge of meeting the many needs that arise from the interconnection of civil and criminal issues.

result, public defenders lack the resources they need to represent their clients.

This lawsuit is not about individual attorneys or errors that may have occurred in individual cases. It is about a system that, as a result of the state's neglect, is so broken and underfunded that it prevents well-intentioned lawyers from providing constitutionally adequate representation.

The state does nothing to ensure that any county has the funding or the policies, programs, guidelines, and other essential resources in place to enable the attorneys it hires to provide constitutionally adequate legal representation. As a result, in Berrien, Muskegon and Genesee Counties, and many other Michigan counties, defendants who cannot afford private counsel do not receive equal justice.

There is no adequate attorney training or qualification standards, so public defense lawyers frequently lack the experience and skills necessary to handle the cases to which they have been assigned.

There are no attorney workload standards and public defense lawyers are burdened by overwhelming caseloads.

There are no written attorney performance standards or meaningful systems of attorney supervision and monitoring.

Moreover, the counties have been dramatically underfunding public defense for years, without any state intervention or assistance. In Genesee County, for example, the prosecution receives three times the funding of the public defense system. In Berrien County, the disparity is close to four to one.

The result is that the public defense provided in each of the three counties, and likely throughout Michigan, does not meet even the minimal constitutional requirements for effective assistance, no less the national standards established by the American Bar Association. Overwhelming caseloads mean that lawyers do not meet with their clients, appropriately investigate the charges, file necessary pre-trial motions, or prepare properly for court appearances. And without exception, lawyers cannot hire investigators or

experts, even when necessary for an adequate defense. The cases of the named plaintiffs demonstrate these deficiencies:

Most of the plaintiffs met with their lawyers only briefly and generally the meetings occurred only immediately before a hearing. For example, plaintiff Brian Secrest met with his attorney twice – both times on the same day as a hearing in his case – and the meetings lasted only a few minutes.

Most of the attorneys failed to conduct any factual investigation and, despite this lack of investigation, permitted their clients to plead guilty to the crime charged. In many of the cases, the defendants had obvious and potentially viable defenses. For example, plaintiff Christopher Duncan was charged with breaking and entering and his attorney allowed him to plead guilty to the crime despite evidence that he did not commit the crime as charged.

When the fundamental right to counsel is violated in this fashion, the justice system cannot function. The result is errors – people spend much longer in jail than appropriate or worse, the wrong people are convicted. Michigan has had two such exonerations – Eddie Joe Lloyd and Ken Wyniemko. In such a system, everyone loses.

Local and national experts have been warning Michigan about its failure to provide constitutionally adequate legal representation for over thirty years.

1975 – The defense services committee, created by Michigan Chief Justice Thomas G. Kavanaugh found the county-based system significantly flawed.

1986 – The Special State Bar Task Force on Assigned Counsel Standards noted the absence of any attorney performance standards and recommended the adoption of specific standards.

1992 – A special issue of the Michigan Bar Journal on public defense was published in which a former prosecutor observed that "the methods we use to appoint, pay, train and supervise appointed counsel virtually guarantee that many will not perform their role effectively."

• 2005 – A Michigan Lawyers Weekly article notes that personnel in all branches of the criminal justice system universally acknowledge that the underfunding of public defense services in Michigan is a serious and growing problem.

• 2005 – An American Bar Association report on the state of public defense across the country repeatedly singled out Michigan for failing to meet the ABA Ten Principles, which are considered the fundamental criteria a system must meet to provide effective, efficient, ethical public defense. Noted deficiencies included lack of appropriate funding, inadequate access to investigators, experts and technology resources, and lack of training.

*All of these warnings have been disregarded.*

By its inaction, the state is in clear violation of the US and Michigan constitutions. This lawsuit seeks to compel the State of Michigan to meet its constitutional obligation to provide adequate defense services for those who cannot afford private counsel and order the state to provide representation consistent with the requirements of the US and Michigan constitutions.

*Executive Summary supplied by the Michigan Coalition for Justice.*

## Six Strategies for Right-sizing Michigan's Prison Population

At a time of massive budget shortfalls, Michigan spends $1.9 billion annually on corrections. Policymakers and opinion leaders are looking at the state's Corrections budget to determine what savings can be derived while ensuring public safety. They recognize that:

The state's incarceration rate of 489 prisoners/100,000 residents far exceeds that of Illinois (351), Indiana (388), Minnesota (180), New York (326), Ohio (430), Pennsylvania (340) and Wisconsin (380). There is no apparent

relationship between incarceration rates and public safety. If Michigan's rate was the average of its Great Lakes neighbors (388), it could save up to $500 million.

Michigan's prisoner population is at an all-time high of 51,500 and still growing. More than 2,000 people were added in 2006.

If the population were reduced to the 1996 level of 42,000, the incarceration rate would be roughly 421. While this would still be higher than comparable states, it would allow for a savings of $526 million.

*As activity continues to mount on reform of Michigan's public defense system, we will continue to provide updates to our readers. These updates will include those addressing attorney fees.*

**Prominent Attorney Resigns from Macomb Assignment List**

Citing her inability to competently represent appellate clients at the rate of $25 per hour paid by Macomb County, Mt. Clemens lawyer Patricia A. Maceroni recently notified administrators to remove her name from the appellate assignment list for that county. In her letter of July 20, 2006 to MAACS Administrator Tom Harp, Ms. Maceroni indicated that she had served on the sixteen years she served on the appellate roster. Stating that she could not in good conscience continue to render legal services for $25 per hour, given the complexity of the issues, she added:

*As you know, an attorney does not accept criminal appointments expecting to get paid commensurate with their retained clients. In accepting court assignments, however, we should not be expected to represent those clients at a financial loss. In fact, the Rules of Professional Conduct recognize that "a lawyer shall not seek to avoid appointment by a tribunal to represent a person except for good cause, such as ... (b) representing the client is likely to result in an unreasonable financial burden on the lawyer." MRPC 6.2*

*Further, Michigan statute MCL 775.16 provides that a reasonable fee must be paid in court appointed cases. Felony appeals are time consuming representations with the appellate attorney required to track down discovery and information not contained in the circuit court file. Additionally, the MAACS standards state that at least one person to person visit be conducted; many of my recent clients were housed in Range in the western part of the Upper Peninsula. I simply am no longer able to provide this service at a financial loss given the professional standards and responsibilities appellate representation requires.*

We have the full text of Ms. Maceroni's letter, which appears within the "Public Defense Resources" at www.sado.org/publicdefense.

by John Powell
CDRC Webmaster

**Technical Tips: System Restore**

Did you know that the Windows XP operating system has a built in "undo" function just like the undo in Microsoft Word or WordPerfect? Every time you install a new program or software update, there is always a chance that your computer may not function as well as it did prior to the installation. The System Restore allows you to turn back time to when your computer was operating normally, assuming you created a restore point. Best of all, System Restore does not affect any documents.

Before installing new applications to your computer, you should create a system restore point. This will allow your computer to return to its previous state before the installation, should something go wrong.

System Restore can be found by selecting: Start, All Programs, Accessories, System Tools, and finally System Restore. Follow or restore your system.

For further information, check out Microsoft's page on System Restore at http://www.microsoft.com/windowsxp/using/helpandsupport/learnmore systemrestore.mspx

**Renew Your CDRC Subscriptions Now!**

A new subscription year began on October 1, 2006 for all services offered by the Criminal Defense Resource Center, including the Forum, and Web Databases. An order form and description of services is inserted in this issue, and appears as well on our web site, www.sado.org.

Want the most bang for the buck? Subscribe to the whole Web Access package, giving you 24/7 access to everything, including books, brief and appellate pleadings, forum messages, expert witness resumes and testimony, video and handouts from conferences, and more. With the Web Access package and access to an archival law collection (Westlaw or Lexis, for example), you have everything you need to practice criminal defense effectively.

*Having difficulty solving a technology related issue? Feel free to forward your technology questions to John Powell (john@sado.org) for solutions.*

---

following high school graduation party that involved drinking), and the sentencing family support of the defendant in order to support a downward departure. *People v Denton*, unpublished opinion per curiam of the Court of Appeals, issued April 12, 2007 (Docket No. 267612, 267790).

**VI. Miscellaneous Points To Remember**

The trial judge may sentence below the range of an intermediate sanction or straddle cell without departing. MCL 769.34(4)(a)(c)(ii).

When trial counsel agrees to the scoring of the sentencing guidelines or accepts a Cobbs evaluation for a specific sentence (either than a range of sentences), guidelines error may be waived for appellate review. *People v McKay*, 474 Mich 967; 706 NW2d 832 (2005); *People v Carter*, 462 Mich 206; 612 NW2d 144 (2000).

by Anne Yantus, Director
SADO's Special Unit on
Pleas and Sentencing

*As activity continues to mount on reform of Michigan's public defense system, we will continue to provide updates to our readers. These updates will include those addressing attorney fees.*

**It is time to heed Gideon's trumpet**

After decades of work by dedicated attorneys to reform Michigan's broken public defense delivery system, the trumpet is finally rallying the armies of reform. Three separate efforts are converging to address the issue.

This fall, a new nonprofit organization, the Campaign for Justice launched a multi-year push to fix Michigan's broken public defense delivery system. The Campaign will educate the public and build a statewide bipartisan coalition seeking legislation requiring the state to fund and exercise appropriate oversight for public defense services, in compliance with standards espoused by the American Bar Association and State Bar of Michigan. The Campaign for Justice that has led the fight for public defense reform in Michigan since 2001. Campaign offices are located in Lansing.

In early 2008, the State Bar of Michigan and the National Legal Aid and Defender Association (NLADA) will issue a report on Michigan's public defense system. David Carroll, a national expert, is evaluating the systems in ten Michigan counties, based on the Ten Principles of a Public Defense Delivery System adopted by the American Bar Association. Legislators expect the information in a resolution (SCR.39) passed last spring.

Finally, as reported last March, the Michigan Coalition for Justice filed a lawsuit in the Ingham County Circuit Court asking the court to order the State of Michigan to provide a public defense system that fully protects plaintiffs' right to counsel. The lawsuit is now pending in the Michigan Court of Appeals, having survived a motion to dismiss which was denied by Judge Laura Baird. [Note: The Coalition is not the Campaign for Justice, which is working toward legislative solutions.]

This convergence of the Campaign for Justice, NLADA report and litigation offers couldn't come at a better time. The state's fiscal crisis will certainly place additional pressures on cash-strapped counties forced to bear the entire burden of funding public defense.

Persons who would like to get involved in the movement to win a justice system that works for all can get more information about the Campaign for Justice by emailing info@michigancampaignforjustice.org. A toolkit to help those seeking to assess their county's public defense delivery system is available from the Michigan Public Defense Task Force. Connect Michelle Weinberg, Task Force Coordinator, for a copy at mweinberg@michigancampaignforjustice.org.

As former Attorney General Janet Reno said, "We must all enhance and publicize the role of a ... defender as someone who gives practical meaning to that wonderful document, the Constitution, and as someone who is essential in achieving justice."

by Laura Sager
Director, Campaign for Justice
lsager@michigancampaignforjustice.org

*Before joining the Campaign for Justice, Ms. Sager served as executive and national campaign director for Families Against Mandatory Minimums (FAMM). In Michigan, her efforts were instrumental in the repeal of mandatory minimum drug laws, leading to early parole for hundreds of prisoners.*

# APPENDICES
## "NEWLY DISCOVERED EVIDENCE"

## CONTENTS

Notice of Withdrawal of Alibi Defense
Notice of Alibi Defense
Letter to Judge

# CATHY M. GARRETT
## Wayne County Clerk

**Clerk:** _____

**Control #** _____

| CIVIL ACTIONS | | | |
|---|---|---|---|
| ☐ Filing Fee | $150.00 | ☐ Appellate Court Appeal | $25.00 |
| ☐ Free ☐ Voids | $ 0.00 | ☐ Court Costs | $_____ |
| ☐ Appeals | $150.00 | ☐ Friend of the Court | $30.00 |
| ☐ Motions | $ 20.00 | ☐ Friend of the Court(Inv.) | $40.00 |
| ☐ Jury Fee | $ 85.00 | ☐ Fines | $_____ |

| COURT DOCKET CERTIFICATION | | | |
|---|---|---|---|
| ☐ Per Page | $ *1.00* | ☐ Certify/Exemplify | $10.00 |
| ☐ Voids | $ 0.00 | ☐ Military Discharge | $ 1.00 |

| MISCELLANEOUS | | | |
|---|---|---|---|
| ☐ Misc. Serv. | $_____ | ☐ Subpoena | $_____ |
| ☐ Bonds | $ 1.00 | ☐ Subpoena | $15.00 |
| ☐ Bar Adm. | $25.00 | ☐ Execution/ Writ | $15.00 |
| ☐ Letters | $10.00 | | |

| PLATS | |
|---|---|
| ☐ Regular | $20.00 |

| ADDITIONAL CASE NUMBERS |
|---|
| 1. *Motion to withdraw alibi* |
| 2. |
| 3. |
| 4. |
| 5. |
| 6. |
| 7. |
| 8. |

Rev. 10/03 sjs

STATE OF MICHIGAN
CITY OF DETROIT
CRIMINAL DIVISION OF THE THIRD JUDICIAL CIRCUIT COURT

People of the State of Michigan,

v.

Damon Smith, et al,
    Defendant,

Stephen M. Taratuta (P46935)
Attorney for Defendant
3700 Cadillac Tower
Detroit, MI 48226
313-964-5777

Kenneth J. King
Asst. Wayne County Prosecuting Attorney

Case Number 99-10166

Hon. W. Moore

NOTICE OF ALIBI DEFENSE

NOW COMES THE DEFENDANT, Damon Smith, by and through his attorney, Stephen M.
Taratuta, and pursuant to M.C.L. 768.20 gives notice to the prosecutor that the
Defendant intends to claim alibi as a defense. The Defendant claims that he was at the
home of his mother, located at 15716 Pierson, Detroit, MI 48223, during and after the
time of the alleged incident.

The Defendant intends to call the following as witnesses to establish that defense:

- Larry Austin    20601  PATION  (AT  PLYMOUTH)
                  DETROIT   MI

- Damus Taylor    400  INDUSTRIAL  WITH
                  PLYMOUTH   MI

- Others

Respectfully,

Stephen M. Taratuta
Attorney for Defendant

Date: 3/25/2000

RECEIVED BY

MAR 3 1 2000

CHIEF _____
WAYNE COUNTY
PROSECUTING ATTORNEY'S OFFICE

STATE OF MICHIGAN
CITY OF DETROIT
CRIMINAL DIVISION OF THE THIRD JUDICIAL CIRCUIT COURT

People of the State of Michigan,
    Plaintiff,

v.                                  Case # 99-10166-01

Damon Smith, et al
    Defendant,

                                         Hon. W. Moore

Stephen M. Taratuta (P46935)
Attorney for Defendant
65 Cadillac Sq., Ste. 3700
Detroit, MI 48226
313-964-5777

## Notice of Withdrawal of Alibi Defense

NOW COMES THE DEFENDANT, Damon Smith, by and through his attorney, Stephen M.
Taratuta, and respectfully Withdraws his Notice of Alibi.

DATED:                                   Respectfully submitted,

                                       Damon Smith
                                       Defendant

                                       Stephen M. Taratuta P46935
                                       Attorney for Defendant

Honorable Karen E. Hood

I pray that this letter greets you in good spirits and health. I have a very very important matter and due to the circumstances I'm out of my control now.

On April 3, 2000 in front of Honorable Wardell Moore jr. I, Damon L. Smith, had a trial, which I was charged with 1st degree murder. And I was found guilty of that charge. I truly felt I was misrepresented by my court appointed lawyer.

In, I wanted to fire him in Oct 1999. But Honorable Wardell Moore jr. stated that he was a very fine lawyer and instructed him to come and see me. That he did and stated to me that he wasn't my girlfriend so hes not going to come every time I called. Besides, he only received so per trial. At the same time he has me thinking the evidence the prosecuter had was not enough. Thats the reason I didn't fire him then. Plus, my family couldn't afford a lawyer at that time. Since this is the first time I ever been in any trouble in my life, on earth, in my ways, so the system he could of told me anything I would of believed him about court and the system.

The last three weeks before my trial I was appointed an investigator. The investigator, and I communicated with him more than I ever did my lawyer. I gave the investigator addresses and phone numbers of my witnesses. The two that he subpoenaed wasn't sure of the time, but they wasn't my main witnesses. The friday before my trial I told my lawyer, and the investigator to go and serve my sister a subpoena for my niece, because shes only 15-16, And my other little sister, in my lawyer read her. He the way he was going to present my case, I could tell he really haven't read my case. Plus, I'm just received the news that she prosecuter offered my three co-defendents a much lesser charge to testify against me. My lawyer told me this than rushed out she bull pin. I didn't see him again till monday morning at trial. I gave him the research I've done, and wrote fact from the draw about my case, because I can tell that what he read for. He did read over my transcripts.

2), I tryed to fire my lawyer again before trial because I knew he wasn't going to fight for me. My life is on the line and he just through my work in his bag. So I stood up and asked Honorable Wardell Moore jr. if I can fire my lawyer. I knew he really didn't care at that point then he stood up and asked to have his self removed. The judge told him what if he really all that he couldn't represent me properly than let him know. But what about me, its my life. My lawyer didn't say anything so we proceeded with the trial. Everything just got worst from that point on.

My lawyer stood in front of my jury and said "Christmas Eve 1999 did any one read the Detroit News. The judge stoped him as he held the artical up to the jury to see this artical was about two pages of the sports section. In the paper it already has me convicted of this crime. With my full name and age the judge didn't do any thing about this. My lawyer had three day to read this paper.

Then my lawyer dismissed witnesses that in there statements gave different descriptions of the shooter.

Then when I asked about my witnesses he told me I don't need them. I argued with him, but trial was going on and I didn't know what to do. Plus I had the stress of everyone lying on me to save there own self.

"Your Honor, I don't know much about she law, but I do know right they wrong, I AM INNOCENT of these charges. I believe My transcripts prove it and my witnesses would of told it. My lawyer failed to attemp to prove it. My right to an fair trial was dismissed with the evidence my lawyer didn't present.

I pray and ask that you please grant me a federal, please. Thank you for your time, God Bless You.

Truly innocent,
Damon L. Smith
99#25172

P.S.
I get sentence on
May 4, 2000.

This letter is mentioned in my sentencing transcripts 5/4/00. pg. 3-4

RECEIVED

AUG 31 2009

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAMON L. SMITH,
        Petitioner

V.

BLAINE LAFLER,
        Respondent

and

JEFFERY WOODS,
        Additional Respondent.

## PROOF OF SERVICE

I, DAMON L. SMITH, in PRO SE, do declare that on this date
August 26, 2009, I have served (3) copies and (1) copy of the
enclosed RULE 9(b) MOTION, RULE 7(b) MOTION, ACTUAL INNOCENTS,
and PETITION FOR WRIT OF HABEAS CORPUS on each party to the above
proceedings, by submitting all of the enclosed to institutional
staff for mailing first class prepaid postage.

The names and addresses of those served are as follows:

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
100   EAST FIFTH STREET,RM.504
CINCINNATI, OHIO   45202-3988

ATTORNEY GENERAL OFFICE
CRIMINAL APPELLATE DIVISION
525   W. OTTAWA
P.O. BOX   30217
LANSING, MI   48909

I declare under penalty of perjury that the above is true and correct.

DAMON L. SMITH   311644
KINROSS CORR. FACILITY
16770   WATERTOWER DR.
KINCHELOE, MI   49788



UNITED STATES POSTAGE

PITNEY BOWES

$ **10.75**⁰

02 1A
0004612916      AUG 27 2009
MAILED FROM ZIP CODE 49788

UNITED STATES
POSTAL SERVICE

U.S. POSTAGE
PAID
KINROSS,MI
49788
AUG 27,'09
AMOUNT

100G                    **$0.00**

45202              00063093-05



PRIORITY
MAIL

UNITED STATES POSTAL SERVICE

www.usps.com
LABEL 107, JUNE 2000